### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, 1201 16th St. NW Suite 117, Washington, DC 20036; <br><br> FEDERAL EDUCATION ASSOCIATION STATESIDE REGION, PO BOX 41035, Fayetteville, NC 28309; <br><br> and <br><br> ANTILLES CONSOLIDATED EDUCATION ASSOCIATION, PO BOX 34425, Fort Buchanan, Puerto Rico 00934; <br><br>      *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, 1600 Pennsylvania Avenue NW, Washington, D.C. 20500; <br><br> PETER HEGSETH, in his official capacity as the United States Secretary of Defense, 1000 Defense Pentagon, Washington, DC 20301; <br><br> UNITED STATES DEPARTMENT OF DEFENSE, 1400 Defense Pentagon, Washington, DC 20301; <br><br> CHARLES EZELL, in his official capacity as Acting Director of the U.S. Office of Personnel Management, 1900 E Street NW, Washington, DC 20415; <br><br> and <br><br> UNITED STATES OFFICE OF PERSONNEL MANAGEMENT, 1900 E Street NW, Washington, DC 20415; <br><br>      *Defendants*. | Civil Action No. 1:25-cv-1362 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

———————————————————————

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

———————————————————————

## I.     INTRODUCTION AND NATURE OF THE ACTION

1.     In this action, Plaintiffs Federal Education Association ("FEA"), Federal Education Association Stateside Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA")—labor organizations representing educators who work in prekindergarten-through-12th-grade ("PreK-12") schools operated by the Department of Defense Education Activity ("DODEA")—challenge Defendant Donald Trump's executive order stripping Plaintiffs and their members of their statutory and contractual collective bargaining rights on purported national security grounds, Exec. Order No. 14251, Exclusions from Federal Labor-Management Programs, 90 Fed. Reg. 14,553 (March 27, 2025) ("Executive Order"), as well as injurious acts and omissions relating to the implementation of the Executive Order committed by the other Defendants.

2.     The Executive Order suffers from manifold constitutional infirmities: (a) it is wholly unmoored from the narrow authority that Congress granted to the president to exclude federal agencies and agency subdivision from collective bargaining for reasons of national security and is therefore *ultra vires* and in violation of the constitutional separation of powers; (b) it violates the First Amendment inasmuch as its real purposes are to retaliate against federal unions for engaging in protected speech and petitioning activities and to facilitate the *en masse* firing of federal employees; (c) it violates the Fifth Amendment's guarantee of equal protection of the laws inasmuch as it was avowedly motivated by a bare desire to harm politically unpopular groups; and (d) by nullifying collective bargaining agreements ("CBAs") between Plaintiffs and the government, it violates the Fifth Amendment's protection against deprivations

of property without due process of law and its protection against unlawful takings of property. Even if the Executive Order were not generally invalid by reason of those constitutional infirmities, Defendant Peter Hegseth's failure to exercise his delegated authority under the Executive Order to suspend its application to DODEA is arbitrary and capricious and contrary to law and therefore violates the Administrative Procedure Act. Plaintiffs seek a declaration that the Executive Order is unlawful in these respects and preliminary and permanent injunctive relief prohibiting any further implementation and enforcement of the Executive Order and setting aside Defendant Hegseth's failure to suspend the Executive Order with respect to DODEA.

## II.    JURISDICTION AND VENUE

3.    This court has jurisdiction under 28 U.S.C. § 1331 as this action arises under federal law, including the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Plaintiff FEA is headquartered in the District of Columbia and thus resides in this District, because this action seeks relief against federal agencies and officials acting in their official capacities residing in the District of Columbia., and because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

## III.    PARTIES

5.    Plaintiff FEA is a labor organization with more than 5,400 members who work as educators and education support professionals in schools operated by DODEA, a subdivision of DOD that operates public schools serving more than 64,000 PreK-12 dependents of military and civilian personnel stationed in bases in the United States, in United States territories, and abroad.

6.      FEA's members include classroom teachers, instructional assistants, information specialists (also known as librarians), counselors, nurses, and classified employees who work in DODEA schools located in military bases in the United States and in the U.S. Territory of Guam, countries throughout Europe and Asia, and in Guantanamo Bay, Cuba, to ensure that children of DOD-employed families have the opportunity to receive the high-quality education that has long characterized DODEA schools.

7.      FEA is dedicated to the proposition that educators should ensure the integrity and effectiveness of educational programs within federal school systems. In FEA's view, this goal requires three things: (a) achieving the high standards, benefits and working conditions that are necessary to attract and retain highly competent professionals; (b) supporting educators' professional growth; and (c) empowering educators to make decisions regarding their professional lives. To these ends, FEA advocates on behalf of DODEA educators before Congress and the courts, and, prior to the Executive Order, had for decades been engaged in collective bargaining with DODEA concerning the working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA's overseas schools pursuant to Chapter 71.

8.      FEA brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

9.      Prior to the Executive Order, FEA-SR had for decades engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA schools in these schools.

10. Plaintiff FEA-SR brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

11. Plaintiff ACEA is a labor organization with 182 members working as educators in four DODEA schools located in Puerto Rico. For nearly half a century prior to the Executive Order, ACEA had engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA schools in Puerto Rico. Plaintiff ACEA brings this action on behalf of itself and its members, whose statutory and contractual rights have been extinguished by the Executive Order.

12. Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

13. Defendant Peter Hegesth is the United States Secretary of Defense. He is sued in his official capacity.

14. Defendant DOD is an agency of the United States.

15. Defendant Charles Ezell is Acting Director of OPM. He is sued in his official capacity.

16. Defendant OPM is an agency of the United States.

## IV.     FACTUAL ALLEGATIONS

### A.     Chapter 71 Has Provided a Sound Basis for Federal Sector Labor Relations for Nearly Half a Century

17. In 1978, Congress enacted the Federal Service Labor-Management Relations Statute, codified as Chapter 71 of Title 5 of the United States Code ("Chapter 71"), to provide a comprehensive statutory framework to govern collective bargaining in the federal civil service

"designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b).

That statutory framework is based on Congress's recognition that "the right of employees to

organize, bargain collectively, and participate through labor organizations of their own choosing

in decisions which affect them …safeguards the public interest, … contributes to the effective

conduct of public business, and … facilitates and encourages the amicable settlements of

disputes between employees and their employers involving conditions of employment." *Id.* §

7101(a).

