## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

FEDERAL EDUCATION ASSOCIATION,
    1201 16th St. NW Suite 117, Washington,
    DC 20036;

FEDERAL EDUCATION ASSOCIATION
    STATESIDE REGION, PO BOX 41035,
    Fayetteville, NC 28309;

and

ANTILLES CONSOLIDATED EDUCATION
    ASSOCIATION, PO BOX 34425, Fort
    Buchanan, Puerto Rico 00934;

        *Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
    President of the United States, 1600
    Pennsylvania Avenue NW, Washington, D.C.
    20500;

PETER HEGSETH, in his official capacity as the
    United States Secretary of Defense, 1000
    Defense Pentagon, Washington, DC 20301;

UNITED STATES DEPARTMENT OF
    DEFENSE, 1400 Defense Pentagon,
    Washington, DC 20301;

CHARLES EZELL, in his official capacity as
    Acting Director of the U.S. Office of
    Personnel Management, 1900 E Street NW,
    Washington, DC 20415;

and

UNITED STATES OFFICE OF PERSONNEL
    MANAGEMENT, 1900 E Street NW,
    Washington, DC 20415;

        *Defendants*.

Civil Action No. 1:25-cv-1362

**FIRST AMENDED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

---

**FIRST AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

---

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.      In this action, Plaintiffs Federal Education Association ("FEA"), Federal Education Association Stateside Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA")—labor organizations representing educators who work in prekindergarten-through-12th-grade ("PreK-12") schools operated by the Department of Defense Education Activity ("DODEA")—challenge Defendant Donald Trump's executive order stripping Plaintiffs and their members of their statutory and contractual collective bargaining rights on purported national security grounds, Exec. Order No. 14251, Exclusions from Federal Labor-Management Programs, 90 Fed. Reg. 14,553 (March 27, 2025) ("Executive Order"), as well as injurious acts and omissions relating to the implementation of the Executive Order committed by the other Defendants.

2.      The Executive Order suffers from manifold constitutional infirmities: (a) it is wholly unmoored from the narrow authority that Congress granted to the president to exclude federal agencies and agency subdivision from collective bargaining for reasons of national security and is therefore *ultra vires* and in violation of the constitutional separation of powers; (b) it violates the First Amendment inasmuch as the Trump administration's own words demonstrate that it was issued to retaliate against federal unions for engaging in protected speech and petitioning activities; (c) it violates the Fifth Amendment's guarantee of equal protection of the laws inasmuch as it was avowedly motivated by a bare desire to harm politically unpopular groups; and (d) by nullifying collective bargaining agreements ("CBAs") between Plaintiffs and

the government, it violates the Fifth Amendment's protection against deprivations of property without due process of law and its protection against unlawful takings of property. Even if the Executive Order were not generally invalid by reason of those constitutional infirmities, Defendant Peter Hegseth's failure to exercise his delegated authority under the Executive Order to suspend its application to DODEA is arbitrary and capricious and contrary to law and therefore violates the Administrative Procedure Act. Plaintiffs seek a declaration that the Executive Order is unlawful in these respects and preliminary and permanent injunctive relief prohibiting any further implementation and enforcement of the Executive Order and setting aside Defendant Hegseth's failure to suspend the Executive Order with respect to DODEA.

## II.     JURISDICTION AND VENUE

3.      This court has jurisdiction under 28 U.S.C. § 1331 as this action arises under federal law, including the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because Plaintiff FEA is headquartered in the District of Columbia and thus resides in this District, because this action seeks relief against federal agencies and officials acting in their official capacities residing in the District of Columbia, and because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

## III.   PARTIES

5.      Plaintiff FEA is a labor organization with more than 5,400 members, all of whom work as educators and education support professionals (ESPs) in schools operated by DODEA, a subdivision of DOD that operates public schools serving more than 64,000 PreK-12 dependents

of military and civilian DOD personnel stationed in bases in the United States, in United States territories, and abroad.

6.    FEA's members include classroom teachers, instructional assistants, information specialists (also known as librarians), counselors, nurses, and classified employees who work in DODEA schools located in military bases in the United States and in the U.S. Territory of Guam, countries throughout Europe and Asia, and in Guantanamo Bay, Cuba, to ensure that children of DOD-employed families have the opportunity to receive the high-quality education that has long characterized DODEA schools.

7.    FEA is dedicated to the proposition that educators should ensure the integrity and effectiveness of educational programs within federal school systems. In FEA's view, this goal requires three things: (a) achieving the high standards, benefits, and working conditions that are necessary to attract and retain highly competent professionals; (b) supporting educators' professional growth; and (c) empowering educators to make decisions regarding their professional lives. To these ends, FEA advocates on behalf of DODEA educators before Congress and the courts, and, prior to the Executive Order, had for decades been engaged in collective bargaining with DODEA concerning the working conditions, benefits, and other terms and conditions of employment of education support professionals working in DODEA's overseas schools pursuant to Chapter 71.

8.    FEA brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

9.    FEA-SR is an affiliated leadership council of FEA that represents DODEA educators in the continental United States and the Territory of Guam. Prior to the Executive

Order, FEA-SR had for decades engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in those schools.

10.    Plaintiff FEA-SR brings this action on behalf of itself, as the Executive Order has eviscerated its core function of collective bargaining, and on behalf of its members, whose statutory and contractual rights have been extinguished by the Executive Order.

11.    Plaintiff ACEA is a labor organization with 182 members working as educators in four DODEA schools located in Puerto Rico. For nearly half a century prior to the Executive Order, ACEA had engaged in collective bargaining with DODEA concerning the pay, working conditions, benefits, and other terms and conditions of employment of educators and education support professionals working in DODEA schools in Puerto Rico. Plaintiff ACEA brings this action on behalf of itself and its members, whose statutory and contractual rights have been extinguished by the Executive Order.

12.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

13.    Defendant Peter Hegesth is the United States Secretary of Defense. He is sued in his official capacity.

14.    Defendant DOD is an agency of the United States.

15.    Defendant Charles Ezell is Acting Director of OPM. He is sued in his official capacity.

16.    Defendant OPM is an agency of the United States.

## IV.     FACTUAL ALLEGATIONS

**A.     For Nearly Half a Century, Chapter 71 Has Provided a Sound and Carefully Calibrated Basis for Federal Sector Labor Relations.**

17.     Congress enacted the Federal Service Labor-Management Relations Statute, codified as Chapter 71 of Title 5 of the United States Code ("Chapter 71"), as part of the broader reforms of the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.). Prior to the CRSA's January 11, 1979 effective date, collective bargaining in the federal civil service had been authorized and governed by two executive orders. The first was issued in 1962 by President John F. Kennedy. *See* Executive Order 10,988, Employee-Management Cooperation in the Federal Service, 27 F. Reg. 551 (Jan.17, 1962). The second, which formed the general blueprint for Chapter 71, was issued in 1969 by President Richard M. Nixon. *See* Exec. Order 11,491, Labor-Management Relations in the Federal Service, 34 FR 17,605 (Oct. 31, 1969).

18.     Congress enacted Chapter 71 to provide a comprehensive statutory framework to govern collective bargaining in the federal civil service "designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b). That statutory framework is based on Congress's recognition that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them … safeguards the public interest, … contributes to the effective conduct of public business, and … facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment." *Id.* § 7101(a).

19.     Like the executive orders that preceded it, Chapter 71 was patterned in part on the main private-sector labor-relations statute, the National Labor Relations Act of 1935 ("NLRA"), 49 Stat. 449 (1935), 29 U.S.C. § 151 *et seq.* Notably, Chapter 71 mirrors the NLRA in

guaranteeing federal employees the basic rights "to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal" 5 U.S.C. § 7102, and to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees," *id.* § 7102(2). *Accord* NLRA Section 7, 29 U.S.C. § 157.

20.    Like the NLRA, Chapter 71 also establishes election procedures for determining if a majority of employees in an appropriate unit choose union representation, 5 U.S.C. § 7111(b), and requires covered agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election," *id.* § 7111(a); *accord* NLRA Section 9(a)-(c); 29 U.S.C. §§ 159(a)-(c). Chapter 71 also requires agencies to negotiate in good faith with such representatives to reach a collective bargaining agreement, 5 U.S.C. § 7114(b)(5), as does the NLRA with respect to covered private employers, NLRA Section 8(d), 29 U.S.C. § 158(d).

21.    Chapter 71 also mirrors the NLRA in its setting out of proscribed agency and union unfair labor practices that make it unlawful for an agency or union, *inter alia*, "to interfere with, restrain, or coerce any employee in the exercise" of their rights under Chapter 71, "to encourage or discourage membership in any labor organization by discrimination" as to terms and conditions of employment, and "to refuse to bargain in good faith" with the labor organization or agency, 5 U.S.C. §§ 7116(a) and (b); *accord* NLRA Section 8(a) and (b), 29 U.S.C. § 158(a) and (b). And Chapter 71 created an independent agency, the Federal Labor Relations Authority ("FLRA"), to resolve unfair labor practice complaints, *see* 5 U.S.C. § 7104,

just as the NLRA created the National Labor Relations Board, *see* NLRA Sections 3,10; 29 U.S.C. §§ 153, 160.

22.     At the same time, given the federal government's "special requirements and needs," 5 U.S.C. § 7101(b), Congress tailored Chapter 71's collective bargaining framework to be more limited than the NLRA in certain significant respects.