18.    Chapter 71 guarantees federal employees the basic rights "to form, join, or assist

any labor organization, or to refrain from any such activity," 5 U.S.C. § 7102, and to "engage in

collective bargaining with respect to conditions of employment through representatives chosen

by employees," *id.* § 7102(2). In these respects, Chapter 71 mirrors the rights that the National

Labor Relations Act ("NLRA"), 49 Stat. 449 (1935), 29 U.S.C. § 151 *et seq.*, guarantees to

private-sector employees. *See* NLRA Section 7, 29 U.S.C. § 157. Chapter 71, also like the

NLRA, establishes election procedures for determining if a majority of employees in an

appropriate unit choose union representation, 5 U.S.C. § 7111(b), and requires covered agencies

to "accord exclusive recognition to a labor organization if the organization has been selected as

the representative, in a secret ballot election, by a majority of the employees in an appropriate

unit who cast valid ballots in the election," *id.* § 7111(a); *accord* NLRA Section 9(a)-(c); 29

U.S.C. §§ 159(a)-(c).

19.    Chapter 71, like the NLRA, also requires agencies to negotiate in good faith with

such representatives to reach a collective bargaining agreement, 5 U.S.C. § 7114(b)(5); *accord*

NLRA Section 8(d), 29 U.S.C. § 158(d), while setting out proscribed agency and union unfair

labor practices, including a refusal by an agency or union to bargain in good faith, 5 U.S.C.

§ 7116(a) and (b); *accord* NLRA Section 8(a) and (b), 29 U.S.C. § 158(a) and (b). And Chapter

71 established an independent agency, the Federal Labor Relations Authority ("FLRA"), to

resolve unfair labor practice complaints, 5 U.S.C. § 7104 *accord* NLRA Sections 3,10; 29 U.S.C.

§§ 153, 160, as well as exceptions to arbitral awards issued under grievance procedures set out in

CBAs between agencies and federal unions. 5 U.S.C. § 7105(2)(a).

20.    At the same time, given the federal government's "special requirements and

needs," *id.* § 7101(b), Congress tailored Chapter 71's collective bargaining framework to be

more limited than the NLRA in certain significant respects.

21.    Chapter 71, for example, provides statutory management rights protections that

preserve "the authority of any management official of any agency" to, *inter alia*, "determine the

mission, budget, organization, number of employees, and internal security practices of the

agency"; "hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove,

reduce in grade or pay, or take other disciplinary action against such employees"; and "assign

work, .. make determinations with respect to contracting out, and ... determine the personnel by

which agency operations shall be conducted." 5 U.S.C. § 7106(a). Under the NLRA, by contrast,

management-rights protections are left to the bargaining process. *See NLRB v. American Nat'l

Ins. Co.*, 343 U.S. 395 (1952).

22.    While the NLRA expressly protects the right of private-sector employees to

strike, 29 U.S.C. § 163, federal employees are forbidden to "participate[] in a strike or assert[]

the right to strike" or even to knowingly be a member of a union that "asserts the right to strike"

against the federal government, 5 U.S.C. §§ 7311(3) and (4). Chapter 71 further makes it an

unfair labor practice for  employee unions to call, participate in, or condone "a strike, work

stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such

picketing interferes with an agency's operations," 5 U.S.C. § 7116(b)(7)(A), and it denies the rights and protections established by Chapter 71 to any employee who participates in a strike against the federal government, 5 U.S.C. § 7103(b)(2)(B)(v) (excluding any agency employee who participates in a strike in violation of section 7311" from the definition of a Chapter 71 "employee").

23.    Chapter 71 also contains provisions excluding particular employers from coverage that have no analog in the NLRA. Chapter 71 expressly excludes certain agencies from its provisions, including the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the United States Secret Service. 5 U.S.C. § 7103(a)(3). And it grants the President a narrow authority to exclude an otherwise covered agency or agency subdivision from Chapter 71's coverage, which narrow authority President Trump has invoked to extinguish collective bargaining for the vast majority of federal employees. Section 7103(b) of Chapter 71 authorizes the exclusion of agencies and agency subdivisions from Chapter 71 based on a determination that two specific limiting conditions are satisfied: (a) the agency or agency subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) Chapter 71 "cannot be applied" to that agency or subdivision "in a manner consistent with national security requirements and considerations." *Id*. § 7103(b)(1). As detailed further below, prior presidential administrations have—true to the narrow limiting conditions prescribed by Congress and in stark contrast to President Trump's sweeping and indiscriminate exclusions—taken a targeted approach, judiciously excluding particular sub-agencies and agency subdivisions clearly having intelligence and/or national security as their primary functions.

**B.      Plaintiffs Have Had Stable and Mutually Beneficial Relationships with DODEA for Decades**

24.      For decades, FEA—under its current name and under its previous name, the Overseas Education Association—has represented education professionals working at DODEA's schools in Europe and Asia for the purposes of collective bargaining and grievance handling, Indeed, under its former name, FEA was first recognized as the collective bargaining representative of DODEA educators in 1970 and negotiated its first CBA with DODEA before Chapter 71 was enacted and federal-sector labor relations were governed by an executive order issued by President Nixon (Exec. Order 11491, Labor-Management Relations in the Federal Service, 34 FR 17,605 (Oct. 31, 1969)).  Since 1999, FEA-SR has represented education professionals at DODEA's stateside schools (which include schools located in the U.S. Territory of Guam) for the purposes of collective bargaining and grievance handling. Prior that, local FEA affiliates had represented education professionals at DODEA's stateside schools for the purposes of collective bargaining and grievance handling for more than a decade.

25.      FEA entered into a CBA with DODEA in 2023, which provides that it will continue in force until Aug 1, 2028. That CBA covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in representational work, employee rights, standards and procedures for employee discipline and adverse employment actions, mid-term bargaining procedures for management proposals on negotiable matters, and district and school-level consultations aimed at promoting and facilitating constructive relationships.

26.      FEA-SR entered into a CBA with DODEA in 2019, with a term that ended in January 2024. By operation of Chapter 71, its provisions governing the terms and conditions of bargaining unit members' employment have continued in force pending the negotiation of a

successor CBA or, failing that, the outcome of Chapter 71's impasse-resolution process. *See U.S. Immigr. & Naturalization Serv.*, 55 FLRA 69, 72-73 (1999); *U.S. Dep't of the Treasury Bureau of Alcohol, Tobacco, and Firearms*, 18 FLRA 466, 468-69 (1985). That CBA covers such subjects as grievance and arbitration procedures, payroll deduction of union membership dues, official time for union officials engaged in representational work, employee and association rights (including employees' rights to union representation in investigatory meetings that may result in discipline), standards and procedures for employee discipline and adverse employment actions, mid-term bargaining procedures for management proposals on negotiable matters, and union-management cooperation. Until the Executive Order issued, FEA-SR had been engaged in bargaining with DODEA over a successor agreement.

27.    ACEA has represented DODEA educators in Puerto Rico for the purpose of collective bargaining since 1976. ACEA's most recent CBA with DODEA was executed in 2023 and provides that it will continue in force until July 24, 2028. That CBA covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in collective bargaining work, employee and association rights (including employees' rights to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, association-management cooperation, and mid-term bargaining procedures for management proposals on negotiable matters.