23.     Chapter 71, for example, provides statutory management rights protections that preserve "the authority of any management official of any agency" to, *inter alia*, "determine the mission, budget, organization, number of employees, and internal security practices of the agency"; "hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees"; and "assign work, .. make determinations with respect to contracting out, and ... determine the personnel by which agency operations shall be conducted." *Id.* § 7106(a). Under the NLRA, by contrast, management-rights protections are left to the bargaining process. *See NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395 (1952). While Chapter 71 thus precludes *decisional* bargaining when an agency invokes its management rights under Section 7106(a), bargaining is permitted as to the effects of such decisions, such as bargaining over the procedures for implementing those decision and for "appropriate arrangements for employees adversely affected by" such management decisions. 5 U.S.C. § 7106(b)(2) and (3).

24.     In addition to creating non-negotiable management rights, Chapter 71 provides that the duty of unions and federal agencies to negotiate over terms and conditions of employment under does not extend to matters established by federal statute or by government-wide regulations. 5 U.S.C. §§ 7103(a)(14)(c) and 7117(a)(2). Thus, where, for instance, agency

employees' pay is determined by statutory wage scales, as is the case for DODEA's overseas educators, bargaining over the amount of employees' compensation is prohibited.

25.    While the NLRA expressly protects the right of private-sector employees to strike, 29 U.S.C. § 163, federal employees are forbidden to strike, to assert the right to strike, or even to knowingly be a member of a union that asserts the right to strike, against the federal government, 5 U.S.C. §§ 7311(3) and (4). Chapter 71 makes it an unfair labor practice for federal employee unions to call, participate in, or condone "a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations," *id.* § 7116(b)(7)(A), and it denies the rights and protections established by Chapter 71 to any employee who participates in a strike against the federal government, *id.* § 7103(b)(2)(B)(v) (excluding any agency employee who participates in a strike in violation of section 7311" from the definition of a Chapter 71 "employee").

26.    Chapter 71 also contains provisions excluding particular employers from coverage that have no analog in the NLRA. Chapter 71 expressly excludes certain agencies from its provisions, including the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, and the United States Secret Service. *Id.* § 7103(a)(3). And it grants the President a narrow authority to exclude an otherwise covered agency or agency subdivision from Chapter 71's coverage, which narrow authority President Trump has invoked to extinguish collective bargaining for the vast majority of federal employees. Section 7103(b) of Chapter 71 authorizes the exclusion of agencies and agency subdivisions from Chapter 71 based on a determination that two specific limiting conditions are satisfied: (a) the agency or agency subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) Chapter 71 "cannot be applied" to that agency or subdivision "in

a manner consistent with national security requirements and considerations." *Id*. § 7103(b)(1). As detailed further below, prior presidential administrations have—true to the narrow limiting conditions prescribed by Congress and in stark contrast to President Trump's sweeping and indiscriminate exclusions—taken a targeted approach, judiciously excluding particular sub-agencies and agency subdivisions clearly having intelligence and/or national security as their primary functions.

**B.    Plaintiffs Have Had Stable and Mutually Beneficial Relationships with DODEA for Decades**

27.    For decades, FEA—under its current name and under its previous name, the Overseas Education Association—has represented education professionals working at DODEA's schools in Europe and Asia for the purposes of collective bargaining and grievance handling, Indeed, under its former name, FEA was first recognized as the collective bargaining representative of DODEA educators in 1970 and negotiated its first CBA with DODEA before Chapter 71 was enacted and federal-sector labor relations were governed by President Nixon's Executive Order 1,1491. Since 1999, FEA-SR has represented education professionals at DODEA's stateside schools (which include schools located in the U.S. Territory of Guam) for the purposes of collective bargaining and grievance handling. Prior that, local FEA affiliates had represented education professionals at DODEA's stateside schools for the purposes of collective bargaining and grievance handling for more than a decade.

28.    FEA entered into a CBA with DODEA in 2023 covering certified educators in DODEA's overseas schools. That CBA provides that it will continue in force until August 1, 2028, and covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in representational work, employee rights, standards and procedures for employee discipline and adverse employment actions, mid-term

bargaining procedures for management proposals on negotiable matters, and district and school-level consultations aimed at promoting and facilitating constructive relationships. The 2023-2028 CBA is the successor to the parties' 1989 CBA, which had an initial term of 3 years, but also included a clause stating that the CBA "shall remain in full force and effect during the renegotiation of said Agreement and until such time as a new Agreement is effective." FEA and DODEA operated under that 1989 agreement until the 2023 CBA was executed.

29.    Since 1996, FEA-SR has represented two units of employees working in stateside DODEA schools. One unit consists of professionally certified, non-supervisory educators; the other unit consists of classified education support professionals ("ESPs"). Prior to 1996, local FEA affiliates had represented those employees in separate, school-level bargaining units for more than a decade. But in 1996, the FLRA issued an order approving the consolidation of those school-level units into two units: one for stateside certified educators and the other for stateside ESPs. Following that order, DODEA recognized FEA-SR as the successor representative for those two units..

30.    The most recent CBA between FEA-SR and DODEA covering certified educators ("the 2019 Certified Educator CBA") went into effect on January 11, 2019. Article 35 of that agreement provides for an initial term of five years, but also includes a renewal clause providing that, if either party requests to bargain over a new agreement at least 365 but not more than 395 days before the end of the initial term, the basic terms and conditions of the agreement remain in effect until bargaining has concluded and a new agreement is executed. As FEA-SR timely provided notice of its request to bargain over a new agreement, the 2019 Certified Educator CBA remained in effect when President Trump issued the Executive Order on March 27, 2025.

31.     The most recent CBA between FEA-SR and DODEA covering ESPs went into effect on March 25, 2010 ("the 2010 ESP CBA").  Article 29 of the 2010 ESP CBA provides for an initial term of four years but also includes a renewal clause providing that if either party gives notice of intent to bargain over a successor agreement at least 60 but not more than 90 days before the CBA's expiration date, "the Agreement shall remain in full force and effect" until the bargaining concludes and a new agreement is reached, and that "[i]f neither party files such written notice, the Agreement shall be automatically renewed" for one year "on each anniversary date."  As neither party provided notice in the initial window period before the CBA's expiration, the CBA was renewed from year to year without negotiations over a successor agreement until DODEA provided notice of its intent to open negotiations for a successor agreement on April 28, 2020, and the parties began bargaining over a successor agreement.  Thus, the 2010 ESP CBA remained in effect when President Trump issued the Executive Order on March 27, 2025.

32.     Both the 2019 Certified Educator CBA and the 2010 ESP CBA govern, among other things, educators' pay, grievance-and-arbitration procedures (which include provisions that protect employees asserting grievances from employer reprisals), payroll deduction of union membership dues, official time and use of office facilities for union officials engaged in representational work, employee and association rights (including the right of bargaining unit employees to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, an emergency leave bank for educators facing medical emergencies, association-management cooperation, and procedures to bargain over the impact and implementation of management-initiated changes to conditions of employments such as new curriculum implementations and new educational initiatives.

33.     ACEA has represented DODEA educators in Puerto Rico for the purpose of collective bargaining since 1974. ACEA's most recent CBA with DODEA was executed in 2023 and provides that it will continue in force until July 24, 2028. That CBA covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in collective bargaining work, employee and association rights (including employees' rights to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, association-management cooperation, and mid-term bargaining procedures for management proposals on negotiable matters.

34.     Over the time that FEA, FEA-SR, and ACEA have represented DODEA education professionals, DODEA has become a pre-eminent public school district. More than two decades ago, an audit report by the General Accounting Office ("GAO") (since renamed the Government Accountability Office) recognized that "[t]he academic achievement of DOD students, as measured by their performance on standardized tests and their plans for enrolling in college, generally exceeds that of elementary and secondary students nationwide." GAO, "BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools" (2001), https://www.gao.gov/assets/gao-01-934.pdf. Since 2020, the 161 schools operated by DODEA have consistently outperformed the national average in reading and mathematics on the benchmark National Assessment of Educational Progress. *See* DODEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025) (quoting DODEA Director Beth Schiavino-Narvaez's statement that "[c]redit for this success belongs to … teachers, administrators, and staff of DoDEA," as well as "to students and their

families"), https://www.dodea.edu/news/press-releases/dod-schools-ranked-best-united-states-again-nations-report-card.

35.    Collective bargaining—which facilitates cooperative labor-management solutions to educational challenges and provides a channel for education professionals at the school level to provide input—has contributed to the success of DODEA schools. For example, FEA-SR and DODEA negotiated arrangements for the union's participation in committees such as the Continuous School Improvement Committee, which focuses on enhancing the delivery of instruction and educational practices, and the Case Study Committee, which ensures that students with special needs receive appropriate educational services. Union representatives have brought valuable expertise in education to bear on these committees' work. And that is aided by the fact that committee members selected by the union to serve in a representational capacity are afforded the rights and protections of Chapter 71, which allows them to provide candid, constructive, and at times critical feedback to support DODEA's mission without fear of reprisal.