28.    Over the time that FEA, FEA-SR, and ACEA have represented DODEA education professionals, DODEA has become a pre-eminent public school district. Indeed, since 2020, the 161 schools operated by DODEA have consistently outperformed the national average in reading and mathematics on the benchmark National Assessment of Educational Progress. *See*

DODEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025) (quoting DODEA Director Beth Schiavino-Narvaez's statement that "[c]redit for this success belongs to … teachers, administrators, and staff of DoDEA," as well as "to students and their families"), https://www.dodea.edu/news/press-releases/dod-schools-ranked-best-united-states-again-nations-report-card.

29.     Collective bargaining—which facilitates cooperative labor-management solutions to educational challenges and provides a channel for education professionals at the school level to provide input—has contributed to the success of DODEA schools. For example, FEA-SR and DODEA negotiated arrangements for the union's participation in committees such as the Continuous School Improvement Committee, which focuses on enhancing the delivery of instruction and educational practices, and the Case Study Committee, which ensures that students with special needs receive appropriate educational services. Union representatives have brought valuable expertise in education to bear on these committees' work. And that is aided by the fact that committee members selected by the union to serve in a representational capacity are afforded the rights and protections of Chapter 71, which allows them to provide candid, constructive, and at times critical feedback to support DODEA's mission without fear of reprisal.

30.     The recent implementation of DODEA's Universal/Full-Day Pre-K program provides an illustrative example. By way of background, when DODEA introduces a new educational program, curriculum, assessment, or resource, the only opportunity for educators to provide the agency with feedback is in the union's response to a statutory notice from DODEA, which typically includes proposals concerning the impact and implementation of the policy. In such responses, FEA and FEA-SR typically provide targeted feedback from school-level educators who will be directly involved in incorporating the new program into their teaching.

Upon receiving the statutory notice for the Pre-K program's rollout, FEA-SR raised numerous concerns regarding DODEA's readiness to deliver appropriate instruction and the inadequate allocation of resources. In response to this feedback, DODEA established a "Tiger Team"—a cross-functional group of DODEA leadership, administrators, and union-selected representatives. This team successfully addressed many of the readiness concerns, developing actionable solutions that ensured the program's effective implementation, and has, at least until the Executive Order, continued to collaborate with the union.

### C. FEA and FEA-SR Have Opposed Trump Administration Policies and Challenged them in Court and in Chapter 71 Grievance Proceedings

31.    Beginning in the first Trump administration, FEA and FEA-SR have spoken out against Trump administration policies attacking federal employees and have challenged such policies in court and in grievance proceedings.

32.    In June of 2018, FEA, along with several other federal unions, brought suit in this District to enjoin three executive orders issued by President Trump during his first administration that detrimentally affected collective bargaining rights under Chapter 71. The lawsuit was consolidated with three other federal union lawsuits challenging the executive orders. That litigation resulted in the District Court's entering summary judgment for the plaintiffs, and on the government's appeal, the Court of Appeals reversed the judgment for lack of subject matter jurisdiction. *See Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018), *rev'd and vacated*, 929 F.3d 748 (D.C. Cir. 2019). Shortly after taking office in 2021, President Biden rescinded those executive orders. *See* Exec. Order 14003, Protecting the Federal Workforce , 86 Fed. Reg. 7,231 (Jan. 22, 2021).

33.    FEA-SR has filed grievances challenging some of the second Trump administration's signature policies affecting federal employees. For example, on February 26,

2025, FEA-SR filed two bargaining-unit-wide grievances, one on behalf of classified education support professionals and the other on behalf of certified educators challenging the second Trump administration's infamous mass "Fork in the Road" e-mails originating from OPM and sent to all government employees purporting to offer a "deferred resignation program" under Chapter 71 and the parties' CBA. And on March 14, 2025, FEA-SR filed another grievance challenging the also-infamous mass "What Did You Do Last Week" e-mail sent by OPM to all federal employees, also under Chapter 71 and the parties' CBA.

34.    FEA and FEA-SR also have spoken out to oppose Trump administration policies and directives affecting federal employees, issuing statements in opposition not only to the "Fork in the Road" and "What did you do last week" directives, but also such Trump administration actions as: drastically cutting congressionally appropriated funding to federal agencies, forcing layoffs of probationary employees, preparing large-scale reductions in force ("RIFs"); attacks on Diversity, Equity, and Inclusion; and executive actions specifically targeting cultural awareness celebrations, gender identity, and certain curriculum materials and library books in public education settings.

### D.    President Trump Issues the Executive Order in Avowed Retaliation for the Protected Speech and Petitioning Activities of "Hostile Federal Unions"

35.    On March 27, 2025, President Trump issued the Executive Order, thereby depriving the overwhelming majority of federal civil service workers of their rights under Chapter 71. *See* Erich Wagner, "Trump order aims to outlaw most government unions on 'national security' grounds," *Government Executive* (March 27, 2025), https://perma.cc/6KF7-7SJY ("All told, the agencies covered by Trump's order amounts to 67% of the federal workforce, and 75% of federal workers who are currently represented by unions.").

36.    The Executive Order is staggering in its breadth. It sweeps up four Cabinet departments in their entirety;[1] two further Cabinet departments, each with a single narrow exception;[2] dozens of agencies and subdivisions within five other Cabinet departments;[3] and seven independent agencies in their entirety.[4] It also is unprecedented. Prior to the Executive Order, no president in the nearly half-century history of Chapter 71 has ever excluded from collective bargaining an entire Cabinet department or an entire independent agency, let alone multiple ones, or so broadly excluded agency subdivisions. Rather, presidents from both major parties—Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, George W. Bush, Barack Obama, and President Trump during his first administration—issued targeted orders excluding particular sub-agencies and agency subdivisions that clearly have intelligence and/or national security functions.[5]

---

[1] The four entirely excluded Cabinet departments are: the DOD, the Department of Justice, the Department of State, and the Department of Veterans Affairs. Executive Order Section 2(b), 90 Fed. Reg. at 14,533.

[2] The two almost-entirely excluded Cabinet departments are: the Department of Energy, with the sole exception of the Federal Energy Regulatory Commission; and the Department of the Treasury, with the sole exception of the Bureau of Engraving and Printing. *Id.*

[3] Those five Cabinet departments are: the Department of Agriculture, the Department of Commerce, the Department of Health and Human Services, the Department of Homeland Security, and the Department of the Interior. *Id.* at 14,533-34.

[4] Those entirely excluded independent agencies are: the Environmental Protection Agency, the United States Agency for International Development, the Nuclear Regulatory Commission, the National Science Foundation, the United States International Trade Commission, the Federal Communications Commission, and the General Services Administration. *Id.* at 14,554.