36.    The recent implementation of DODEA's Universal/Full-Day Pre-K program also provides an illustrative example. By way of background, when DODEA introduces a new educational program, curriculum, assessment, or resource, the only opportunity for educators to provide the agency with feedback is in the union's response to a statutory notice from DODEA, which typically includes proposals concerning the impact and implementation of the policy. In such responses, FEA and FEA-SR typically provide targeted feedback from school-level educators who will be directly involved in incorporating the new program into their teaching. Upon receiving the statutory notice for the Pre-K program's rollout, FEA-SR raised numerous concerns regarding DODEA's readiness to deliver appropriate instruction and the inadequate allocation of resources. In response to this feedback, DODEA established a "Tiger Team"—a

cross-functional group of DODEA leadership, administrators, and union-selected representatives. This team successfully addressed many of the readiness concerns, developing actionable solutions that ensured the program's effective implementation, and has, at least until the Executive Order, continued to collaborate with the union.

**C.**    **FEA and FEA-SR Have Opposed Trump Administration Policies and Challenged them in Court and in Chapter 71 Grievance Proceedings**

37.    Beginning in the first Trump administration, FEA and FEA-SR have spoken out against Trump administration policies attacking federal employees and have challenged such policies in court and in grievance proceedings.

38.    In June of 2018, FEA, along with several other federal unions, brought suit in this District against President Trump, the OPM, and the OPM Director at the time, seeking to enjoin three executive orders issued by President Trump during his first administration that detrimentally affected collective bargaining rights under Chapter 71. The lawsuit was consolidated with three other federal union lawsuits challenging the executive orders. The District Court entered summary judgment for the plaintiffs in that case, although the Court of Appeals reversed on jurisdictional grounds. *See Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018), *rev'd and vacated*, 929 F.3d 748 (D.C. Cir. 2019). FEA, working with a coalition of federal unions, publicized the District Court's judgment prior to its reversal in a press release.  Shortly after taking office in 2021, President Biden rescinded those executive orders. *See* Exec. Order 14003, Protecting the Federal Workforce , 86 Fed. Reg. 7,231 (Jan. 22, 2021).

39.    Throughout President Trump's first administration and into his second administration, FEA worked with the same coalition of federal unions to speak out in opposition to Trump administration policies that harm federal workers through letters to members of

Congress, including a 2017 letter opposing the confirmation of President Trump's nominee for OPM Director, a 2019 letter to all U.S. Senators opposing the confirmation of President Trump's nominee for General Counsel of the FLRA, and a 2025 letter opposing President's illegal impoundments and unconstitutional executive orders and urging the Senate Appropriations Committee to take a variety of actions to protect the civil service and federal unions.

40.     FEA-SR has filed grievances challenging some of the second Trump administration's signature policies affecting federal employees. For example, on February 26, 2025, FEA-SR filed two bargaining-unit-wide grievances, one on behalf of classified education support professionals and the other on behalf of certified educators challenging the second Trump administration's infamous mass "Fork in the Road" e-mails originating from OPM and sent to all government employees purporting to offer a "deferred resignation program" under Chapter 71 and the parties' CBA. And on March 14, 2025, FEA-SR filed another grievance challenging the also-infamous mass "What Did You Do Last Week" e-mail sent by OPM to all federal employees, also under Chapter 71 and the parties' CBA.

41.     FEA and FEA-SR also have spoken out to oppose Trump administration policies and directives affecting federal employees, issuing statements in opposition not only to the "Fork in the Road" and "What did you do last week" directives, but also such Trump administration actions as: drastically cutting congressionally appropriated funding to federal agencies, forcing layoffs of probationary employees, preparing large-scale reductions in force ("RIFs"); attacks on Diversity, Equity, and Inclusion; and executive actions specifically targeting cultural awareness celebrations, gender identity, and certain curriculum materials and library books in public education settings.

**D.    President Trump Issues the Executive Order in Avowed Retaliation for the Protected Speech and Petitioning Activities of "Hostile Federal Unions"**

42.    On March 27, 2025, President Trump issued the Executive Order, thereby depriving the overwhelming majority of federal civil service workers of their rights under Chapter 71. *See* Erich Wagner, "Trump order aims to outlaw most government unions on 'national security' grounds," *Government Executive* (March 27, 2025), https://perma.cc/6KF7-7SJY ("All told, the agencies covered by Trump's order amounts to 67% of the federal workforce, and 75% of federal workers who are currently represented by unions.").

43.    The Executive Order is staggering in its breadth. It sweeps up four Cabinet departments in their entirety;[1] two further Cabinet departments, each with a single narrow exception;[2] dozens of agencies and subdivisions within five other Cabinet departments;[3] and seven independent agencies in their entirety.[4] It also is unprecedented. Prior to the Executive Order, no president in the nearly half-century history of Chapter 71 has ever excluded from collective bargaining an entire Cabinet department or an entire independent agency, let alone multiple ones, or so broadly excluded agency subdivisions. Rather, presidents from both major parties—Jimmy Carter, Ronald Reagan, George H.W. Bush, Bill Clinton, George W. Bush,

---

[1] The four entirely excluded Cabinet departments are: the DOD, the Department of Justice, the Department of State, and the Department of Veterans Affairs. Executive Order Section 2(b), 90 Fed. Reg. at 14,533.

[2] The two almost-entirely excluded Cabinet departments are: the Department of Energy, with the sole exception of the Federal Energy Regulatory Commission; and the Department of the Treasury, with the sole exception of the Bureau of Engraving and Printing. *Id.*

[3] Those five Cabinet departments are: the Department of Agriculture, the Department of Commerce, the Department of Health and Human Services, the Department of Homeland Security, and the Department of the Interior. *Id.* at 14,533-34.

[4] Those entirely excluded independent agencies are: the Environmental Protection Agency, the United States Agency for International Development, the Nuclear Regulatory Commission, the National Science Foundation, the United States International Trade Commission, the Federal Communications Commission, and the General Services Administration. *Id.* at 14,554.

Barack Obama, and President Trump during his first administration—issued targeted orders

excluding particular sub-agencies and agency subdivisions that are clearly engaged in sensitive

intelligence and/or national security work.[5]

---

[5] *See* Exec. Order No. 12,171, 44 Fed. Reg. 6,565 (Nov. 19, 1979) (excluding agencies and subdivisions of the DOD such as the Army Intelligence and Security Command and Defense Intelligence Agency); Exec. Order No. 12,338, 47 Fed. Reg. 1,369 (Jan. 11, 1982) (excluding intelligence and security centers and directorates of the DOD's Joint Chiefs of Staff; the DOD's Air Force Assistant Chief of Staff or Intelligence and Intelligence Service; and the Department of Energy's Office of the Assistant Secretary for Defense Programs as well as military nuclear safety offices); Exec. Order No. 12,410, 48 Fed. Reg. 13,143 (March 28, 1983) (excluding the then-recently created Joint Special Operations Command of DOD); Exec. Order No. 12,559, 51 Fed. Reg. 18,761 (May 20, 1986) (excluding the Department of Justice's Offices of Enforcement and Intelligence of the Drug Enforcement Administration as well as several offices of the United States Marshals Services); Exec. Order No. 12,666, 4 Fed. Reg. 1,921 (Jan. 12, 1989) (excluding the Federal Air Marshal Branch of the Department of Transportation, as well as units of Civil Aviation Security Inspectors with air marshal functions); Exec. Order No. 12,671, 4 Fed. Reg. 11,157 (March 14, 1989) (excluding the Office of Enforcement of the U.S. Customs Service); Exec. Order No. 12681, 54 Fed. Reg. 28,997 (July 6, 1989) (excluding several subdivisions of the National Preparedness Directorate of the Federal Emergency Management Agency ("FEMA")); Exec. Order No. 12,693, 54 Fed. Reg. 40,629 (Sept. 29, 1989) (excluding DOD's Defense Mapping Agency Reston Center); Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (March 11, 1997) (excluding the DOD's Naval Special Warfare Development Group); Exec. Order No. 13,252, 67 Fed. Reg 1,601 (Jan. 7, 2002) (excluding Department of Justice subdivisions such as INTERPOL and the Office of Intelligence and Policy Review); Exec. Order No. 13,381, 70 Fed. Reg. 37,953 (June 27, 2005) (excluding OPM's Center for Federal Investigative Services); Exec. Order 13,480, 67 Fed. Reg. 1,601 (Nov. 26, 2008) (excluding subdivisions of the then-newly created Department of Homeland Security such as the Domestic Nuclear Detection Office and the Office of Intelligence and Analysis; subdivisions of the Department of Energy such as the National Nuclear Security Administration and the Office of Intelligence and Counterintelligence; offices and subdivisions of the U.S. Coast Guard; offices and subdivisions within the then-newly created U.S. Immigration and Customs Enforcement such as the Offices of Intelligence and International Affairs; subdivisions of FEMA such as the Continuity of Operations Division and the Integrated Public Alert and Warning Systems Division; the Department of Justice's National Security Division and Bureau of Alcohol, Tobacco, Firearms, and Explosives; the Federal Aviation Administration's Office of Security and Hazardous Materials; and subdivisions of the Treasury Department such as the Office of Terrorism and Financial Intelligence and the Financial Crimes Enforcement Network); Exec. Order No. 13,760, 82 Fed. Reg. 5,325 (Jan. 12, , 2017) (excluding subdivisions of the DOD such as the U.S. Strategic Command, U.S. Cyber Command, and the Marine Special Operations Command); Exec. Order No. 13,869, 84 Fed. Reg. 18,125, (April 24, 2019) (excluding the DOD's Defense Counterintelligence and Security Agency).