[5] *See* Exec. Order No. 12171, 44 Fed. Reg. 6,565 (Nov. 19, 1979) (excluding agencies and subdivisions of the DOD such as the Army Intelligence and Security Command and Defense Intelligence Agency); Exec. Order No. 12338, 47 Fed. Reg. 1,369 (Jan. 11, 1982) (excluding intelligence and security centers and directorates of the DOD's Joint Chiefs of Staff; the DOD's Air Force Assistant Chief of Staff or Intelligence and Intelligence Service; and the Department of Energy's Office of the Assistant Secretary for Defense Programs as well as military nuclear safety offices); Exec. Order No. 12410, 48 Fed. Reg. 13,143 (March 28, 1983) (excluding the then-recently created Joint Special Operations Command of DOD); Exec. Order No. 12559, 51

*(continued…)*

14

37.    Nor does the Executive Order stop with these staggeringly broad and unprecedented exclusions. In Section 5, the Executive Order authorizes further exclusions by delegating to the Secretary of Transportation the authority "to issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration," from Chapter 71's coverage and "suspending any provision of that law with respect to any Department of Transportation installation or activity located outside the 50 States and the District of Columbia." 90 Fed. Reg. at 14,556. And in Section 7, the Executive Order

---

Fed. Reg. 18,761 (May 20, 1986) (excluding the Department of Justice's Offices of Enforcement and Intelligence of the Drug Enforcement Administration as well as several offices of the United States Marshals Services); Exec. Order No. 12666, 4 Fed. Reg. 1,921 (Jan. 12, 1989) (excluding the Federal Air Marshal Branch of the Department of Transportation, as well as units of Civil Aviation Security Inspectors with air marshal functions); Exec. Order No. 12671, 4 Fed. Reg. 11,157 (March 14, 1989) (excluding the Office of Enforcement of the U.S. Customs Service); Exec. Order No. 12681, 54 Fed. Reg. 28,997 (July 6, 1989) (excluding several subdivisions of the National Preparedness Directorate of the Federal Emergency Management Agency ("FEMA")); Exec. Order No. 12693, 54 Fed. Reg. 40,629 (Sept. 29, 1989) (excluding DOD's Defense Mapping Agency Reston Center); Exec. Order No. 13039, 62 Fed. Reg. 12,529 (March 11, 1997) (excluding the DOD's Naval Special Warfare Development Group); Exec. Order No. 13252, 67 Fed. Reg 1,601 (Jan. 7, 2002) (excluding Department of Justice subdivisions such as INTERPOL and the Office of Intelligence and Policy Review); Exec. Order No. 13381, 70 Fed. Reg. 37953 (June 27, 2005) (excluding OPM's Center for Federal Investigative Services); Exec. Order 13480, 67 Fed. Reg. 1,601 (Nov. 26, 2008) (excluding subdivisions of the then-newly created Department of Homeland Security such as the Domestic Nuclear Detection Office and the Office of Intelligence and Analysis; subdivisions of the Department of Energy such as the National Nuclear Security Administration and the Office of Intelligence and Counterintelligence; offices and subdivisions of the United States Coast Guard; offices and subdivisions within the then-newly created U.S. Immigration and Customs Enforcement such as the Offices of Intelligence and International Affairs; subdivisions of FEMA such as the Continuity of Operations Division and the Integrated Public Alert and Warning Systems Division; the Department of Justice's National Security Division and Bureau of Alcohol, Tobacco, Firearms, and Explosives; the Federal Aviation Administration's Office of Security and Hazardous Materials; and subdivisions of the Treasury Department such as the Office of Terrorism and Financial Intelligence and the Financial Crimes Enforcement Network); Exec. Order No. 13760, 82 Fed. Reg. 5,325 (Jan. 12, , 2017) (excluding subdivisions of the DOD such as the U.S. Strategic Command, U.S. Cyber Command, and the Marine Special Operations Command); Exec. Order No. 13869, 84 Fed. Reg. 18,125, (April 24, 2019) (excluding the DOD's Defense Counterintelligence and Security Agency).

directs all agency heads to report within 30 days to the President which additional agency subdivisions they determine should be excluded from Chapter 71. *Id.*

38.    Section 6 of the Executive Order directs agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the FLRA involving exceptions or arbitral awards or unfair labor practices. *Id.*

39.    Also on March 27, 2025, but before the Executive Order was publicly released, Defendant Ezell, as Acting Director of OPM, issued a memorandum providing guidance to agency leadership regarding implementation of the Executive Order. *See* Memorandum of Charles Ezell, "Guidance on Executive Order Exclusions from Federal Labor-Management Programs" (March 27, 2025) ("OPM Guidance"), https://perma.cc/V6WH-435Z. The OPM Guidance declares that Chapter 71 "will no longer apply" to the agencies and agency subdivisions listed in the Executive Order, that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions," and that the affected unions "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" the Executive Order. *Id.* at 1, 3 (alterations in original). The OPM Guidance also directs agencies to "cease participating in grievance procedures after terminating their CBAs." *Id.* at 5.

40.    The Executive Order is wholly unmoored from the narrow authority that Congress has granted the President to exclude agencies or agency subdivisions from Chapter 71 where (a) the agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) the provisions of Chapter 71 "cannot be applied

16

in a manner consistent with national security requirements and considerations." 5 U.S.C.

§ 7103(b)(1) (emphasis added). Many, if not most, of the agencies and agency subdivisions

swept up in the Executive Order's dragnet—including Cabinet departments such as  the

Department of Veterans Affairs and the Department of the Treasury, and independent agencies

such as the Environmental Protection Agency, the Federal Communications Commission, and

the General Services Administration—do little to no national security work, much less do they

have "as a *primary* function intelligence, counterintelligence, investigative, or national security

work." *Id.* (emphasis added). Nor can it be reasonably said that the collective bargaining

provisions of Chapter 71 "cannot be applied in a manner consistent with national security

requirements and considerations" to the panoply executive departments, agencies, and agency

subdivisions swept up in the Executive Order's dragnet. *Id.*

41.　　The staggering and unprecedented breadth of the Executive Order—which ends

collective bargaining for some two-thirds of federal civil service employees and three-quarters of

those represented by unions, many if not most of whom are not engaged in national security

work—belies its purported national security justification.

42.　　Beyond that, the Trump administration's own statements in support of the

Executive Order reveal the administration's actual motivations for extinguishing collective

bargaining for the overwhelming majority of federal civil service workers—namely (a) to

retaliate against federal unions by reason of their First-Amendment-protected speech and

petitioning activities and chill any further such speech and petitioning by any federal unions; and

(b) to facilitate the firing of civil service employees *en masse*.