44.     Nor does the Executive Order stop with these staggeringly broad and unprecedented exclusions. In Section 5, the Executive Order authorizes further exclusions by delegating to the Secretary of Transportation the authority "to issue orders excluding any subdivision of the Department of Transportation, including the Federal Aviation Administration," from Chapter 71's coverage and "suspending any provision of that law with respect to any Department of Transportation installation or activity located outside the 50 States and the District of Columbia." 90 Fed. Reg. at 14,556. And in Section 7, the Executive Order directs all agency heads to report to the President any additional agency subdivisions they determine should be excluded from Chapter 71. *Id.*

45.     Section 6 of the Executive Order directs agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the FLRA involving exceptions or arbitral awards or unfair labor practices. *Id.*

46.     Also on March 27, 2025, but before the Executive Order was publicly released, Defendant Ezell, as Acting Director of OPM, issued a memorandum providing guidance to agency leadership regarding implementation of the Executive Order. *See* Memorandum of Charles Ezell, "Guidance on Executive Order Exclusions from Federal Labor-Management Programs" (March 27, 2025) ("OPM Guidance"), https://perma.cc/V6WH-435Z. The OPM Guidance declares that Chapter 71 "will no longer apply" to the agencies and agency subdivisions listed in the Executive Order, that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions," and that the affected unions "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and

agency subdivisions covered by" the Executive Order. *Id.* at 1, 3 (alterations in original). The OPM Guidance also directs agencies to "cease participating in grievance procedures after terminating their CBAs." *Id.* at 5.

47.    The Executive Order is wholly unmoored from the narrow authority that Congress has granted the President to exclude agencies or agency subdivisions from Chapter 71 where (a) the agency or subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) the provisions of Chapter 71 "cannot be applied in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). Many, if not most, of the agencies and agency subdivisions swept up in the Executive Order's dragnet—including Cabinet departments such as  the Department of Veterans Affairs and the Department of the Treasury, and independent agencies such as the Environmental Protection Agency, the Federal Communications Commission, and the General Services Administration—do little to no national security work, much less do they have "as a *primary* function intelligence, counterintelligence, investigative, or national security work." *Id.* (emphasis added). Nor can it be reasonably said that the collective bargaining provisions of Chapter 71 "cannot be applied in a manner consistent with national security requirements and considerations" to the panoply executive departments, agencies, and agency subdivisions swept up in the Executive Order's dragnet. *Id.*

48.    The staggering and unprecedented breadth of the Executive Order—which ends collective bargaining for some two-thirds of federal civil service employees and three-quarters of those represented by unions, many if not most of whom are not engaged in national security work—belies its purported national security justification.

49.    Beyond that, the Trump administration's own statements in support of the Executive Order reveal the administration's actual motivations for extinguishing collective bargaining for the overwhelming majority of federal civil service workers—namely (a) to retaliate against federal unions by reason of their First-Amendment-protected speech and petitioning activities and chill any further such speech and petitioning by any federal unions; and (b) to facilitate the firing of civil service employees *en masse*.

50.    The Trump administration bluntly admitted the first of these motivations in a White House "Fact Sheet" purporting to justify the Executive Order. *See* The White House, "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2G-MUSH. In that document, the White House railed against "hostile Federal unions" that, in the White House's view, have "declared war on President Trump's agenda" by, for example, "filing grievances to block Trump policies." *Id.* The White House further decried "[t]he largest Federal union"—a clear reference to the American Federation of Government Employees—because it "describes itself as 'fighting back' against Trump" and "is widely filing grievances to block Trump policies." *Id.*

51.    At the same time, the White House Fact Sheet pointedly declares that "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This statement sends a clear message that that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies, while unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the

injuries those polices inflict will be punished. This message is made all the more clear by the

Executive Order's blanket exception preserving collective bargaining rights for federal agency

police, firefighters, and security guards—whose unions have supported Republicans in general

and President Trump in particular—which the Fact Sheet takes pains to trumpet: "***Law***

***Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." *Id.*

(emphasis in original).

52.    In addition, scarcely two days after the Executive Order was issued, a White

House spokesperson candidly acknowledged the motivation for the Exclusion Order in these

terms: "The goal is to stop employees in certain security-related agencies from unionizing in

ways that disrupt the president's agenda." Rebecca Davis O'Brien, "Trump Order Could Cripple

Federal Worker Unions Fighting DOGE Cuts," *New York Time*s (Mar. 29, 2025),

https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html.

53.    The Fact Sheet also reveals the administration's second motivation by

complaining about an FLRA ruling that affirmed an independent arbitrator's decision on a union

grievance that required the reinstatement of employees of the Department of Veterans Affairs

who had been wrongfully dismissed by reason of the agency's implementation of a policy from

the first Trump administration. *Id.* (referring in substance to *Dep't of Veterans Affs. Veterans*

*Benefits Admin.*, 71 F.L.R.A. 1113 (Nov. 16, 2020)).

54.    The administration's second motivation is further laid bare by the OPM Guidance,

which is largely devoted to the subject of "facilitat[ing] the separation of underperforming

employees." OPM Guidance at 3-5. To that end, the OPM Guidance directs agencies, after

"terminating their collective bargaining agreements" a "to prepare large-scale reductions in force

(RIFs)," which are to be "conduct[ed] … without regard to provisions in terminated CBAs that go beyond [statutory and regulatory] requirements." *Id.* at 5.

55.     Neither retaliating against federal unions for their speech and petitioning activities nor the desire to engage in mass firings of federal workers is a legitimate national security rationale under Section 7103(b).

56.     The Executive Order itself implicitly acknowledges that exclusion from Chapter 71 is unwarranted with respect to at least some subdivisions of excluded agencies, inasmuch as it delegates to two Cabinet secretaries the authority to restore collective bargaining to subdivisions of their agencies. Section 2(a) of the Executive Order—which lists DOD and the Department of Veterans Affairs among the many agencies excluded from Chapter 71—includes the proviso "except for any subdivisions excluded pursuant to section 4" of the Executive Order. 90 Fed. Reg. at 14,553. And Section 4, in turn, "delegate[s] authority under 5 U.S.C. § 7103(b)(1)" to the Secretaries of Defense and Veterans Affairs to "suspend[] the application" of the Executive Order's exclusion "to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of [Chapter 71]" upon their certification that the provisions of Chapter 71 "can be applied to such subdivision in a manner consistent with national security requirements and considerations." *Id.* at 14,555-56.

57.     The orders that Secretary of Veterans Affairs Doug Collins ("VA Secretary") and Defendant Hegseth issued pursuant to Section 4 of the Executive Order carry out and further demonstrate the retaliatory purpose of the Executive Order and the absence of any meaningful grounding in national security requirements and considerations for its exclusions.

58.     By order dated April 11, 2025, the VA Secretary exercised the authority delegated by Section 4 in a manner fully and admittedly consistent with the Trump

administration's retaliatory motives. *See* Dep't of Veterans Affairs, Order Suspending the

Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16,427 (April 17,

2025). Rather than suspend the Executive Order with respect to particular "subdivisions of the

agency," as Section 7103(b) provides and the Executive Order directs, the VA Secretary

pointedly did so with respect to "employees represented by" eight specified unions. *Id.* And the

agency's press secretary has admitted the rank favoritism that the administration shows toward

unions the administration considers to be complaisant and its retaliation against unions that have

exercised their right to challenge Trump administration actions that inheres in that order, stating

as follows: "The unions in the exempted units have posed no or minimal hinderance to VA

operations …. They have filed no or few grievances against VA and they have not proved an

impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE,

NNU and SEIU by contrast are using their authority under the Federal Service Labor-

Management Relations Statute to broadly frustrate the administration's ability to broadly frustrate

the administration's ability to manage the agency.'" Erich Wagner, "VA is selectively enforcing

Trump's order stripping workers of union rights," *Government Executive* (April 19, 2025)

(quoting VA Press Secretary Pete Kasperowicz), https://perma.cc/2FMX-6L33.

    59.    On April 4, 2025, forty-five members of Congress wrote to Defendant Hegseth,

urging that he "exercise [his] authority to exempt DoDEA employees from the President's

Executive Order and maintain their existing collective bargaining protections." Letter from Hon.

Jill Tokuda, Member of Congress, *et al.*, to Secretary of Defense Peter Hegesth at 1 (April 4,

2025), https://tokuda.house.gov/imo/media/doc/dod_dodea_letter.pdf. The letter stressed that

DODEA "does not have a primary function related to 'intelligence, counterintelligence,

investigative, or national security'" and further pointed out that "federal collective bargaining

protections can be applied to DoDEA in a manner consistent with national security requirements and considerations" because "DoDEA schools are not located in the frontlines of any conflict" and "DoDEA educators and personnel do not have security clearances or handle sensitive military information." *Id.* at 1-2.