43.　　The Trump administration bluntly admitted the first of these motivations in a

White House "Fact Sheet" purporting to justify the Executive Order. *See* The White House,

"Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2G-MUSH. In that document, the White House railed against "hostile Federal unions" that, in the White House's view, have "declared war on President Trump's agenda" by, for example, "filing grievances to block Trump policies." *Id.* The White House further decried "[t]he largest Federal union"—a clear reference to the American Federation of Government Employees—because it "describes itself as 'fighting back' against Trump" and "is widely filing grievances to block Trump policies." *Id.*

44.     At the same time, the White House Fact Sheet pointedly declares that "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This statement sends a clear message that that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies, while unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the injuries those polices inflict will be punished. This message is made all the more clear by the Executive Order's blanket exception preserving collective bargaining rights for federal agency police, firefighters, and security guards—whose unions have supported Republicans in general and President Trump in particular—which the Fact Sheet takes pains to trumpet: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." *Id.*

45.     In addition, scarcely two days after the Executive Order was issued, a White House spokesperson candidly acknowledged the motivation for the Exclusion Order in these terms: "The goal is to stop employees in certain security-related agencies from unionizing in

ways that disrupt the president's agenda." Rebecca Davis O'Brien, "Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts," *New York Time*s (Mar. 29, 2025), https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html.

46.    The Fact Sheet also reveals the administration's second motivation by complaining about an FLRA ruling that affirmed an independent arbitrator's decision on a union grievance that required the reinstatement of employees of the Department of Veterans Affairs who had been wrongfully dismissed during the agency's implementation of a policy from the first Trump administration. *Id.* (referring in substance to *Dep't of Veterans Affs. Veterans Benefits Admin.*, 71 F.L.R.A. 1113 (Nov. 16, 2020)).

47.    The administration's second motivation is further laid bare by the OPM Guidance, which is largely devoted to the subject of "facilitat[ing] the separation of underperforming employees." OPM Guidance at 3-5. To that end, the OPM Guidance directs agencies, after "terminating their collective bargaining agreements" a "to prepare large-scale reductions in force (RIFs)," which are to be "conduct[ed] … without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.* at 5.

48.    Neither retaliating against federal unions for their speech and petitioning activities nor the desire to engage in mass firings of federal workers is a legitimate national security rationale under Section 7103(b).

49.    The Executive Order itself implicitly acknowledges that exclusion from Chapter 71 is unwarranted with respect to at least some subdivisions of excluded agencies, inasmuch as it delegates to two Cabinet secretaries the authority to restore collective bargaining to subdivisions of their agencies. Section 2(a) of the Executive Order—which lists DOD and the Department of Veterans Affairs among the many agencies excluded from Chapter 71—includes the proviso

19

"except for any subdivisions excluded pursuant to section 4" of the Executive Order. 90 Fed. Reg. at 14,553. And Section 4, in turn, "delegate[s] authority under 5 U.S.C. § 7103(b)(1)" to the Secretaries of Defense and Veterans Affairs to "suspend[] the application" of the Executive Order's exclusion "to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of [Chapter 71]" upon their certification that the provisions of Chapter 71 "can be applied to such subdivision in a manner consistent with national security requirements and considerations." *Id.* at 14,555-56.

50.     The orders that Secretary of Veterans Affairs Doug Collins ("VA Secretary") and Defendant Hegseth issued pursuant to Section 4 of the Executive Order further demonstrate the retaliatory purpose of the Executive Order and the absence of any meaningful grounding in national security requirements and considerations for its exclusions.

51.     By order dated April 11, 2025, the VA Secretary exercised the authority delegated by Section 4 in a manner fully and admittedly consistent with the Trump administration's retaliatory motives. *See* Dep't of Veterans Affairs, Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16, 427 (April 17. 2025). Rather than suspend the Executive Order with respect to particular "subdivisions of the agency," as Section 7103(b) provides and the Executive Order directs, the VA Secretary pointedly did so with respect to "employees represented by" eight specified unions. *Id.* And the agency's press secretary has admitted the rank favoritism that the administration shows toward unions the administration considers to be complaisant and its retaliation against unions that have exercised their right to challenge Trump administration actions that inheres in that order, stating as follows: "The unions in the exempted units have posed no or minimal hinderance to VA operations …. They have filed no or few grievances against VA and they have not proved an

impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to broadly frustrate the administration's ability to manage the agency.'" Erich Wagner, "VA is selectively enforcing Trump's order stripping workers of union rights," *Government Executive* (April 19, 2025) (quoting VA Press Secretary Pete Kasperowicz), https://perma.cc/2FMX-6L33.

52.     On April 4, 2025, forty-five members of Congress wrote to Defendant Hegseth, urging that he "exercise [his] authority to exempt DoDEA employees from the President's Executive Order and maintain their existing collective bargaining protections." Letter from Hon. Jill Tokuda, Member of Congress, *et al.*, to Secretary of Defense Peter Hegesth at 1 (April 4, 2025), https://tokuda.house.gov/imo/media/doc/dod_dodea_letter.pdf. The letter stressed that DODEA "does not have a primary function related to 'intelligence, counterintelligence, investigative, or national security'" and further pointed out that "federal collective bargaining protections can be applied to DoDEA in a manner consistent with national security requirements and considerations" because "DoDEA schools are not located in the frontlines of any conflict" and "DoDEA educators and personnel do not have security clearances or handle sensitive military information." *Id.* at 1-2.

53.     Defendant Hegseth did not exercise his delegated authority to exempt DODEA from the Executive Order. Rather, in an order dated April 17, 2025, Defendant Hegseth stated that Chapter 71 "can be applied … in a manner consistent with national security requirements and considerations" to "federal wage system employees in the trades" who work in four DOD subdivisions. DOD, Executive Order 14251 Certification, 90 Fed. Reg. 17,052 (April 23, 2025). Those subdivisions are the following:

"(a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army," *id.*, which, among other things, maintains air-to-air and air-to-ground precision guided missiles stores, serves as an ammunition supply depot for all DOD armed services, and demilitarizes tactical missiles and conventional munitions;

"(b) Air Force Test Center, Air Force Materiel Command, Department of Air Force," *id.*, which conducts research and development, testing, and evaluation of manned and unmanned aircraft for the Air Force;

"(c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force," *id.*, which provides depot-maintenance and supply-chain-management services, as well as operations and installation support for Air Force weapons systems ranging from fighter jets to intercontinental ballistic missiles; and

"(d) Fleet Readiness Center Southeast," *id.*, which provides aircraft repair and technical services for the U.S. Navy.

54.     There is no conceivable justification under Section 7103(b) for Defendant Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—which are primarily if not exclusively involved in national security work of the most obvious kinds—while maintaining the Executive Order's exclusion of DODEA.

55.     Like many if not most of the other agencies and agency subdivisions swept up in the Executive Order's dragnet, DODEA does not have, as a primary function, intelligence, counterintelligence, investigative, or national security. Indeed, DODEA is not involved in intelligence, counterintelligence, investigative, or national security work at all. Rather, it is one of two federally operated public school systems, which provides high-quality PreK-12 education to children of uniformed and civilian DOD personnel. And DODEA's educators—like many if

not most of the other federal employees whose rights under Chapter 71 have been extinguished by the Executive Order's dragnet but unlike the employees whose bargaining rights have been restored by Defendant Hegseth—are not engaged in intelligence, counterintelligence, investigative, or national security work.