60.    Defendant Hegseth did not exercise his delegated authority to exempt DODEA from the Executive Order. Rather, in an order dated April 17, 2025, Defendant Hegseth stated that Chapter 71 "can be applied … in a manner consistent with national security requirements and considerations" to "federal wage system employees in the trades" who work in four DOD subdivisions. DOD, Executive Order 14251 Certification, 90 Fed. Reg. 17,052 (April 23, 2025). Those subdivisions are the following:

"(a) Letterkenny Munition Center, US Army Aviation and Missile Command, United States Army," 90 Fed. Reg. at 17,052, which, among other things, maintains air-to-air and air-to-ground precision guided missiles stores, serves as an ammunition supply depot for all DOD armed services, and demilitarizes tactical missiles and conventional munitions, *see* https://www.jmc.army.mil/Installations.aspx?id=Letterkenny;

"(b) Air Force Test Center, Air Force Materiel Command, Department of Air Force," 90 Fed. Reg. at 17,052, which conducts research and development, testing, and evaluation of manned and unmanned aircraft for the Air Force, *see* https://www.afmc.af.mil/About-Us/Fact-Sheets/Display/Article/1614225/air-force-test-center/;

"(c) Air Force Sustainment Center, Air Force Materiel Command, Department of Air Force," 90 Fed. Reg. at 17,052, which provides depot-maintenance and supply-chain-management services, as well as operations and installation support for Air Force weapons systems ranging from fighter jets to intercontinental ballistic missiles, *see*

https://www.afmc.af.mil/About-Us/Fact-Sheets/Display/Article/2828599/air-force-

sustainment-center/; and

"(d) Fleet Readiness Center Southeast," 90 Fed. Reg. at 17,052, which provides aircraft

repair and technical services for the U.S. Navy, *see* https://frcse.navair.navy.mil/.

61.     There is no conceivable justification under Section 7103(b) for Defendant

Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—

which are primarily if not exclusively involved in national security work of the most obvious

kinds—while maintaining the Executive Order's exclusion of DODEA.

62.     Like many if not most of the other agencies and agency subdivisions swept up in

the Executive Order's dragnet, DODEA is not involved in intelligence, counterintelligence,

investigative, or national security work. Rather, it is one of two federally operated public school

systems, which provides high-quality PreK-12 education to children of uniformed and civilian

DOD personnel. Likewise, DODEA's educators—like many if not most of the other federal

employees whose rights under Chapter 71 have been extinguished by the Executive Order's

dragnet but unlike the employees whose bargaining rights have been restored by Defendant

Hegseth—are not engaged in intelligence, counterintelligence, investigative, or national security

work.

63.     Nor can it reasonably be said that continuing to apply the collective bargaining

provisions of Chapter 71 to DODEA is somehow inimical to national security requirements and

considerations. Not only is there no remotely plausible basis for maintaining that DODEA has

any meaningful connection to intelligence, counterintelligence, or national security work, but it

is risible to suppose that there are any legitimate national security concerns implicated by

collective bargaining between DODEA and the educators and education support professionals

teaching in DODEA's schools at all, much less that such collective bargaining "cannot be conducted consistent with national security requirements and considerations." The latter point is shown starkly by the fact that DODEA has been engaged in collective bargaining with unions representing its educator employees, including Plaintiffs, since the early 1970s.

### F.    The Executive Order Has Caused and Will Continue to Cause Irreparable Harm to Plaintiffs

64.     Plaintiffs FEA, FEA-SR, and ACEA—and their members—have suffered and absent injunctive relief from this Court will continue to suffer, severe and irreparable harm by reason of the Executive Order.

65.     On April 3, 2025, the Chief of DODEA's Labor Management Employee Relations Division, Alexa Rukstele—citing the Executive Order, the White House Fact Sheet, and the OPM Guidance—notified Plaintiffs that DODEA "will pause all labor relations-related activities." Notwithstanding DODEA's use of the seemingly anodyne verb "pause," DODEA has already effectively repudiated its obligations under existing CBAs that remain in force by their terms by unilaterally cancelling dues deductions, bringing collective bargaining negotiations and participation in grievance arbitration proceedings to a halt, cancelling contractual official time arrangements, unilaterally altering terms and conditions of employment, and bringing other routine labor-management interactions to a halt.

> (1)    *Contrary to Chapter 71 and its CBAs, DODEA Has Unilaterally Ceased Honoring Employees' Voluntary Authorizations to Pay Their Membership Dues Via Payroll Deduction*

66.     On or about April 7, 2025, DODEA terminated the statutorily and contractually required payroll deductions of FEA, FEA-SR, and ACEA dues from union members who have voluntarily authorized those deductions, thereby cutting off "dues payments of union members," which are the "economic lifeblood of a labor organization and normally its primary source of

income." *Loc. Union No. 5741, United Mine Workers of Am. v. NLRB*, 865 F.2d 733, 738 (6th

Cir. 1989) (quotation marks omitted). As a consequence, Plaintiffs have lost revenue and are

forced to expend their dwindling funds and resources to effectuate alternative payment

arrangements that are costly and less reliable than payroll deduction, and then seek electronic

payment authorizations for thousands of members, which in FEA's case involves seeking such

authorizations from members around the globe. *See Alachua County Educ. Ass'n v. Carpenter*,

No. 1:23CV111-MW/HTC, 2024 WL 4708983, at *2 (N.D. Fla. Nov. 6, 2024) (explaining that

unions suffered injury arising from state law's ban on payroll deduction "because it prohibits this

bargained-for method of dues deduction").

67.     Prior to DODEA's unilateral termination of payroll deductions, those deductions

accounted for 83% percent of membership dues collected by FEA. These dues make up the

overwhelming majority of FEA's income, and these funds are used to carry out all of FEA's core

activities as a labor organization, including paying staff, supporting collective bargaining and

organizing, funding the grievance and arbitration system, and providing representation to

members as well as other critical services such as assisting bargaining unit educators to navigate

the DODEA human resources and payroll systems.

68.     As a result of DODEA's decision to unilaterally stop payroll deductions, FEA has

begun costly and resource-intensive efforts to ensure that members around the world are signing

up for alternative methods for paying dues. These alternative methods are more costly to the

union and less reliable and effective than payroll deduction. Despite these efforts, as of June 2,

2025, only 48% of FEA members had opted in to an alternative method of payment.

69.     When DODEA unilaterally ceased payroll deduction, there were three remaining

pay cycles for educators at the stateside schools. FEA and FEA-SR were subsequently unable to

collect dues using an alternative pay method, leaving approximately 600 FEA-SR members who still owed over $65,000 that FEA-SR had expected to be collected through payroll deduction.

70. The termination of payroll deductions means that FEA and FEA-SR are suffering from an immediate loss of revenue while also expending more of FEA's dwindling resources on signing up members for alternative payment methods. These resources would have been used to represent and advocate for our members. Union members frequently need representation services on an on-demand basis – for example, if they need advice and counsel when called in to speak to an administrator for a disciplinary reason.

71. With fewer resources to draw on, and with those remaining resources strained because it is necessary to FEA's continued existence that substantial resources be devoted to the effort to convert members to a new dues payment system, it is inevitable that such representation work will suffer. Even if FEA were to recover its dues revenue eventually, the immediate harm to FEA and its members from such curtailment of services cannot be repaired after the fact. A subsequent restoration of FEA funds cannot, for instance, retroactively help the member who has gone into a disciplinary meeting without the counsel of their union. And restoration of revenue at a later date cannot undo the injury to FEA and FEA-SR in the eyes of members and prospective members arising from its diminished ability to help its members.

72. As a result of DODEA's decision to repudiate its contractual commitment and statutory duty to honor employees' voluntary assignment of FEA dues via payroll deduction, FEA and FEA-SR have already had to make difficult decisions about resources, including cutting down on travel to DODEA schools, located from West Point, New York to Fort Rucker, Alabama, and from South Korea and Japan to Germany, England and Belgium. These visits are a

critical part of organizing and providing services to members; they also ensure that members feel heard, represented, and connected to the union.

73.    The Administration's unilateral action to stop payroll deduction of voluntary membership dues has created a vicious cycle for FEA and its ability to carry out its core functions. FEA is expending more resources on signing up members while immediately having fewer resources to provide representational services to members, a principal reason why educators and ESPs sign up to pay dues to the union.

74.    This vicious cycle is exacerbated by the loss of collective bargaining rights, which eliminates Plaintiffs' core function. DODEA is not abiding by its obligations under its CBAs with the Plaintiffs, which makes it very difficult to convince members to pay dues. This will inevitably lead to fewer funds for the Plaintiffs and thus, even fewer services for members, making it increasingly difficult to convince them to continue to be members by signing up for alternative means of paying dues. The Executive Order and DODEA's implementation of it thus pose an existential threat to the Plaintiffs—one that goes to the core of their purpose and mission, which is to collectively bargain, represent their members, and enforce CBAs under Chapter 71.

75.    As a result of DODEA's cancelling of employees' dues payments by payroll deduction, ACEA has already experienced a drop in its projected revenue, as of the pay period ending on May 31, 2025, of $29,257.65 for the current school year. ACEA is now in the process of establishing a different arrangement for members to pay a fee to ACEA by electronic means, which adds to the union's expenses and is a drain on the union's resources while the union's usual source of operating funds has been cut off. As a result, ACEA has fewer resources to devote to its mission of advocating for the interests of its members, the main reason why educators join the union. Moreover, given that Executive Order 14251 and its implementation by

DODEA, has halted collective bargaining and associated labor relations interactions between ACEA and DODEA, it is uncertain how many of ACEA's current membership will choose to remain members of ACEA now that it is unable to engage in collective bargaining and can no longer even enforce its current CBA.