56.     Nor can it reasonably be said that the collective bargaining provisions of Chapter 71 cannot continue to apply to DODEA in a manner consistent with national security requirements and considerations. Not only is there no remotely plausible basis for maintaining that DODEA has intelligence, counterintelligence, or national security as "primary function" but it is risible to suppose that there are any legitimate national security concerns implicated by collective bargaining between DODEA and the educators and education support professionals teaching in DODEA's schools, much less that such collective bargaining "cannot be conducted consistent with national security requirements and considerations." The latter point is shown starkly by the fact that DODEA has been engaged in collective bargaining with unions representing its educator employees, including Plaintiffs, since the 1970s.

**F.     The Executive Order Has Caused and Will Continue to Cause Irreparable Harm to Plaintiffs**

57.      Plaintiffs FEA, FEA-SR, and ACEA—and their members—have suffered and absent injunctive relief from this Court will continue to suffer, severe and irreparable harm by reason of the Executive Order.

58.     On April 3, 2025, the Chief of DODEA's Labor Management Employee Relations Division, Alexa Rukstele—citing the Executive Order, the White House Fact Sheet, and the OPM Guidance—notified Plaintiffs that DODEA "will pause all labor relations-related activities." Notwithstanding DODEA's use of the seemingly anodyne verb "pause," DODEA has already effectively repudiated its obligations under existing CBAs that remain in force by their

terms or by operation of law by cancelling dues deductions and bringing bargaining, grievance handling, and other routine labor-management interactions to a halt.

59.     On or about April 7, 2025, DODEA terminated the statutorily and contractually required payroll deductions of FEA, FEA-SR, and ACEA dues from union members who have voluntarily authorized those deductions, thereby cutting off "dues payments of union members," which are the "economic lifeblood of a labor organization and normally its primary source of income." *Loc. Union No. 5741, United Mine Workers of Am. v. NLRB*, 865 F.2d 733, 738 (6th Cir. 1989) (quotation marks omitted). *See also Alachua County Educ. Ass'n v. Carpenter*, No. 1:23CV111-MW/HTC, 2024 WL 4708983, at *2 (N.D. Fla. Nov. 6, 2024) (explaining that unions suffered injury arising from state law's ban on payroll deduction "because it prohibits this bargained-for method of dues deduction"). As a consequence, Plaintiffs are forced to expend funds and resources to effectuate alternative payment arrangements that are costly and less reliable than payroll deduction, and then seek electronic payment authorizations for thousands of members spread across the globe, which in FEA's case involves seeking such authorizations from members around the globe.

60.     DODEA has ceased participating in grievance proceedings that arose, and have been pending, before the Executive Order issued. DODEA has claimed that by reason of the Executive Order, DODEA has no obligation to abide by unexpired CBAs, including their provisions for the resolution of grievances, and that arbitrators have no jurisdiction to decide grievances that arose and were pending prior to the Executive Order. These actions not only amount to a repudiation of DODEA's contractual obligations but also retroactively seek to extinguish grievance claims that accrued before the Executive Order issued, including many that have already been upheld in arbitration awards.

61.     For example, FEA has been prosecuting numerous grievances on behalf of more than 800 educators that seek relief from DODEA's wrongful garnishment of purported overpayments from educators' pay—or other failures to pay educators their rightful salaries—by reason of DODEA's chronic failure to correctly calculate their overseas employees' pay. Those grievances were all pending, in various stages of the arbitration process, when the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order. In grievance proceedings involving nearly 500 affected employees, arbitrators have already issued decisions upholding the grievances and ordering DODEA to make the affected employees whole through the payment of back pay and interest, but DODEA has yet to effectuate the decisions. The awards in these cases are substantial, amounting to more than $100,000 in back pay for some affected employees. The remaining grievances have either not yet been submitted to arbitration or are the subject of ongoing arbitration proceedings.

62.     In other pending grievance proceedings initiated by FEA, DODEA attorneys have refused to further participate in arbitral proceedings. In one such proceeding, DODEA's procurement officer purported to cancel a scheduled arbitration and dismiss the arbitrator's services with the clear suggestion that the arbitrator would not be paid for any further contracted work on the case.

63.     FEA-SR has 36 pay grievances on behalf of 122 bargaining unit employees that are in various stages of the arbitration process and an additional 10 grievance cases that have not yet been scheduled for arbitration; 7 of those are on behalf of multiple employees and the remaining three are individual grievances. All of those grievances were filed before the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order.

64.    Absent relief from this Court, those FEA and FEA-SR members with pay and other grievances that arose CBAs—including the hundreds who have already been awarded back pay and interest—will retroactively lose their ability to recover the pay they are owed because limitations periods have long expired for any alternative remedies.

65.    ACEA has two pending grievances under its CBA with DODEA, one that was scheduled for arbitration on April 28, 2025. Both have been placed in abeyance because of the Executive Order.

66.    DODEA has effectively nullified the sick leave bank established pursuant to its current CBA with ACEA to provide temporary assistance to employees who are incapacitated or are required to attend to a family member's medical emergency or serious medical condition. Under this CBA provision, participating bargaining unit members donate leave time to the leave bank, and a committee consisting of two union-appointed employees and one DODEA representative administers the bank and decides whether to grant employee requests to draw on the leave bank. The sick leave bank currently has more than 13,000 donated hours, but after the Executive Order issued DODEA has refused to convene the committee and consider employee requests. Three participating employees have since requested grants from the leave bank, but the requests have not been processed.

67.    DODEA's repudiation of its CBAs pursuant to the Executive Order have caused—and, absent relief from this Court, will continue to cause—grave and irreparable harm to Plaintiffs and their members. Absent relief from this Court, Plaintiffs' members will lose their contractual and statutory rights and remedies under CBAs validly entered into prior to the Executive Order and that continue in force either by their terms or, as in the case of FEA-SR, by operation of Chapter 71, including remedies for grievances predating the Executive Order.

68.    Nor will Plaintiffs and their members have any recourse to the FLRA.  FLRA case law holds that once an agency has been excluded from Chapter 71 under Section 7103(b), "the Authority has no jurisdiction to decide" union unfair labor practice complaints. *U.S. Attorney's Off. S. Dist. of Texas Houston*, 57 F.L.R.A. 750, 750 (Apr. 25, 2002). On April 4, 2025, the FLRA issued an order in a years-old unfair labor practice proceeding initiated by FEA, that cites the *U.S. Attorney's Office* decision and directs FEA to show cause why, in light of the Executive Order, "the Authority should not dismiss this matter for lack of jurisdiction." The FLRA has issued identical orders to other federal unions with pending cases before the FLRA. On April 18 2025, FEA responded that it considers the Executive Order to be unlawful on the same statutory and constitutional grounds underlying this pleading, and that it would therefore be more appropriate for the FLRA to stay the matter pending the outcome of litigation challenging the Executive Order. DODEA, in turn, replied to the FEA's response on April 30, 2025, taking the position that by reason of the Executive Order, the FLRA "lacks jurisdiction to stay this matter and hold it in abeyance as requested by the Union."