76.    Convincing DODEA educators to remain members by signing up for electronic payment systems is all the more challenging because DODEA educators have lost critical statutory protections, such as the right to engage in union activity "freely and without fear of penalty or reprisal." 5 U.S.C. § 7102. Those formerly protected rights include the right "to form, join, or assist any labor organization"; "to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities"; and "to engage in collective bargaining." The loss of these statutory protections makes joining or remaining a member of Plaintiffs FEA, FEA-SR, and ACEA riskier than it was before the Executive Order issued.

> (2)    *Contrary to Chapter 71 and its CBAs, DODEA Has Ceased Participation in Collective Bargaining Negotiations and in Contractually Required Grievance Arbitration Proceedings*

77.    Before the Executive Order issued, FEA-SR and DODEA were engaged in bargaining over successor agreements to the 2019 Certified Educator CBA and the 2010 ESP CBA. The parties had finalized an agreement as ground rules for both contracts in 2023 and subsequently reached agreement on a majority of the contract articles in both CBAs and worked with mediators from the Federal Mediation Conciliation Service to attempt to conclude the bargaining process for both CBAs. After the Executive Order issued and Ms. Rutskele sent her April 3, 2025, email "paus[ing] all labor management activities," DODEA ceased any communication with FEA-SR concerning the contract negotiations.

78.     DODEA also has ceased participating in grievance arbitration proceedings under its CBAs with FEA and FEA-SR not only with respect to grievances filed after the Executive Order under CBAs that remain in force by their terms but also with respect to grievances that arose, and have been pending, before the Executive Order issued. DODEA has claimed that by reason of the Executive Order, DODEA has no obligation to abide by its CBAs, including their provisions for the resolution of grievances, and that arbitrators have no jurisdiction to issue decisions on grievances that arose and were pending prior to the Executive Order. These actions not only amount to a repudiation of DODEA's contractual obligations but also retroactively seek to extinguish grievance claims that accrued before the Executive Order issued, including many that have already been upheld in arbitration awards.

79.     For example, FEA has been prosecuting numerous grievances on behalf of more than 800 overseas educators that seek relief from DODEA's wrongful garnishment of purported overpayments from educators' pay, and/or other failures to pay educators their rightful salaries, by reason of DODEA's chronic failure to correctly calculate their overseas employees' pay. Some of these grievances date back as far as 2011. Those grievances were all pending, in various stages of the arbitration process, when the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order. In grievance proceedings involving nearly 500 affected employees, arbitrators have issued merits awards upholding the grievances, but the grievants have yet to be made whole—either because the processes of auditing pay records that follow such merits awards have not yet concluded, or because DODEA has not yet complied with the awards, thus requiring further arbitral proceedings. Of the 493 grievants who are still waiting to made whole in accordance with merits awards, more than 200 were underpaid by as much as $125,000. The rest had their pay garnished illegally without the due process

protections required by the applicable CBA and by the Debt Collection Act, 5 U.S.C. § 5514. The remaining grievances have either not yet been submitted to arbitration or are the subject of ongoing arbitration proceedings.

80.     DODEA attorneys have refused to further participate in arbitral proceedings on such grievances, have told arbitrators that they have no jurisdiction over grievances predating the Executive Order, and have also told arbitrators that FEA is no longer the representative of the employees. In at least three such proceedings, with upcoming arbitration hearings or briefing deadlines at the time the Executive Order issued, DODEA went so far as to communicate with arbitrators *ex parte* purporting to cancel the arbitral proceedings and the arbitrators' contracts, and making clear that DODEA would not pay for any further contracted services performed by the arbitrators.

81.     FEA-SR also has 36 pay grievances on behalf of 122 bargaining unit employees that are in various stages of the arbitration process and an additional 10 grievance cases that have not yet been scheduled for arbitration; 7 of those are on behalf of multiple employees and the remaining three are individual grievances. All of those grievances were filed before the Executive Order issued, and all of course arose from CBA rights and conduct predating the Executive Order.

82.     Given DODEA's refusal to honor its contractual obligations to engage in the grievance-resolution process under CBAs that remain in force to this day, DODEA has plainly repudiated its CBAs and cannot be expected to honor its contractual obligations by complying with any arbitration awards issued in grievances arising prior to the Executive Order, including the awards already issued in pending cases involving 493 grievants who have yet to be made whole, or with any arbitral awards that may yet be issued resolving grievances arising under its

CBAs prior to or after the issuance of the Executive Order. DODEA's repudiation of its contractual obligations is particularly devastating to those grievants whose grievances arose from DODEA actions outside the limitations periods applicable in any other forum in which relief could be sought, such as the U.S. Court of Claims (for compensation claims under the Tucker Act) or the Merit Systems Protection Board (for adverse action claims under Civil Service Reform Act). Those grievants constitute the majority of the more than 800 whose grievances were pending when the Executive Order issued. The hundreds of FEA and FEA-SR members with pay and other grievances that arose and were brought under CBAs in force and effect when the Executive Orde issued—including the hundreds who have had their grievances upheld by arbitrators but have not been made whole—will therefore be irreparably harmed absent relief from this Court.

> (3)    *Contrary to Chapter 71 and its CBAs, DODEA Has Unilaterally Instituted a Reorganization Altering Employees' Terms and Conditions of Employment without Bargaining Over the Impact and Implementation of its Actions*

83.    DODEA also has unilaterally instituted a reorganization that alters employees' terms and conditions of employment in contravention of its duty to bargain with FEA, FEA-SR, and ACEA over the impact and implementation of such changes under both the collective-bargaining agreements and the CBAs in force between DODEA and each of the Plaintiffs and under Chapter 71.

84.    On May 22, 2025, employees at DODEA schools received an e-mail from DODEA Director Beth Schiavino-Narvaez announcing that in connection with a Department of Defense "optimization of its civilian workforce," DODEA was implementing a "Future-Ready DoDEA (FRD) initiative." While the e-mail uses euphemisms like "workforce shaping efforts" and "a strategic plan to streamline and improve student services," its clear import is that this

reorganization will eliminate positions for the 2025-2026 school year. Indeed, the email ends with the following warning: "As part of FRD, DoDEA will offer the Voluntary Early Retirement Authority (VERA) and a Voluntary Separation Incentive Payment (VSIP) to eligible employees impacted by the transformation efforts while working to identify placement or job opportunities for affected employees."

85.    On the evening of May 22, 2025, Ms. Rukstele sent an e-mail to all Educational Technologists, Speech Assessors, Special Education Assessors, and Automation Clerks working for DODEA. The e-mail tells recipients that their positions are "impacted by" the FDR initiative and that DODEA is "working to identify placement and job opportunities for affected employees," but that "[t]his does not guarantee that you will not be involuntarily separated from your position." The e-mail goes on to state that the recipients' positions are "eligible for" VERA and VSIP, provided that the recipient meets the eligibility requirements for those programs.

86.    On May 27, 2025, Amy Bower, Chief of DODEA's Human Resources Division, sent a memorandum to the affected employees DODEA-wide explaining the VERA and VSIP options and eligibility criteria and setting a June 2, 2025, deadline for applications for early retirement and voluntary separation.

87.    On June 10, 2025, DODEA sent notices of management-directed reassignments to some of the educators affected by the reorganization. Some of those reassignment notices require relocation to worksites that are far distant from the employees' current duty stations that would require Permanent Change of Station Orders. The notices are dated June 9, 2025, and they set a June 11, 2025, deadline for affected employees either accept or decline the reassignments.

88.    DODEA's announcement that eligible employes affected by the reorganization can request early retirement and its reassignment notices require affected employees to make

significant life and career decisions on an extremely short deadline, which exerts pressure on those employees to choose early retirement or reassignment under onerous conditions, rather than face potential termination.

89.    The reorganization was announced and is being implemented in violation of DODEA's obligation to bargain with FEA, FEA-SR, and ACEA over the impact and implementation of the reorganization. Each of the CBAs in force between DODEA and the Plaintiffs requires DODEA to bargain over the impact and implementation of changes to terms and conditions of employment arising from management decision. Each of the Plaintiffs timely sent bargaining requests to DODEA and in each case DODEA responded with an identically worded email saying that the request would be "held in abeyance" pending the outcome of litigation over the Executive Order.

> (4)    *Contrary to its CBAs with Plaintiffs, DODEA Has Cancelled all Official Time Arrangements*

90.    Each of the CBAs in force between DODEA and the Plaintiffs has provisions requiring that DODEA allow certain union officials to use official time to conduct representation activities as well as provisions providing for the Plaintiffs' use of office space for such activities.

91.    On April 29, 2025, Ms. Rukstele notified Plaintiffs FEA, FEA-SR, and ACEA that "**official time**"—a term referring to contractual arrangements that allow union officials to perform representational functions while on duty status—"**is no longer authorized for any purpose**" and directed that "all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school" and must "promptly vacate any office space used by the union/association."

92.    The loss of official time has impaired Plaintiffs' ability to carry out their representation of DODEA educators and increased their costs due to the need to move and store

their union records. Without official time, union business and representational functions will have to be performed outside of duty hours, which will create significant delays in the provision of services to members who may, for example, be facing a disciplinary interview or who need advice when faced with management directives that contravene the CBA. For FEA, the loss of official time is particularly harmful as it is a global organization representing members in time zones across the world. Consequently, official time has been integral to FEA's ability to conduct its business and representational functions in a timely manner.