69.    On April 29, 2025, Rukstele notified Plaintiffs FEA, FEA-SR, and ACEA that "**official time**"—a term referring to contractual arrangements that allow union officials to perform representational functions while on duty status—"**is no longer authorized for any purpose**" and directed that "all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school" and must "promptly vacate any office space used by the union/association."

70.    As of April 29, 2025, DODEA has refused to allow employees to have a union representative present during meetings that may result in discipline—so-called "*Weingarten*

rights," after the Supreme Court's decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975)—regardless of whether the meeting is held during the duty day or not.

71.    By reason of the Executive Order, Plaintiffs are losing revenue and are bereft of their core functions as unions: they have lost their status as collective bargaining representatives chosen by unit employees, they have therefore lost the ability to negotiate CBAs or even enforce their existing CBAs through contractually agreed-upon grievance procedures, and they have lost recourse to the FLRA for unfair labor practices and other labor-management disputes within the FLRA's jurisdiction. The loss of these core union functions causes irreparable injury to the Plaintiffs and to Plaintiffs' members, who have lost their statutory and contractual rights and protections—including, in hundreds of cases, the retroactive nullification of pending grievances arising from CBA violations long predating the Executive order.

## CLAIMS FOR RELIEF

### COUNT ONE
### *ULTRA VIRES* ACTION IN VIOLATION OF THE SEPARATION OF POWERS
### (All Plaintiffs v. Defendants Trump, Ezell, and OPM)

72.    Plaintiffs incorporate paragraphs 1–71 above by reference as if fully set forth herein.

73.    Under the authority granted by Congress in 5 U.S.C. § 7103(b)(1), agencies or subdivisions thereof may only be excluded from Chapter 71 if two narrow conditions are met: (a) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

74.    From the enactment of Chapter 71 through the Trump administration's first term, the practice of every president who has invoked Section 7103(b) confirms the narrowness of the

President's exclusion authority: each applied Section 7103(b) judiciously, targeting only those portions of Cabinet departments and independent agencies that clearly have a primary function of performing intelligence, counterintelligence, investigative, or national security work,

75.     The Executive Order—which excludes 75% of federal employees heretofore represented by federal unions under Chapter 71 and 67% of federal civil service employees overall—is wholly unmoored from Section 7103(b)'s narrow conditions. No limiting principle consistent with Section 7103(b)'s conditions can justify the Executive Order's staggeringly broad sweep, which takes in agencies and subdivisions including the Bureau of Land Management, the Environmental Protection Agency, and, by reason of the Executive Order's exclusion of the entirety of DOD, DODEA's PreK-12 schools, especially when coupled with the Executive Order's blanket exemption for agency law enforcement units.  The President's attempt to press the narrow authority granted by Section 7103(b) into the service of extinguishing collective bargaining for the overwhelming majority of federal employees—vast swathes of whom, like DODEA educators, perform no national security work—amounts to an effective nullification of the comprehensive collective bargaining system established by Congress.

76.     Wholly apart from the Executive Order's staggering overbreadth, the White House's own admissions betray the pretextual nature of the order's purported national security justification. The White House has bluntly admitted that the Executive Order's purpose is both (a) to harm and punish "hostile Federal unions" for voicing opposition to Trump administration policies and challenging Trump administration policies by petitioning for redress of the injuries inflicted by those policies through the courts and through collectively bargaining grievance proceedings; and (b) to facilitate the mass firing of federal employees. Neither of these purposes is legitimate under Section 7103(b).

77.     Because the Executive Order uses the narrow authority granted by Section 7103(b) to upend Congress's comprehensive framework for collective bargaining among federal agencies, and because the Executive Order does so for venal and retaliatory reasons under the pretext of national security, the Executive Order is *ultra vires* and violates the Constitution's separation of executive from legislative powers.

### COUNT TWO:
### VIOLATION OF THE FIRST AMENDMENT
### (All Plaintiffs v. All Defendants)

78.     Plaintiffs incorporate paragraphs 1–77 above by reference as if fully set forth herein.

79.     The First Amendment to the United States Constitution protects against government actions "abridging the freedom of speech" and "the right of the people … to petition the Government for a redress of grievances."

80.     FEA and FEA-SR have exercised their First Amendment rights to voice opposition to Trump administration policies that harm the federal employees they represent and to petition for redress of those harms through recourse to the courts and grievance proceedings governed by Chapter 71.

81.     The Executive Order was avowedly issued in retaliation for the protected speech and petitioning activities by federal unions—including FEA and FEA-SR—who have opposed Trump administration policies, and it aims to chill the protected speech of all federal unions going forward. The White House's Fact Sheet baldly admitted this motivation. That document justified the Executive Order on the basis of its assertions that "Federal unions have declared war on President Trump's agenda," that one such union "describes itself as 'fighting back' against Trump," and that such unions have filed grievances seeking relief from Trump administration policies.

82.    The White House's Fact Sheet further makes clear that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies and punish unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the injuries those polices inflict. The Fact Sheet declares, "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This message that unions supporting Trump policies will receive favor and those opposing Trump policies will receive punishment is reinforced by the Executive Order's blanket exception preserving collective bargaining rights for federal agency police, firefighters, and security guards—whose unions have supported Republicans in general and President Trump in particular—which the Fact Sheet highlights: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." *Id.*

83.    The Executive Order's purpose and effect is to harm and punish federal unions by reason of their First-Amendment-protected speech and petitioning and to chill protected activity by all federal unions going forward.

84.    The OPM Guidance, and Secretary Hegseth's Executive Order 14251 Certification all carry out and share in the Executive Order's retaliatory purpose and effects.

## COUNT THREE:
## VIOLATION OF THE FIFTH AMENDMENT'S PROTECTIONS AGAINST THE GOVERNMENT'S ANNULMENT OF VESTED RIGHTS ARISING FROM THE GOVERNMENT'S OWN CONTRACTS
### (All Plaintiffs v. All Defendants)

85.    Plaintiffs incorporate paragraphs 1–84 above by reference as if fully set forth herein.

86.    The Fifth Amendment of the United States Constitution protects against deprivations of property "without due process of law" and provides that "private property" shall not be "taken for public use, without just compensation."