> (5)  *Contrary to its CBAs and Chapter 71, DODEA Has Refused to Honor Employees' Rights to Have a Union Representative During Investigatory Interviews*

93.     Each of the CBAs in force between DODEA and the Plaintiffs has provisions that give employees the right to have a union representative present at any interview that could lead to discipline or discharge of the employee.  And Chapter 71 mandates that an exclusive representative shall be given the opportunity to be represented at any examination of an employee in the unit by a representative of the agency in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary action and requests representation.  *See* 5 U.S.C. § 7114(a)(2)(B). (These rights are often referred to as "*Weingarten* rights," after the Supreme Court's decision in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251 (1975).)

94.     Following the Executive Order's issuance, DODEA has refused to allow employees to have a union representative present during any such meetings, regardless of whether they are held during the duty day or not.

> (6)  *Contrary to its CBA with ACEA, DODEA's Implementation of the Executive Order Has Stymied the Operation of the CBA's Sick Leave Bank*

95.     The CBA currently in force between DODEA and ACEA established an emergency sick leave bank to provide temporary assistance to employees who are incapacitated

or are required to attend to a family member's medical emergency or serious medical condition. To participate in the leave bank, bargaining unit members donate leave time and can request leave time from the bank in emergencies. The bank is administered by a committee consisting of two union-appointed employees and one DODEA representative, which meets to decide whether to grant participating employees' requests to draw on the leave bank when they or their family members are facing medical emergencies. The sick leave bank currently has more than 13,000 donated hours.

96.    Shortly before Ms. Rutskele sent the April 3, 2025, e-mail announcing that DODEA "will pause all labor-relations activities," ACEA Vice-President Janet Lopez wrote to DODEA's Caribbean Community Superintendent, Andrew Rynberg, as the official responsible for appointing the agency representative to the committee that manages employee requests for hours from the leave bank, requesting a meeting of the committee because ACEA had received requests for leave hours from three bargaining unit employees who were experiencing medical emergencies. In the wake of Ms. Rutskele's e-mail "paus[ing] all labor-relations activities," that request went unfulfilled, leaving the three employees, who were in the midst of medical emergencies, without any way to obtain leave hours from the bank to which they had contributed.

> (7)    *DODEA's Various Repudiations of its CBAs with the Plaintiffs Are Causing and Unless Enjoined Will Continue to Cause Plaintiffs and Their Members Irreparable Harm*

97.    DODEA's repudiation of its CBAs by reason of the Executive Order have caused—and, absent relief from this Court, will continue to cause—grave and irreparable harm to Plaintiffs and their members. Absent relief from this Court, Plaintiffs' members will lose their contractual and statutory rights and remedies under CBAs that were in force at the time the

Executive Order issued and that continue in force by their terms or, including remedies for grievances predating the Executive Order.

98.     Nor will Plaintiffs and their members have any recourse to the FLRA. FLRA case law holds that once an agency has been excluded from Chapter 71 under Section 7103(b), "the Authority has no jurisdiction to decide" union unfair labor practice complaints. *U.S. Attorney's Off. S. Dist. of Texas Houston*, 57 F.L.R.A. 750, 750 (Apr. 25, 2002). On April 4, 2025, the FLRA issued an order in a years-old unfair labor practice proceeding initiated by FEA, that cites the *U.S. Attorney's Office* decision and directs FEA to show cause why, in light of the Executive Order, "the Authority should not dismiss this matter for lack of jurisdiction." The FLRA has issued identical orders to other federal unions with pending cases before the FLRA. On April 18, 2025, FEA responded that it considers the Executive Order to be unlawful on the same statutory and constitutional grounds underlying this pleading, and that it would therefore be more appropriate for the FLRA to stay the matter pending the outcome of litigation challenging the Executive Order. DODEA, in turn, replied to the FEA's response on April 30, 2025, taking the position that by reason of the Executive Order, the FLRA "lacks jurisdiction to stay this matter and hold it in abeyance as requested by the Union." On June 10, 2025, the FLRA placed that proceeding in abeyance. The FLRA also has responded to unfair labor practice charges filed after the Executive Order stating that action would be deferred by reason of the Executive Order.

99.     By reason of the Executive Order, the OPM Guidance, and DODEA's implementation of both, Plaintiffs are losing revenue and are bereft of their core functions as unions. They have lost their status as collective bargaining representatives chosen by unit employees, and with it the ability to negotiate CBAs or even enforce their existing CBAs through contractually agreed-upon grievance procedures. And they have lost recourse to the FLRA for

unfair labor practices and other labor-management disputes within the FLRA's jurisdiction. The loss of these core union functions causes irreparable injury to the Plaintiffs and to Plaintiffs' members, who have lost their statutory and contractual rights and protections—including, in hundreds of cases, their pending grievances arising from CBA violations long predating the Executive Order, which are in the process of being retroactively nullified.

## CLAIMS FOR RELIEF

### COUNT ONE
### *ULTRA VIRES* ACTION IN VIOLATION OF THE SEPARATION OF POWERS
#### (All Plaintiffs v. Defendants Trump, Ezell, and OPM)

100.    Plaintiffs incorporate paragraphs 1–99 above by reference as if fully set forth herein.

101.    Under the authority granted by Congress in 5 U.S.C. § 7103(b)(1), agencies or subdivisions thereof may only be excluded from Chapter 71 if two narrow conditions are met: (a) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

102.    From the enactment of Chapter 71 through the Trump administration's first term, the practice of every president who has invoked Section 7103(b) confirms the narrowness of the President's exclusion authority: each applied Section 7103(b) judiciously, targeting only those portions of Cabinet departments and independent agencies that clearly have a primary function of performing intelligence, counterintelligence, investigative, or national security work,

103.    The Executive Order—which excludes 75% of federal employees heretofore represented by federal unions under Chapter 71 and 67% of federal civil service employees overall—is wholly unmoored from Section 7103(b)'s narrow conditions. No limiting principle

consistent with Section 7103(b)'s conditions can justify the Executive Order's staggeringly broad sweep, which takes in agencies and subdivisions including the Bureau of Land Management, the Environmental Protection Agency, and, by reason of the Executive Order's exclusion of the entirety of DOD, DODEA's PreK-12 schools, especially when coupled with the Executive Order's blanket exemption for agency law enforcement units. The President's attempt to press the narrow authority granted by Section 7103(b) into the service of extinguishing collective bargaining for the overwhelming majority of federal employees—vast swathes of whom, like DODEA educators, perform no national security work—amounts to an effective nullification of the comprehensive collective bargaining system established by Congress.

104.    Wholly apart from the Executive Order's staggering overbreadth, the White House's own admissions betray the pretextual nature of the order's purported national security justification. The White House has bluntly admitted that the Executive Order's purpose is both (a) to harm and punish "hostile Federal unions" for voicing opposition to Trump administration policies and challenging Trump administration policies by petitioning for redress of the injuries inflicted by those policies through the courts and through collectively bargaining grievance proceedings; and (b) to facilitate the mass firing of federal employees. Neither of these purposes is legitimate under Section 7103(b).

105.    Because the Executive Order uses the narrow authority granted by Section 7103(b) to upend Congress's comprehensive framework for collective bargaining among federal agencies, and because the Executive Order does so for venal and retaliatory reasons under the pretext of national security, the Executive Order is *ultra vires* and violates the Constitution's separation of executive from legislative powers.

**COUNT TWO:**
**VIOLATION OF THE FIRST AMENDMENT**
**(All Plaintiffs v. All Defendants)**

106.    Plaintiffs incorporate paragraphs 1–105 above by reference as if fully set forth herein.

107.    The First Amendment to the United States Constitution protects against government actions "abridging the freedom of speech" and "the right of the people … to petition the Government for a redress of grievances."

108.    FEA and FEA-SR have exercised their First Amendment rights to voice opposition to Trump administration policies that harm the federal employees they represent and to petition for redress of those harms through recourse to the courts and grievance proceedings governed by Chapter 71.

109.    The Executive Order was avowedly issued in retaliation for the protected speech and petitioning activities by federal unions—including FEA and FEA-SR—who have opposed Trump administration policies, and it aims to chill the protected speech of all federal unions going forward. The White House's Fact Sheet baldly admitted this motivation. That document justified the Executive Order on the basis of its assertions that "Federal unions have declared war on President Trump's agenda," that one such union "describes itself as 'fighting back' against Trump," and that such unions have filed grievances seeking relief from Trump administration policies.

110.    The White House's Fact Sheet further makes clear that the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies and punish unions that express dissent from Trump administration policies and "fight[] back'" *id.*, against those policies by petitioning the government for redress from the injuries those polices inflict. The Fact Sheet

42

declares, "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* This message that unions supporting Trump policies will receive favor and those opposing Trump policies will receive punishment is reinforced by the Executive Order's blanket exception preserving collective bargaining rights for federal agency police, firefighters, and security guards—whose unions have supported Republicans in general and President Trump in particular—which the Fact Sheet highlights: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain." *Id.*

111.     The Executive Order's purpose and effect is to harm and punish federal unions by reason of their First-Amendment-protected speech and petitioning and to chill protected activity by all federal unions going forward.

112.     The OPM Guidance, and Secretary Hegseth's Executive Order 14251 Certification all carry out and share in the Executive Order's retaliatory purpose and effects.