87.    Collective bargaining agreements entered into pursuant to Chapter 71 are contracts that bind federal agencies and unions representing their employees. *See* 5 U.S.C. §§ 7114(c)(3); 7116. Such "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934). As such, contracts with the federal government are protected by the Takings Clause. *Id.*

88.    The Fifth Amendment's Due Process Clause also protects against the government's retroactive abrogation of its contracts. Where Congress has "the power to authorize" contracts, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Lynch*, 292 U.S. at 579. *See also Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

89.    The Executive Order and the OPM Guidance seek to nullify CBAs and extinguish vested rights under them such as pending grievances over actions predating the Executive Order—including FEA's unresolved pay grievances on behalf of approximately 800 educators and ACEA's sick leave bank—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their vested rights under CBAs and thus their constitutionally protected property interests in CBAs lawfully entered into with DODEA. And they do so with no legitimate public purpose or rational justification. The Executive Order

and OPM Guidance therefore constitute unlawful takings and violate the Fifth Amendment's guarantee of substantive due process.

## COUNT FOUR:
## VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION OF THE LAWS
### (All Plaintiffs v. All Defendants)

90.    Plaintiffs incorporate paragraphs 1–89 above by reference as if fully set forth herein.

91.    The due process guarantee of the Fifth Amendment to the United States Constitution includes a guarantee of equal protection. *See United States v. Windsor*, 570 U.S. 744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

92.    "The Constitution's guarantee of equality 'must at the very least mean that a bare … desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534–35 (1973)).

93.    A "bare … desire to harm a politically unpopular group" is precisely what motivated the Executive Order's exclusion of 75% of union-represented employees across multiple Cabinet departments and independent agencies, while providing a blanket exception for agency police and firefighters, whose unions have supported President Trump. This conclusion is all the more inescapable given the White House's statements admitting that the purpose of the order is to harm and punish federal unions that have voiced opposition to Trump administration policies and petitioned the government for redress from those policies.

## COUNT FIVE:
## VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE
## OF PROCEDURAL DUE PROCESS
### (All Plaintiffs v. All Defendants)

94.    Plaintiffs incorporate paragraphs 1–93 above by reference as if fully set forth herein.

95.    The Fifth Amendment's protection against deprivations of property "without due process of law" requires, at a minimum, notice and an opportunity to be heard before the government may deprive a person of property.

96.    "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch*, 292 U.S. at 579.

97.    The Executive Order and the OPM Guidance seek to retroactively nullify CBAs and extinguish pending grievances over actions predating the Executive Order—such as FEA's approximately 800 unresolved pay grievances on behalf of DODEA educators—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their constitutionally protected property interests in CBAs lawfully entered into with DODEA, and they do so without having afforded Plaintiffs any notice or opportunity to be heard in violation of the Fifth Amendment's guarantee of procedural due process. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

## COUNT SIX
## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:
## ARBITRARY AND CAPRICIOUS AGENCY ACTION
### (All Plaintiffs v. Defendants Hegseth and DOD)

98.    Plaintiffs incorporate paragraphs 1–97 above by reference as if fully set forth herein.

99.     Under the APA, a reviewing court "shall … hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706 (2)(A).

100.    An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

101.    Defendant Hegseth provided no explanation of his failure—in the face of a letter from members of Congress cogently explaining that the exclusion of DODEA from collective bargaining is not justified under Section 7103(b) no less—to suspend the Executive Order with respect to DODEA while suspending the Executive Order for a subset of employees working in four DOD subdivisions working on weapons systems and munitions. Defendant Hegseth entirely failed to consider an important aspect of the problem, relied on factors which Congress has not intended it to consider, while offering no explanation whatsoever for his action.

102.    Moreover, there is no conceivable legal justification under Section 7103(b) for Defendant Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—which are primarily if not exclusively involved in national security work involving DOD weapons systems and munitions—while maintaining the Executive Order's exclusion of DODEA. DODEA does not perform intelligence, counterintelligence, investigative, or national security at all, much less does it have any such work as a primary function. Rather, DODEA operates high-quality public schools serving the dependents of uniformed and civilian DOD personnel. It follows from this fact that collective bargaining manifestly *can* be conducted

in a manner consistent with national security requirements and considerations, as confirmed by

DODEA's decades-long history of mutually productive collective bargaining with Plaintiffs

under Chapter 71.

103.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of

the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to

DODEA or even explain that failure is arbitrary and capricious.

## COUNT SEVEN
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: AGENCY ACTION CONTRARY TO LAW
#### (All Plaintiffs v. Defendants Hegseth and DOD)

104.    Plaintiffs incorporate paragraphs 1–103 above by reference as if fully set forth

herein.

105.    Under the APA, a reviewing court "shall … hold unlawful and set aside agency

action" that is "contrary to law." 5 U.S.C. § 706(2)(A).

106.    Section 7103(b) provides no lawful justification for the continued exclusion of

DODEA from Chapter 75. DODEA performs no intelligence, counterintelligence, investigative,

or national security at all; much less does it have any such work as a primary function. It follows

from this fact that collective bargaining manifestly *can* be conducted in a manner consistent with

national security requirements and considerations, as confirmed by DODEA's decades-long

history of stable and mutually productive collective bargaining under Chapter 71. Defendant

Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to

suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA is contrary to

law.

107.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of

the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to

DODEA also is contrary to law because the Executive Order is *ultra vires* the President's narrow statutory authority and violates the separation of powers, the First Amendment's protection of speech and petitioning, the Fifth Amendment's guarantee of equal protection of the laws, and the Fifth Amendment's guarantee of procedural and substantive due process as well as its protection against unlawful government takings of property.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for the following relief:

(a)    a declaratory judgment that:

    i.  the Executive Order, the OPM Guidance, and their nullification of Plaintiffs' CBAs and contractual grievances, are *ultra vires*, in violation of the separation of powers, in violation of the First Amendment's protection of speech and petitioning activities, in violation of the Fifth Amendment's guarantee of equal protection of the laws, and in violation of the Fifth Amendment's protection against unlawful takings and its guarantee of substantive due process; and

    ii.  Defendant Hegseth's failure to suspend application of the Executive Order with respect to DODEA or to explain that failure violates the Administrative Procedure Act;

(b)    preliminary and permanent injunctive relief that:

    i.  prohibits the Defendants and their agents and successors from implementing or otherwise giving effect to the Executive Order and the OPM Guidance with respect to Plaintiffs and their members; or in the absence of such relief

ii. sets aside Defendant Hegseth's April 23, 2025, Executive Order 14251

Certification and directs Defendant Hegseth to address the question of

whether suspending the Executive Order as to DODEA is warranted under

U.S.C. § 7103(b).

(c) an order granting Plaintiffs attorney's fees and costs; and

(d) an order granting such other relief as this Court may deem just and proper.

DATED: May 5, 2025                    Respectfully submitted,


/s/Jason Walta
Jason Walta
Alice O'Brien*
Philip Hostak*
Caitlin Rooney*
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
jwalta@nea.org
phostak@nea.org
crooney@nea.org

*Attorneys for Plaintiffs*

*Application for admission *pro hac vice*
forthcoming