## COUNT THREE:
### VIOLATION OF THE FIFTH AMENDMENT'S PROTECTIONS AGAINST THE GOVERNMENT'S ANNULMENT OF VESTED RIGHTS ARISING FROM THE GOVERNMENT'S OWN CONTRACTS
### (All Plaintiffs v. All Defendants)

113.     Plaintiffs incorporate paragraphs 1–112 above by reference as if fully set forth herein.

114.     The Fifth Amendment of the United States Constitution protects against deprivations of property "without due process of law" and provides that "private property" shall not be "taken for public use, without just compensation."

115.     Collective bargaining agreements entered into pursuant to Chapter 71 are contracts that bind federal agencies and unions representing their employees. *See* 5 U.S.C. §§ 7114(c)(3); 7116. Such "[v]alid contracts are property, whether the obligor be a private

individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934). As such, contracts with the federal government are protected by the Takings Clause. *Id.*

116.    The Fifth Amendment's Due Process Clause also protects against the government's retroactive abrogation of its contracts. Where Congress has "the power to authorize" contracts, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Lynch*, 292 U.S. at 579. *See also Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

117.    The Executive Order and the OPM Guidance seek to nullify CBAs and extinguish vested rights under them such as pending grievances over actions predating the Executive Order—including FEA's unresolved pay grievances on behalf of approximately 800 educators and ACEA's sick leave bank—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their vested rights under CBAs and thus their constitutionally protected property interests in CBAs lawfully entered into with DODEA. And they do so with no legitimate public purpose or rational justification. The Executive Order and OPM Guidance therefore constitute unlawful takings and violate the Fifth Amendment's guarantee of substantive due process.

## COUNT FOUR:
## VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE OF EQUAL PROTECTION OF THE LAWS
### (All Plaintiffs v. All Defendants)

118.    Plaintiffs incorporate paragraphs 1–117 above by reference as if fully set forth herein.

119.    The due process guarantee of the Fifth Amendment to the United States Constitution includes a guarantee of equal protection. *See United States v. Windsor*, 570 U.S. 744, 769–70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

120.    "The Constitution's guarantee of equality 'must at the very least mean that a bare … desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534–35 (1973)).

121.    A "bare … desire to harm a politically unpopular group" is precisely what motivated the Executive Order's exclusion of 75% of union-represented employees across multiple Cabinet departments and independent agencies, while providing a blanket exception for agency police and firefighters, whose unions have supported President Trump. This conclusion is all the more inescapable given the White House's statements admitting that the purpose of the order is to harm and punish federal unions that have voiced opposition to Trump administration policies and petitioned the government for redress from those policies.

## COUNT FIVE:
## VIOLATION OF THE FIFTH AMENDMENT'S GUARANTEE
## OF PROCEDURAL DUE PROCESS
### (All Plaintiffs v. All Defendants)

122.    Plaintiffs incorporate paragraphs 1–121 above by reference as if fully set forth herein.

123.    The Fifth Amendment's protection against deprivations of property "without due process of law" requires, at a minimum, notice and an opportunity to be heard before the government may deprive a person of property.

124.    "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch*, 292 U.S. at 579.

125.    The Executive Order and the OPM Guidance seek to retroactively nullify CBAs and extinguish pending grievances over actions predating the Executive Order—such as FEA's approximately 800 unresolved pay grievances on behalf of DODEA educators—as well as any that might be filed on or after March 27, 2025. These actions deprive Plaintiffs and their members of their constitutionally protected property interests in CBAs lawfully entered into with DODEA, and they do so without having afforded Plaintiffs any notice or opportunity to be heard in violation of the Fifth Amendment's guarantee of procedural due process. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

## COUNT SIX
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:
### ARBITRARY AND CAPRICIOUS AGENCY ACTION
#### (All Plaintiffs v. Defendants Hegseth and DOD)

126.    Plaintiffs incorporate paragraphs 1–125 above by reference as if fully set forth herein.

127.    Under the APA, a reviewing court "shall … hold unlawful and set aside agency action" that is "arbitrary and capricious." 5 U.S.C. § 706(2)(A).

128.    An agency's decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

129.    Defendant Hegseth provided no explanation of his failure—in the face of a letter from members of Congress cogently explaining that the exclusion of DODEA from collective bargaining is not justified under Section 7103(b)—to suspend the Executive Order with respect to DODEA while suspending the Executive Order for a subset of employees working in four DOD subdivisions working on weapons systems and munitions. Defendant Hegseth entirely failed to consider an important aspect of the problem, relied on factors which Congress has not intended it to consider, while offering no explanation whatsoever for his action.

130.    Moreover, there is no conceivable legal justification under Section 7103(b) for Defendant Hegseth to preserve collective bargaining for a subset of employees in four DOD subdivisions—which are primarily if not exclusively involved in national security work involving DOD weapons systems and munitions—while maintaining the Executive Order's exclusion of DODEA. DODEA does not perform intelligence, counterintelligence, investigative, or national security. Rather, DODEA operates high-quality public schools serving the dependents of uniformed and civilian DOD personnel. It follows from this fact that collective bargaining manifestly *can* be conducted in a manner consistent with national security requirements and considerations, as confirmed by DODEA's long history of mutually productive collective bargaining with Plaintiffs under Chapter 71.

131.    Defendant Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA or even explain that failure is arbitrary and capricious.

**COUNT SEVEN**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:**
**AGENCY ACTION CONTRARY TO LAW**
**(All Plaintiffs v. Defendants Hegseth and DOD)**

132.     Plaintiffs incorporate paragraphs 1–131 above by reference as if fully set forth herein.

133.     Under the APA, a reviewing court "shall … hold unlawful and set aside agency action" that is "contrary to law." 5 U.S.C. § 706(2)(A).

134.     Section 7103(b) provides no lawful justification for the continued exclusion of DODEA from Chapter 75. DODEA performs no intelligence, counterintelligence, investigative, or national security. Rather, it provides high-quality PreK-12 education opportunities to children of civilian and uniformed employees of DOD. It follows from this fact that collective bargaining manifestly *can* be conducted in a manner consistent with national security requirements and considerations, as confirmed by DODEA's  long history of stable and mutually productive collective bargaining under Chapter 71. Defendant Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA is contrary to law.

135.     Defendant Hegseth's failure to exercise his delegated authority under Section 4 of the Executive Order to suspend the Executive Order's exclusion of DOD insofar as it applies to DODEA also is contrary to law because the Executive Order is *ultra vires* the President's narrow statutory authority and violates the separation of powers, the First Amendment's protection of speech and petitioning, the Fifth Amendment's guarantee of equal protection of the laws, and the Fifth Amendment's guarantee of procedural and substantive due process as well as its protection against unlawful government takings of property.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for the following relief:

(a)     a declaratory judgment that:

      i.   the Executive Order, the OPM Guidance, and their nullification of Plaintiffs' statutory and contractual rights, are *ultra vires*, in violation of the separation of powers, in violation of the First Amendment's protection of speech and petitioning activities, in violation of the Fifth Amendment's guarantee of equal protection of the laws, and in violation of the Fifth Amendment's protection against unlawful takings and its guarantee of substantive due process; and

      ii.  Defendant Hegseth's failure to suspend application of the Executive Order with respect to DODEA or to explain that failure violates the Administrative Procedure Act;

(b)     preliminary and permanent injunctive relief that:

      i.   prohibits the Defendants and their agents and successors from implementing or otherwise giving effect to the Executive Order and the OPM Guidance with respect to Plaintiffs and their members; or in the absence of such relief

      ii.  sets aside Defendant Hegseth's April 23, 2025, Executive Order 14251 Certification insofar as it failed to suspend the Executive Order as to DODEA and directs Defendant Hegseth to address the question of whether suspending the Executive Order as to DODEA is warranted under U.S.C. § 7103(b).

(c) an order granting Plaintiffs attorney's fees and costs; and

(d) an order granting such other relief as this Court may deem just and proper.

DATED: June 21, 2025                    Respectfully submitted,


/s/Jason Walta
Jason Walta
Alice O'Brien*
Philip Hostak**
Caitlin Rooney**
National Education Association
1201 16th Street NW
Washington, DC 20036
(202) 822-7035
jwalta@nea.org
phostak@nea.org
crooney@nea.org

*Attorneys for Plaintiffs*

\*Application for admission *pro hac vice*
forthcoming

\*\*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2025, a true copy of the foregoing First Amended Complaint for Declaratory and Injunctive Relief was filed electronically filed with the Clerk of Court using the CM/ECF system, and, because no counsel has yet appeared on behalf of the Defendants, was sent by certified U.S. Mail to each of the Defendants and to the United States Attorney General and the United States Attorney for the District of Columbia at the following addresses:

Donald J. Trump
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Peter Hegseth
1000 Defense Pentagon
Washington, DC 20301

United States Department of Defense
1400 Defense Pentagon
Washington, DC 20301

Charles Ezell
1900 E Street NW
Washington, DC 20415

United States Office of Personnel
    Management
1900 E Street NW
Washington, DC 20415

Jeanine Ferris Pirro
Interim United States Attorney for the
    District of Columbia
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530

Pamela Bondi
United States Attorney General
950 Pennsylvania Ave., NW
Washington, D.C. 20530


/s/Jason Walta
Jason Walta

51