**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

FEDERAL EDUCATION
ASSOCIATION, *et al.*,

     *Plaintiffs,*

v.

DONALD J. TRUMP, *et al.*,

     *Defendants.*

Civil Action No. 1:25-cv-1362

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

Table of contents ................................................................................................................ ii

Table of authorities ........................................................................................................... iii

Introduction ........................................................................................................................1

I.  Statement of Facts .......................................................................................................2

    A.  Chapter 71 Has Provided a Sound, Carefully Calibrated Basis for Federal Sector
        Labor Relations for Nearly Half a Century.........................................................2

    B.  Plaintiffs Have Had Stable and Mutually Beneficial Relationships with DODEA
        for Decades ........................................................................................................5

    C.  FEA and FEA-SR Have Opposed Trump Administration Policies and Challenged
        them in Court, Before Congress, and in Chapter 71 Grievance Proceedings ....................9

    D.  President Trump Issues EO 14,251 in Avowed Retaliation for the Protected
        Speech and Petitioning Activities of "Hostile Federal Unions" ......................10

    E.  EO 14,251 Has Caused and Will Continue to Cause Irreparable
        Harm to Plaintiffs ............................................................................................16

II.  Argument ...................................................................................................................27

    A.  This Court Has Jurisdiction Over Plaintiffs' Challenge to EO 14,251
        and to its Implementation and Enforcemeent ..................................................27

    B.  The Preliminary Injunction Factors Decisively Weigh in Favor of a Preliminary
        Injunction .........................................................................................................29

        1.  Plaintiffs Are Likely to Succeed on the Merits of their Constitutional
            Challenges to EO 14,251 ......................................................................29

            (a)  EO 14,251 is *Ultra Vires* and Violates the Separation of Powers ........................30

            (b)  EO 14,251 Violates the First Amendment ........................................29

            (c)  EO 14,251 Violates the Equal Protection Guarantee of the Fifth
                Amendment ..........................................................................40

            (d)  EO 14,251 Violates the Fifth Amendment's Protections Against Takings
                and Against the Deprivation of Property Without Due Process of Law ..............41

        2.  Plaintiffs and Their Members Are Suffering Irreparable Harm ................................42

3.  Restoring the Longstanding *Status Quo* of Chapter 71
Coverage Harms Neither the Government Nor the Public Interest ...........................45

Conclusion ...............................................................................................................................45

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Al Otro Lado v. Wolf*, 952 F.3d 999 (9th Cir. 2020) .................................................45

*Am. Fed'n of Gov't Emps. v. Nicholson,* 475 F.3d 341 (D.C. Cir. 2007) ...................28

*Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018),
    *rev'd and vacated*, 929 F.3d 748 (D.C. Cir. 2019).........................................................9

*Am. Fed'n of Gov. Emps. v. Trump*, No. 25-CV-03070, 2025 WL 17554
    (N.D. Cal. Jun. 24, 2025) ......................................................................................*passim*

*Am. Foreign Serv. Ass'n v. Trump*, No. CV 25-1030, 2025 WL 1387331
    (D.D.C. May 14, 2025) .................................................................. 1,36,37,45

*Am. Foreign Serv. Ass'n, v. Trump*, No. 25-5184, 2025 WL 1742853
    (D.C. Cir. June 20, 2025) ..........................................................................................1

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
    897 F.3d 314 (D.C. Cir. 2018) .................................................................................29

*Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)....................................................38

*BE&K Constr. Co. v. NLRB*, 536 U.S. 516 (2002)......................................................38

*Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008) .......................................................1

*Berrigan v. Sigler*, 499 F.2d 514 (D.C. Cir. 1974) ......................................................1

*Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)..............................................................40

*Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)......................36,37

*Cherokee Nation of Okl. v. Leavitt*, 543 U.S. 631 (2005) ..........................................42

*Clinton v. City of New York*, 524 U.S. 417 (1998)......................................................36

*Cole v. Young*, 351 U.S. 536 (1956) ................................................................ 30,31,37

*Dart v. U.S.*, 848 F.2d 217 (D.C. Cir. 1988) ..............................................................37

*Dep't of Agriculture v. Moreno*, 413 U.S. 528 (1973)................................................41

*Dep't of Veterans Affs.*, 71 F.L.R.A. 1113 (Nov. 16, 2020)........................................15

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................39,43

**Cases—continued**

*Franks Bros. Co. v. NLRB*, 321 U.S. 702 (1944) ........................................................44

*Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016) ...................................39,40

*Int'l Union of Elec., Radio & Mach. Workers v. NLRB*,
    426 F.2d 1243 (D.C. Cir. 1970) .................................................................44

*Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018) ...........................................38

*Lynch v. U.S.*, 292 U.S. 571 (1934) ......................................................................41

*Mills v. D.C.*, 571 F.3d 1304 (D.C. Cir. 2009) ....................................................38

*Mountain States Legal Found. v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002) ...............36

*Nat'l Treasury Emps. Union v. FLRA*, 414 F.3d 50, 53 (D.C. Cir. 2005) ...............5

*Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563
    (D.C. Cir. May 16, 2025) .....................................................................1,43

*Nat'l Treasury Emps. Union v. Trump*, No. CV 25-0935, 2025 WL 1218044
    (D.D.C. Apr. 28, 2025) ..........................................................................1

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................................29

*NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395 (1952) .......................................4

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014) ...........42

*Simms v. D.C.*, 872 F. Supp. 2d 90 (D.D.C. 2012) ..............................................45

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011) ........................45

*Turgeon v. FLRA*, 677 F.2d 937 (D.C. Cir.1982) .................................................29

*Trump v. Hawaii*, 585 U.S. 667 (2018) ...............................................................38

*U.S. Attorney's Off.*, 57 F.L.R.A. 750 (Apr. 25, 2002) .........................................28

*U.S. Dep't of the Air Force*, 66 F.L.R.A. 589 (Apr. 20, 2012) ..............................28

*U.S. v. Windsor*, 570 U.S. 744 (2013) ..............................................................40,41

*U.S. v. Winstar Corp.*, 518 U.S. 839 (1996) ........................................................42

*Welch v. Ciampa*, 542 F.3d 927 (1st Cir. 2008) ...................................................40

**Cases—continued**

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..................................35

**Statutes**

5 U.S.C. § 7101 ..................................................................................................3,31

5 U.S.C. § 7101(b) ............................................................................................2,4,32

5 U.S.C. § 7101(a)(1)(A)-(C) ...................................................................................3

5 U.S.C. § 7102 ..................................................................................................3,19

5 U.S.C. § 7102(2) ...................................................................................................3

5 U.S.C. § 7103(a)(2)(B)(v) .....................................................................................5

5 U.S.C. § 7103(a)(3) ...............................................................................................5

5 U.S.C. § 7103(a)(14)(c) .........................................................................................5

5 U.S.C. § 7103(b)(1) .......................................................................................*passim*

5 U.S.C. § 7104 .......................................................................................................4

5 U.S.C. § 7105(a)(2)(A) ........................................................................................27

5 U.S.C. § 7105(a)(2)(A)-(I) ....................................................................................4

5 U.S.C. § 7105(a)(2)(E) ........................................................................................27

5 U.S.C. § 7105(a)(2)(G) ........................................................................................27

5 U.S.C. §7105(a)(2)(H) .........................................................................................27

5 U.S.C. § 7106(a) ...................................................................................................4

5 U.S.C. § 7106(b)(2) and (3) ..................................................................................4

5 U.S.C. § 7111(a) ...................................................................................................3

5 U.S.C. § 7111(b) ...................................................................................................3

5 U.S.C. § 7114(a)(4) ...............................................................................................3

5 U.S.C. § 7116(a) and (b) .......................................................................................4

5 U.S.C. § 7116(b)(7)(A) .........................................................................................5

**Statutes—continued**

5 U.S.C. § 7117(a)(2) ........................................................................................5

22 U.S.C. § 4103(b) ........................................................................................37

29 U.S.C. § 153 ................................................................................................4

29 U.S.C. § 158(a) and (b) ..............................................................................4

29 U.S.C. § 157 ................................................................................................4

29 U.S.C. § 159(a) ...........................................................................................3

29 U.S.C. § 160 ................................................................................................4

29 U.S.C. § 163 ................................................................................................5

Federal Service Labor-Management Relations Statute, codified as Chapter 71 of
 Title 5 of the U.S. Code .............................................................................1

Homeland Security Act of 2002, Pub. L. 107-296 (2002) ............................34

National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. § 151 *et seq.* ...............................11

National Security Act of Act of 1947, Pub. L. 235, 61 Stat. 496 (1947) ....................................11

**Executive Branch Materials**

Exec. Order 10,988, 27 F. Reg. 551 (Jan.17, 1962) ........................................2

Exec. Order 11,491, 34 Fed. Reg. R 17,605 (Oct. 31, 1969) ..........................2

Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 19, 1979) ...........................................

Exec. Order 13,480, 73 Fed. Reg. 73,991 (Nov. 26, 2008) ...............................................

Exec. Order 14,251, Exclusions from Federal Labor-Management Programs,
 90 Fed. Reg. 14,553 (March 27, 2025) ...........................................................*passim*

Government Accounting Office, "BIA and DOD Schools: Student Achievement
 and Other Characteristics Often Differ from Public Schools" (2001),
 https://www.gao.gov/assets/gao-01-934.pdf .................................................

President's Study Committee on Labor-Management Relations in the Federal
 Service: Report and Recommendations (August 1969),
 https://perma.cc/PY4F-AVQM ....................................................................2

**Executive Branch Materials—continued**

The White House, "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2G-MUSH ............................ *passim*

Report of the President's Task Force on Employee-Management Relations in the Federal Service: A Policy for Employee- Management Cooperation in the Federal Service (Nov. 30, 1961), https://perma.cc/GBV8-MUE3 ........................................... 2

U.S. Dep't of Defense, Agency Financial Report Fiscal Year 2024, https://comptroller.defense.gov/Portals/45/Documents/afr/fy2024/DoD_FY24 _Agency_Financial_Report.pdf ............................................................................... 22

U.S. Dep't of Defense Education Activity, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025), https://perma.cc/YC24-G3MV ............................................................................... 8

U.S. Dep't of Veterans Affairs, Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16,427 (April 17, 2025) ................... 16

**Legislative Materials**

124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) ................................................. 3,32

**Other Authorities**

Darren W. Stanhouse, *Ambition and Abdication: Congress, the Presidency, and the Evolution of the Department of Homeland Security*, 29 N.C. J. Int'l L. & Com. Reg. 691 (2004) ........................................................................................ 34

Erich Wagner, "Trump order aims to outlaw most government unions on 'national security' grounds," *Government Executive* (March 27, 2025), https://perma.cc/6KF7-7SJY ............................................................................... 10

Erich Wagner, "VA is selectively enforcing Trump's order stripping workers of union rights," *Government Executive* (April 19, 2025), https://perma.cc/2FMX-6L33 ............................................................................... 12

Fraternal Order of Police Press Release: FOP Endorses Trump! (Sept. 6, 2024), https://perma.cc/D498-5GEE ............................................................................... 14

Fraternal Order of Police Press Release: Fraternal Order of Police Endorses Trump!! (Sept. 16, 2016), https://perma.cc/NWZ3-3G8F ................................... 14

Fraternal Order of Police Press Release: Fraternal Order of Police Endorses Trump for President (Sept. 4, 2020), https://perma.cc/WW8Q-L2TW ................... 14

**Other Authorities—continued**

Donald J. Trump, Remarks at a Campaign Rally in Atlanta, Georgia (Oct. 15,
    2024), https://perma.cc/98ZS-G3V2 ....................................................................14

Katherine Fung & Joe Edwards, "IAFF Under Fire for Not Endorsing Female
    Presidential Hopefuls" Newsweek (Oct. 4, 2024), https://perma.cc/6PPH-
    6L6F ...................................................................................................................15

Presidential Debate at Hofstra University (Sept. 26, 2016),
    https://perma.cc/W697-5RH2 .............................................................................14

Trump Campaign Press Release - Philadelphia Firefighters' and Paramedics'
    Union Endorses President Donald J. Trump, Applauds His Strong Support for
    First Responders (Sept. 29, 2020) https://perma.cc/BLS8-PSUN .........................15

Trump Campaign Press Release: President Trump Is Backing The Blue, And
    They're Backing Him (Sept. 10, 2020), https://perma.cc/5V84-JF8D .................14

## INTRODUCTION

Plaintiffs Federal Education Association ("FEA"), Federal Education Association Stateside Region ("FEA-SR"), and Antilles Consolidated Education Association ("ACEA") are labor organizations representing educators who work in prekindergarten-through-12th-grade ("PreK-12") schools operated by the Department of Defense Education Activity ("DODEA"). Plaintiffs seek a preliminary injunction against the implementation and enforcement of Defendant Donald Trump's executive order stripping Plaintiffs and their members of their statutory and contractual collective bargaining rights on purported national security grounds, Exec. Order No. 14,251, Exclusions from Federal Labor-Management Programs, 90 Fed. Reg. 14,553 (March 27, 2025) ("EO 14,251").

This Court has issued preliminary injunctions in two related challenges to EO 14,251: *Nat'l Treasury Emps. Union v. Trump*, No. CV 25-0935, 2025 WL 1218044 (D.D.C. Apr. 28, 2025) ("*NTEU I*"), and *Am. Foreign Serv. Ass'n v. Trump*, No. CV 25-1030, 2025 WL 1387331 (D.D.C. May 14, 2025) ("*AFSA I*"). And on June 24, 2025, the U.S. District Court for the District of California preliminarily enjoined EO 14,251 in a challenge brought by the American Federation of Government Employees ("AFGE") and five other unions. *Am. Fed'n of Gov. Emps. v. Trump*, No. 25-CV-03070, 2025 WL 17554 (N.D. Cal. Jun. 24, 2025) ("*AFGE*"). Much of the reasoning in these decisions applies equally here.[1]

---

[1] We are of course aware that the preliminary injunctions in *NTEU I* and *AFSA I* were stayed by special panels of the D.C. Circuit in *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ("*NTEU II*"), and *Am. Foreign Serv. Ass'n, v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ("*AFSA II*"). An appellate order granting or denying a motion to stay an injunction pending appeal "does not constitute the law of the case for the purposes of further proceedings," *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974), much less does a stay order in one case constitute binding authority in other cases. *See also Belbacha v. Bush*, 520 F.3d 452, 458 (D.C. Cir. 2008) (rejecting the Government's

(*continued* . . .)

## I.    STATEMENT OF FACTS

### A.    Chapter 71 Has Provided a Sound, Carefully Calibrated Basis for Federal Sector Labor Relations for Nearly Half a Century

In 1978, Congress enacted the Federal Service Labor-Management Relations Statute, codified as Chapter 71 of Title 5 of the U.S. Code ("Chapter 71"). Prior to that, collective bargaining in the federal civil service had been authorized by two executive orders, which informed Congress's crafting of Chapter 71. The first was issued by President John F. Kennedy based on the recommendations of a six-member presidential task force that included then-Secretary of Defense Robert McNamara.[2] The second, issued by President Richard M. Nixon, built on President Kennedy's order based on the recommendations of a five-member study committee that included then-Secretary of Defense Melvin Laird; it governed federal labor relations until Chapter 71's January 11, 1979 effective date.[3]

In Chapter 71, Congress created a comprehensive statutory framework governing labor-management relations in federal agencies, one that was expressly "designed to meet the special requirements and needs of the Government," 5 U.S.C. § 7101(b). That statutory framework was predicated on Congress's conclusion that "labor organizations and collective bargaining in the

---

argument that a merits panel "should affirm on the basis of the order of a motions panel of this court denying … a temporary stay pending this appeal"). While such "non-controlling orders" may "be persuasive for their reason and authority to the extent applicable in any new context," *Berrigan,* 499 F.2d  at 518, as discussed below, the record and issues raised here make this motion distinguishable on the matters the special panels found dispositive, and in any event the reasoning in support of each order is flawed and therefore merits no deference here.

[2] Exec. Order 10,988, 27 F. Reg. 551 (Jan.17, 1962); A Policy for Employee- Management Cooperation in the Federal Service: Report of the President's Task Force on Employee-Management Relations in the Federal Service (Nov. 30, 1961), https://perma.cc/GBV8-MUE3.

[3] Exec. Order 11,491, 34 Fed. Reg. R 17,605 (Oct. 31, 1969); President's Study Committee on Labor-Management Relations in the Federal Service: Report and Recommendations (August 1969), https://perma.cc/PY4F-AVQM.

civil service are in the public interest," *id.* § 7101, which was based on its findings that "the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them …safeguards the public interest, … contributes to the effective conduct of public business, and … facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment," *id.* § 7101(a)(1)(A)-(C). As a principal sponsor of Chapter 71 made clear, Congress's goal was to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. William Clay).

Chapter 71 was patterned in part on the main private-sector labor-relations statute, the National Labor Relations Act of 1935 ("NLRA"), 29 U.S.C. § 151 *et seq.* Chapter 71 mirrors the NLRA by guaranteeing federal employees the basic rights "to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal," 5 U.S.C. § 7102, and "to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees," *id.* § 7102(2). *Accord* 29 U.S.C. § 157. Like the NLRA, Chapter 71 also establishes election procedures to determine if a majority of employees choose union representation, 5 U.S.C. § 7111(b), and requires covered agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election," *id.* § 7111(a). *Accord* 29 U.S.C. § 159(a).

Chapter 71 also mirrors the NLRA in establishing a duty on the part of federal agencies and unions to negotiate in good faith to arrive at CBAs, 5 U.S.C. § 7114(a)(4), as well as a set of proscribed unfair labor practices that make it unlawful for an agency or union, *inter alia*, "to interfere with, restrain, or coerce any employee in the exercise" of their Chapter 71 rights, "to

encourage or discourage membership in any labor organization by discrimination" as to terms and conditions of employment, and "to refuse to bargain in good faith" with the labor organization or agency, 5 U.S.C. §§ 7116(a) and (b). *Accord* 29 U.S.C. § 158(a) and (b). And Chapter 71 created the Federal Labor Relations Authority ("FLRA"), and empowered it to resolve unfair labor practice complaints, issues relating to the duty to bargain, and other specified labor-management issues, *see* 5 U.S.C. §§ 7104, 7105(a)(2)(A)-(I), just as the NLRA created the National Labor Relations Board for similar purposes, *see* 29 U.S.C. §§ 153, 160.

At the same time, given the federal government's "special requirements and needs," 5 U.S.C. § 7101(b), Congress calibrated Chapter 71's collective bargaining framework to be more limited than the NLRA in significant respects. Notably, Chapter 71 provides statutory management rights protections for covered agencies that preserve "the authority of any management official of any agency" to, *inter alia*, "determine the mission, budget, organization, number of employees, and internal security practices of the agency"; "hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees"; and "assign work, .. make determinations with respect to contracting out, and ... determine the personnel by which agency operations shall be conducted." *Id.* § 7106(a).[4] Under the NLRA, by contrast, management-rights protections are left entirely to the bargaining process. *See NLRB v. American Nat'l Ins. Co.*, 343 U.S. 395, 409-410 (1952). Chapter 71 also provides that the duty of unions and federal agencies to negotiate over

---

[4] While Chapter 71 precludes *decisional* bargaining when an agency invokes its statutory management rights, bargaining is permitted as to the "impact and implementation," *Nat'l Treasury Emps. Union v. FLRA*, 414 F.3d 50, 53 (D.C. Cir. 2005), of such decisions, *e.g.*, the procedures by which the decisions are implemented or "appropriate arrangements for employees adversely affected by" them, 5 U.S.C. § 7106(b)(2) and (3).

terms and conditions of employment under does not extend to matters established by federal statute or by government-wide regulations. 5 U.S.C. §§ 7103(a)(14)(c) and 7117(a)(2).

While the NLRA expressly protects the right of private-sector employees to strike, 29 U.S.C. § 163, Chapter 71 makes it an unlawful for federal employee unions to call, participate in, or condone "a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations," 5 U.S.C. § 7116(b)(7)(A), and it denies the rights and protections established by Chapter 71 to any employee who participates in a strike against the federal government, *id.* § 7103(a)(2)(B)(v).

Chapter 71's provisions excluding particular employers from coverage also have no analog in the NLRA. Chapter 71 expressly excludes nine agencies from its coverage, most with intelligence and national security functions. 5 U.S.C. § 7103(a)(3). And of central importance here, the statute grants the President a narrow authority to exclude an otherwise covered agency or agency subdivision from Chapter 71's coverage, which President Trump has invoked to extinguish collective bargaining for the vast majority of federal employees. Section 7103(b) of Chapter 71 authorizes the exclusion of agencies and agency subdivisions from Chapter 71 based on a determination that two specific limiting conditions are satisfied: (a) the agency or agency subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; *and* (b) Chapter 71 "cannot be applied" to that agency or subdivision "in a manner consistent with national security requirements and considerations." *Id*. § 7103(b)(1).

### B. Plaintiffs Have Had Stable and Mutually Beneficial Relationships with DODEA for Decades

For decades, Plaintiffs have represented educators working in DODEA's schools in the U.S. and abroad. FEA has represented education professionals working at DODEA's schools in Europe and Asia for more than 50 years; indeed, under its former name, the Overseas Education

Association, FEA was first recognized as the collective bargaining representative of DODEA educators in 1970, before Chapter 71 was enacted and federal-sector labor relations were governed by President Nixon's Executive Order 1,1491. Declaration of Richard Tarr ("Tarr Decl.") ¶ 8. In 2023, FEA and DODEA entered into their most recent CBA covering certified educators in DODEA's overseas schools, which provides that it will continue in force until August 1, 2028. Tarr Decl. ¶ 10 and Exh. 1. That CBA covers such subjects as grievance procedures, payroll deduction of membership dues, official time for union officials engaged in representational work, employee rights, standards and procedures for employee discipline and adverse employment actions, mid-term bargaining procedures for management proposals on negotiable matters, and consultations aimed at promoting constructive relationships. *Id.*

Since 1996, FEA-SR has represented two units of employees working in stateside DODEA schools: one consists of professionally certified, non-supervisory educators, and the other consists of classified education support professionals ("ESPs"). Declaration of Alan Danahy ("Danahy Decl.") ¶ 5.[5] The most recent CBA between FEA-SR and DODEA covering certified educators ("2019 Certified Educators CBA") went into effect on January 11, 2019; it provides for an initial term of 5 years but was renewed pursuant to Article 35 and remained in force when EO 14,251 issued. Danahy Decl. ¶ 8 & Exh. 2. The most recent CBA between FEA-SR and DODEA covering ESPs ("2010 ESP CBA") went into effect on March 25, 2010; it provides for an initial term of 4 years but also was renewed under Article 29 of the agreement and remained in force when EO 14,251 issued. *Id.* ¶ 9 & Exh. 4.

---

[5] Before 1996, local FEA affiliates had represented those employees in separate, school-level bargaining units for more than a decade. *Id.* In 1996, the FLRA issued an order consolidating those school-level units into two units: one for stateside certified educators and the other for stateside ESPs. *Id.* and Exh. 1.

Both the 2019 Certified Educator CBA and the 2010 ESP CBA govern, among other things, stateside educators' pay, grievance-and-arbitration procedures, payroll deduction of union membership dues, official time and use of office facilities for union officials engaged in representational work, employee and association rights (including the right of bargaining unit employees to union representation in investigatory meetings), standards and procedures for disciplinary and adverse actions, association-management cooperation, and procedures to bargain over the impact and management actions changing the terms and conditions of employment. *Id.* ¶ 11 & Exhs. 2 and 4.

ACEA has represented DODEA educators in the U.S. Territory of Puerto Rico for the purpose of collective bargaining since 1974, when labor relations in the federal service were governed by President Nixon's Executive Order 11,491. Declaration of Alexis Gorbea ¶ 7. ACEA's most recent CBA with DODEA was executed in 2023 and provides that it will continue in force until July 24, 2028. *Id.* ¶ 8 and Exh. 1. That CBA covers such subjects as grievance procedures, payroll deduction of union membership dues, official time for union officials engaged in collective bargaining work, employee and association rights (including employees' rights to union representation in investigatory meetings that may result in discipline), standards and procedures for disciplinary and adverse actions, association-management cooperation, and mid-term bargaining procedures for management proposals on negotiable matters. *Id.*

Over the time that FEA, FEA-SR, and ACEA have represented DODEA educators, DODEA has become a pre-eminent public school district. More than two decades ago, a General Accounting Office audit report recognized that "[t]he academic achievement of DOD students, as measured by their performance on standardized tests and their plans for enrolling in college,

generally exceeds that of elementary and secondary students nationwide."[6] And since 2020, the 161 schools operated by DODEA have consistently outperformed the national average in reading and mathematics on the benchmark National Assessment of Educational Progress.[7]

Collective bargaining has contributed to the success of DODEA schools. For example, FEA-SR and DODEA negotiated the union's participation in committees such as the Continuous School Improvement Committee, which focuses on enhancing the delivery of instruction and educational practices, and the Case Study Committee, which ensures that students with special needs receive appropriate educational services. Danahy Decl. ¶ 14. Union representatives have brought valuable expertise to bear on these committees' work, which has been aided by the fact that committee members selected by the union had the rights and protections of Chapter 71, which allowed them to provide candid, constructive, and at times critical feedback to support DODEA's mission without fear of reprisal. *Id.*

FEA-SR also has played a constructive role when DODEA has introduced new educational programs. Under the CBAs and Chapter 71, DODEA is required to provide notice to the union when it exercises such management rights in a way that affects members' employment; and if FEA-SR responds by requesting bargaining, DODEA is required to bargain over the impact and implementation of the program. *Id.* ¶15. In these situations, FEA-SR typically provides targeted feedback from school-level educators who will be directly involved in incorporating the new program into their teaching. *Id.* In fact, the union's response to DODEA's

---

[6] GAO, "BIA and DOD Schools: Student Achievement and Other Characteristics Often Differ from Public Schools" (2001), https://www.gao.gov/assets/gao-01-934.pdf.

[7] DODEA, "DoD Schools Ranked Best in the United States Again on Nation's Report Card" (Jan. 29, 2025), https://perma.cc/YC24-G3MV.

notice of such a change, as required by both the FSLMRS and the CBAs, is the only opportunity for educators to provide the agency with feedback on management proposals. *Id.*

For example, FEA-SR provided feedback that aided in DODEA's recent implementation of its Universal/Full-Day Pre-K program. Upon receiving the statutory notice for the Pre-K program's rollout, FEA-SR raised numerous concerns regarding DODEA's readiness to deliver appropriate instruction and the inadequate allocation of resources, which led to DODEA's establishment of a cross-functional team consisting of DODEA leadership, administrators, and union-selected representatives. *Id.* ¶ 16. This team successfully addressed many of those concerns, developing actionable solutions that ensured the program's effective implementation, and continued its collaboration with the union in this endeavor until EO 14,251, at which point the team's last scheduled meeting was cancelled and the team has not met since. *Id.*

### C.    FEA and FEA-SR Have Opposed Trump Administration Policies and Challenged them in Court and in Chapter 71 Grievance Proceedings

Beginning in President Trump's first term, FEA and FEA-SR have spoken out against Trump administration policies attacking federal employees and have challenged such policies in court and in grievance proceedings. In June of 2018, FEA, along with several other federal unions, brought suit in this District against President Trump, the OPM, and the OPM Director at the time, seeking to enjoin three executive orders issued by President Trump during his first administration that detrimentally affected collective bargaining rights under Chapter 71. Tarr Decl. ¶ 15 and Exh. 5. The lawsuit was consolidated with three other federal union challenges to the executive orders, and the court entered summary judgment for the plaintiffs, *see Am. Fed'n of Gov't Emps. v. Trump*, 318 F. Supp. 3d 370 (D.D.C. 2018), *rev'd and vacated*, 929 F.3d 748 (D.C. Cir. 2019). FEA, working with a coalition of federal unions, publicized the District Court's judgment and criticized the administration for its lawless actions, Tarr Decl. ¶ 15 and Exh.6.

Throughout President Trump's first administration and into his second, FEA worked with the same coalition of federal unions to speak out in opposition to Trump administration policies that harm federal workers through letters to members of Congress, including a 2017 letter opposing the confirmation of President Trump's nominee for OPM Director, a 2019 letter to all U.S. Senators opposing the confirmation of President Trump's nominee for General Counsel of the FLRA, and a 2025 letter opposing President's illegal impoundments and unconstitutional executive orders and urging the Senate Appropriations Committee to take a variety of actions to protect the civil service and federal unions. Tarr Decl. ¶¶ 16-20 and Exhs. 7-10.

In addition, FEA-SR has filed grievances challenging some of the second Trump administration's signature policies affecting federal employees. Declaration of Benjamin Hunter ("Hunter Decl.") ¶ 13. For example, on February 26, 2025, FEA-SR filed two bargaining-unit-wide grievances, one on behalf of certified educators and the other on behalf of ESPs challenging, under Chapter 71 and the relevant CBA, the second Trump administration's infamous mass "Fork in the Road" e-mails sent by OPM to all government employees purporting to offer a "deferred resignation program" under Chapter 71 and the parties' CBA. *Id.* and Exh.9. And on March 14, 2025, FEA-SR filed another grievance challenging the also-infamous mass "What Did You Do Last Week" e-mail sent by OPM to all federal employees, also under Chapter 71 and the relevant CBA. *Id.* and Exh. 10.

### D.    President Trump Issues EO 14,251 in Avowed Retaliation for the Protected Speech and Petitioning Activities of "Hostile Federal Unions"

On the evening of March 27, 2025, President Trump issued EO 14,251, thereby depriving the overwhelming majority of federal civil service workers of their rights under Chapter 71: "All told, the agencies covered by Trump's order amounts to 67% of the federal workforce, and 75% of federal workers who are currently represented by unions." Erich Wagner, "Trump order aims

to outlaw most government unions on 'national security' grounds," *Government Executive*

(March 27, 2025), https://perma.cc/6KF7-7SJY.

EO 14,251 is staggering in its breadth. It sweeps up four Cabinet departments in their

entirety;[8] two further Cabinet departments, each with a single narrow exception;[9] dozens of

agencies and subdivisions within five other Cabinet departments;[10] and seven independent

agencies in their entirety.[11] It also is unprecedented. Prior to EO 14,251, no president in the

nearly half-century history of Chapter 71 has ever excluded from collective bargaining an entire

Cabinet department or an entire independent agency, let alone multiple ones, or so broadly

excluded agency subdivisions. Rather, presidents from both major parties—Jimmy Carter,

Ronald Reagan, George H.W. Bush, Bill Clinton, George W. Bush, Barack Obama, and

President Trump during his first administration—issued targeted orders excluding particular sub-

agencies and agency subdivisions that are clearly engaged in sensitive intelligence and/or

national security work.[12]

---

[8] The four entirely excluded Cabinet departments are: the DOD, the Department of Justice, the Department of State, and the Department of Veterans Affairs. Executive Order Section 2(b), 90 Fed. Reg. at 14,533.

[9] The two almost-entirely excluded Cabinet departments are the Department of Energy, with the sole exception of the Federal Energy Regulatory Commission; and the Department of the Treasury, with the sole exception of the Bureau of Engraving and Printing. *Id.*

[10] Those five Cabinet departments are the Department of Agriculture, the Department of Commerce, the Department of Health and Human Services, the Department of Homeland Security, and the Department of the Interior. *Id.* at 14,533-34.

[11] Those entirely excluded independent agencies are the Environmental Protection Agency, the United States Agency for International Development, the Nuclear Regulatory Commission, the National Science Foundation, the United States International Trade Commission, the Federal Communications Commission, and the General Services Administration. *Id.* at 14,554.

[12] All prior Section 7103(b)(1) executive orders are catalogued, with examples, in Plaintiffs' First Amended Complaint, Doc. 21, page 18 n.5.

EO 14,251 does not stop with the exclusions enumerated in Section 2. In Section 5, it authorizes further exclusions by delegating to the Secretary of Transportation the authority "to issue orders excluding any subdivision" of the agency, "including the Federal Aviation Administration." 90 Fed. Reg. at 14,556. And in Section 7, it directs all agency heads to report to the President any additional agency subdivisions they determine should be excluded from Chapter 71. *Id.* At the same time, however, Section 2 also contains a blanket carveout that preserves collective bargaining for "agency police officers, security guards, or firefighters," 90 Fed. Reg. 12, 553, notwithstanding the nexus they have to national security or intelligence work.

EO 14,251 implicitly acknowledges that exclusion from Chapter 71 is unwarranted with respect to at least some excluded agency subdivisions, as it delegates to two Cabinet secretaries the authority to restore collective bargaining to subdivisions of their agencies. Section 4 "delegate[s] authority under 5 U.S.C. § 7103(b)(1)" to the Secretaries of Defense and Veterans Affairs to "suspend[] the application" of EO 14,251's exclusion "to any subdivisions of the departments they supervise, thereby bringing such subdivisions under the coverage of [Chapter 71]" upon their certification that the provisions of Chapter 71 "can be applied to such subdivision in a manner consistent with national security requirements and considerations." *Id.* at 14,555-56.

Section 6 addresses implementation, directing agency heads, "upon termination of the applicable collective bargaining agreement," to reassign employees performing representational duties pursuant to official-time arrangements in CBAs, terminate pending grievance proceedings, and terminate proceedings before the FLRA involving exceptions or arbitral awards or unfair labor practices. *Id.* at 14,556.

Also on March 27, 2025, Defendant Ezell, issued a guidance memorandum further instructing agency leadership as to the implementation of EO 14,251.[13] The memorandum declares that Chapter 71 "will no longer apply" to the agencies and agency subdivisions listed in EO 14,251, that "those agencies and subdivisions are no longer required to collectively bargain with Federal unions," and that the affected unions "lose their status as the 'exclusive[ly] recogni[zed]' labor organizations for employees of the agencies and agency subdivisions covered by" EO 14,251. OPM Guidance at 1, 3 (alterations in original). It also directs agencies to "cease participating in grievance procedures after terminating their CBAs." *Id.* at 5.

The Trump administration's own statements in support of EO 14,251 reveal that the President had motives for extinguishing collective bargaining for the overwhelming majority of federal civil service workers having nothing to do with national security, namely, to retaliate against federal unions by reason of their First-Amendment-protected speech and petitioning activities, and to chill any further such speech and petitioning, and to facilitate the firing of civil service employees *en masse*. The White House bluntly admitted the first of these motivations in a "Fact Sheet" purporting to justify EO 14,251.[14] In it, the White House railed against "hostile Federal unions" that, in its view, have "declared war on President Trump's agenda" by, for example, "filing grievances to block Trump policies." *Id.* The White House further decried "[t]he largest Federal union"—a clear reference to the American Federation of Government Employees—because it "describes itself as 'fighting back' against Trump" and "is widely filing

---

[13] Memorandum of Charles Ezell, "Guidance on Executive Order Exclusions from Federal Labor-Management Programs" (March 27, 2025), https://perma.cc/V6WH-435Z ("OPM Guidance").

[14] The White House, "Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements" (March 27, 2025), https://perma.cc/5M2G-MUSH.

grievances to block Trump policies." *Id.* At the same time, the Fact Sheet pointedly declares that "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate" what the White House characterizes as "mass obstruction." *Id.* The message could not be more clear: the Trump administration will favor unions voicing support for Trump administration policies and/or refraining from exercising their First Amendment rights to challenge those policies and punish unions that express dissent from Trump administration policies and "fight[] back,'" *id.*, against those policies by petitioning the government for redress from the injuries those polices inflict.

This message is reinforced by the Fact Sheet's trumpeting of EO 14,251's blanket carveout preserving collective bargaining rights for federal agency police, firefighters, and security guards: "***Law Enforcement Unaffected.*** Police and firefighters will continue to collectively bargain," *id.* (emphasis in original), given the pattern of presidential candidate endorsements by key law enforcement and firefighter unions: The country's largest law enforcement union, the National Fraternal Order of Police ("FOP"), endorsed Trump's candidacy in 2016, 2020, and 2024,[15] and President Trump has regularly touted those endorsements.[16] And the largest firefighters' union in the country, the International Association of Fire Fighters

---

[15] FOP Press Release: FOP Endorses Trump! (Sept. 6, 2024), https://perma.cc/D498-5GEE; FOP Press Release: Fraternal Order of Police Endorses Trump for President (Sept. 4, 2020), https://perma.cc/WW8Q-L2TW; FOP Press Release: Fraternal Order of Police Endorses Trump!! (Sept. 16, 2016), https://perma.cc/NWZ3-3G8F.

[16] *See, e.g.,* Donald J. Trump, Remarks at a Campaign Rally in Atlanta, Georgia (Oct. 15, 2024), https://perma.cc/98ZS-G3V2 ("I was also honored to receive the endorsement of the Fraternal Order of Police. Something they don't do easily. … 400,000 law enforcement officers nationwide."); Trump Campaign Press Release: President Trump Is Backing The Blue, And They're Backing Him (Sept. 10, 2020), https://perma.cc/5V84-JF8D; Presidential Debate at Hofstra University (Sept. 26, 2016), https://perma.cc/W697-5RH2 ("I just got today the, as you know, the endorsement of the Fraternal Order of Police ... We have endorsements from, I think, almost every police group, very—I mean, a large percentage of them in the United States.").

("IAFF"), after having exclusively supported Democratic presidential candidates for more than

50 years, broke with that tradition, declining to endorse either candidate in the 2016 and 2024

elections;[17] and in 2020, then-candidate Trump touted his endorsement by one of IAFF's larger

chapters.[18]

The Fact Sheet also reveals the administration's second motivation by complaining about

an FLRA decision affirming an independent arbitrator's decision that required the reinstatement

of employees of the Department of Veterans Affairs who had been wrongfully dismissed by

reason of the agency's implementation of a policy from the first Trump administration. *Id.*

(referring in substance to *Dep't of Veterans Affs.*, 71 F.L.R.A. 1113 (Nov. 16, 2020)). The

administration's second motivation is further laid bare by the OPM Guidance, which is largely

devoted to the subject of "facilitat[ing] the separation of underperforming employees." OPM

Guidance at 3-5. To that end, the OPM Guidance directs agencies, after "terminating their

collective bargaining agreements" a "to prepare large-scale reductions in force (RIFs)," which

are to be "conduct[ed] … without regard to provisions in terminated CBAs that go beyond

[statutory and regulatory] requirements." *Id.* at 5.

On April 11, 2025, Secretary of Veterans Affairs Doug Collins ("VA Secretary") issued

an order exercising the authority delegated to him by Section 4 in a manner fully and admittedly

---

[17] Katherine Fung & Joe Edwards, "IAFF Under Fire for Not Endorsing Female Presidential Hopefuls" *Newsweek* (Oct. 4, 2024), https://perma.cc/6PPH-6L6F ("The union … announced Thursday that the group's executive board voted … not to support Vice President Kamala Harris nor former President Donald Trump. It is only the second time that the group has refused to back a Democratic presidential candidate since 1960, the only other time being in 2016 when Hillary Clinton was on the ballot.").

[18] Trump Campaign Press Release - Philadelphia Firefighters' and Paramedics' Union Endorses President Donald J. Trump, Applauds His Strong Support for First Responders (Sept. 29, 2020) https://perma.cc/BLS8-PSUN.

consistent with the Trump administration's retaliatory motives. Dep't of Veterans Affairs, Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12,171, 90 Fed. Reg. 16,427 (April 17, 2025). Rather than suspend the executive order's exclusions with respect to particular "subdivisions of the agency," as Section 7103(b)(1) provides and EO 14,251 directs, the VA Secretary pointedly did so with respect to "employees represented by" eight specified *unions*. *Id.* The agency's press secretary admitted motives of retaliation and rank favoritism as follows: "The unions in the exempted units have posed no or minimal hinderance to VA operations …. They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to broadly frustrate the administration's ability to manage the agency.'" Erich Wagner, "VA is selectively enforcing Trump's order stripping workers of union rights," *Government Executive* (April 19, 2025) (quoting VA Press Secretary Pete Kasperowicz), https://perma.cc/2FMX-6L33.

### E. EO 14,251 Has Caused and Will Continue to Cause Irreparable Harm to Plaintiffs

Plaintiffs FEA, FEA-SR, and ACEA—and their members—have suffered, and absent injunctive relief from this Court will continue to suffer, severe and irreparable harm by reason of EO 14,251.

On April 3, 2025, the Chief of DODEA's Labor Management Employee Relations Division, Alexa Rukstele—citing EO 14,251, the White House Fact Sheet, and the OPM Guidance—notified Plaintiffs that DODEA "will pause all labor relations-related activities." Tarr Decl. ¶ 22; Danahy Decl. ¶ 22; Gorbea Decl. ¶ 11. Notwithstanding DODEA's use of the

seemingly anodyne verb "pause," the agency has repudiated its obligations under existing CBAs and acted contrary to Chapter 71 in multiple ways.

(1) On or about April 7, 2025, DODEA terminated the statutorily and contractually required payroll deductions of FEA, FEA-SR, and ACEA dues from union members who have voluntarily authorized those deductions. Tarr Dec. ¶ 23; Danahy Decl. ¶ 26; Gorbea Decl. ¶ 13. As a consequence, Plaintiffs have lost revenue and are forced to expend their dwindling funds and resources to effectuate alternative payment arrangements that are costly and less reliable than payroll deduction, and then seek electronic payment authorizations for thousands of members, which in FEA's case involves seeking such authorizations from members around the globe. Tarr Decl. ¶ 26; Danahy Decl. ¶ 30; Gorbea Decl. ¶ 11

Prior to DODEA's unilateral termination of payroll deduction of member dues, those deductions accounted for 83% percent of membership dues collected by FEA and 92% of those collected by FEA-SR. Tarr Decl. ¶ 24; Danahy Decl. ¶ 27. Dues revenue makes up the overwhelming majority of FEA's income and is used to carry out all of FEA's core activities as a labor organization, including paying staff, supporting collective bargaining and organizing, funding the grievance and arbitration system, and providing representation to members—as well as other critical services such as assisting bargaining unit educators to navigate DODEA's human resources and payroll systems. *Id.*

As a result of DODEA's cancellation of dues deductions, FEA and FEA-SR began extensive efforts to ensure that members around the world are signing up for alternative methods for paying dues. *Id.* ¶ 26; Danahy Decl. ¶ 30. These alternative methods are more costly to the union, less reliable, and more logistically challenging than payroll deduction. Tarr Dec. ¶ 26; Danahy Decl. ¶¶ 33-34. Despite these efforts, as of June 2, 2025, only 48% of FEA members had

17

opted in to an alternative method of payment. *Id.* ¶ 27. When DODEA unilaterally ceased payroll deduction, there were three remaining pay cycles for educators at the stateside schools. *Id.* ¶ 28. FEA and FEA-SR were subsequently unable to collect dues using an alternative pay method, leaving a shortfall of over $65,000. *Id.*

The cancellation of payroll deductions has caused an immediate reduction in union revenue while also diverting dwindling resources to the task of signing up members for alternative payment methods—resources that would have been used to represent and advocate for members. Tarr Decl. ¶ 29-30. With fewer resources to draw on, and with those remaining resources strained because it is necessary to Plaintiffs' continued existence that substantial resources be devoted to the effort to convert members to a new dues payment system, it is inevitable that such representation work will suffer. *Id.* ¶ 30. Because union members and other represented employees frequently need representation services on an on-demand basis—for example, if they need advice and counsel when called in to speak to an administrator for a disciplinary reason—the loss of those services works irreparable harm to the unions and their members. *Id.* Hence, even if FEA were to recover its dues revenue in the future, the immediate harm to FEA and its members from such curtailment of services cannot be repaired after the fact. *Id.* A subsequent restoration of FEA funds cannot, for instance, retroactively help the member who has gone into a disciplinary meeting without the counsel of their union. *Id.* ¶ 30. Nor can it help union members who need the services of their union in the face of DODEA's recent unilateral reorganization resulting in the elimination of many positions, as discussed below. And restoration of revenue at a later date cannot undo the injury to FEA and FEA-SR in the eyes of members and prospective members arising from its diminished ability to help its members. *Id.*; Danahy Decl. ¶ 35.

DODEA's cancelling of payroll sues deductions has caused ACEA, too, to experience a drop in its revenue of $29,257.65 for the school year that just ended. Gorbea Decl. ¶ 14. ACEA is now in the process of establishing a different arrangement for members to pay a fee to ACEA by electronic means, which is a drain on the union's resources while the union's usual source of operating funds has been cut off. *Id.* As a result, ACEA has fewer resources to devote to its mission of advocating for the interests of its members, the main reason why educators join the union. *Id.* Given that EO 14,251 has halted collective bargaining and associated labor relations interactions between ACEA and DODEA, it is uncertain how many of ACEA's current membership will choose to remain members of ACEA now that it is unable to engage in collective bargaining and can no longer even enforce its current CBA. *Id.* ¶15.

DODEA's cancellation of dues deductions has created a vicious cycle for Plaintiffs, creating escalating harms to their ability to carry out their core functions. Plaintiffs are expending more resources on signing up members while immediately having fewer resources to provide representational services to members, a principal reason why educators and ESPs sign up to pay dues to the union. Tarr Decl. ¶ 32; Gorbea Decl. ¶¶ 14-15. Convincing members to remain members and sign up for electronic payments is all the more challenging under EO 14,251 as DODEA educators have lost critical statutory protections, such as the right under 5 U.S.C. § 7102 to engage in union activity "freely and without fear of penalty or reprisal," including the right "to form, join, or assist any labor organization," "to act for a labor organization in the capacity of a representative." Tarr Decl. ¶ 33; Danahy Decl. ¶ 32; Gorbea Decl. ¶¶ 14-15. The loss of these statutory protections makes joining or remaining a member of Plaintiffs riskier than it was before EO 14,251 issued, which will almost certainly lead to reduced membership. *Id.*

This vicious cycle is further exacerbated by the loss of collective bargaining rights, which eliminates Plaintiffs' core function. DODEA is not abiding by its obligations under its CBAs with the Plaintiffs, making it very difficult to convince members to pay dues, which will in turn inevitably lead to fewer funds for the Plaintiffs hence fewer services for members, making it even more difficult to convince remaining members to continue to be members by signing up for alternative means of paying dues. Tarr Decl. ¶¶ 32-33; Danahy Decl. ¶ 31; Gorbea Decl. ¶ 15. In sum, EO 14,251 and DODEA's implementation of it have immeasurably weakened the Plaintiffs and therefore pose an existential threat to them—one that goes to the core of their purpose and mission, which is to collectively bargain, represent their members, and enforce their CBAs. Tarr Decl. ¶ 33; Danahy Decl. ¶ 31; Gorbea Decl. ¶ 31.

(2) Before EO 14,251, FEA-SR and DODEA were engaged in bargaining over successor agreements to the 2019 Certified Educator CBA and the 2010 ESP CBA, having finalized an agreement as ground rules for both contracts in 2023 and subsequently reached agreement on a majority of the contract articles and worked with mediators from the Federal Mediation Conciliation Service to attempt to conclude the bargaining process. Hunter Decl. ¶ 9; Danahy Decl. ¶¶ 17-19. After EO 14,251 issued and Ms. Rutskele sent the email "paus[ing] all labor management activities," DODEA has refused to engage in any further negotiations for a new collective bargaining agreement. Hunter Decl. ¶ 9; Danahy Decl. ¶¶ 17-19.

DODEA also has ceased participating in grievance arbitration proceedings under CBAs with FEA and FEA-SR, even with respect to grievances that arose, and have been pending, well before EO 14,251 issued. Tarr Dec. ¶ 39; Declaration of William Freeman ("Freeman Decl.") ¶¶ 11-13; Declaration of Robin Smith ("Smith Decl.") ¶ 4; Hunter Decl. ¶ 13-15. DODEA has claimed that by reason of EO 14,251, it has no obligation to abide by its CBAs, including their

provisions for the resolution of grievances, and that arbitrators have no jurisdiction to issue decisions on grievances that arose and were pending prior to EO 14,251. Tarr Decl. ¶ 39; Freeman Decl. ¶¶ 13-15; Smith Decl. ¶ 8. These actions not only amount to a repudiation of DODEA's contractual obligations but also retroactively seek to extinguish contractual grievance claims that arose, were filed, and were pending before EO 14,251 issued, including many that have already been upheld in merits awards issued by arbitrators. Freeman Decl. ¶ 15.

For example, FEA has been prosecuting numerous group grievances on behalf of more than 800 overseas educators seeking relief from DODEA's wrongful garnishment of purported overpayments from educators' pay, and/or other failures to pay educators their rightful salaries. Freeman Decl. ¶¶ 11-12. These grievances—and their protracted nature—arise from DODEA's chronic failure to correctly calculate their overseas employees' pay and its procedurally improper recovery of claimed debts to the Government, which in most cases prove to be spurious. *Id.* ¶¶ 7-9. Those grievances all arose from CBA rights and conduct predating EO 14,251 and were all pending, at various stages of the arbitration process, when EO 14,251 issued; many arose under the 1989 CBA between FEA and DODEA and date back as far as 2011. *Id.* ¶ 12.

In grievance proceedings involving 493 educators, arbitrators have issued merits awards upholding the grievances, but the grievants have yet to be made whole, either because the post-merits-award process in these cases (which involves DODEA's providing audits of its pay records and FEA's vetting of those audits) have not yet concluded or because DODEA has not yet complied with awards, thus in either case requiring further arbitral proceedings. *Id.* ¶ 11. Of those 493 grievants, more than 200 were underpaid by as much as $125,000. *Id.* The rest had their pay garnished illegally without the due process protections required by the applicable CBA

21

and by the Debt Collection Act, 5 U.S.C. § 5514. *Id.* The remaining grievances have either not yet been submitted to arbitration or are the subject of ongoing arbitration proceedings. *Id.*

DODEA attorneys have refused to further participate in arbitral proceedings on such grievances, have told arbitrators that they have no jurisdiction over grievances predating EO 14,251 and that FEA is no longer the representative of the employees. Freeman Decl. ¶ 13. In three such proceedings of which FEA is aware, in which arbitration hearings or briefing deadlines had been held or scheduled before EO 14,251 issued, DODEA went so far as to communicate with arbitrators *ex parte* purporting to cancel the arbitral proceedings and the arbitrators' contracts and making clear that DODEA would not pay for any further contracted services performed by the arbitrators. Freeman Dec. ¶ 15; Smith Decl. ¶¶ 9 and 14.

Before EO 14,251 issued, 36 FEA-SR pay grievances on behalf of 122 bargaining unit employees were in various stages of the arbitration process, along with an additional 10 FEA-SR grievance cases that have not yet been scheduled for arbitration, 7 of which are group grievances and the remaining three are individual grievances. Hunter Decl. ¶ 10-11. All of those grievances were filed before EO 14,251 issued, and all of course arose from CBA rights and conduct predating EO 14,251. *Id.* DODEA also has refused to honor its contractual obligation to continue to engage in the resolution of those grievances or of the more recent "Fork in the Road" and "5 Things" grievances discussed above. *Id.* ¶ 14.

Given DODEA's refusal to honor its contractual obligations to engage in the grievance-resolution process under CBAs that remain in force to this day, DODEA has plainly repudiated its CBAs and cannot be expected to honor its contractual obligations by complying with any arbitration awards resolving grievances arising under its CBAs prior to or after the issuance of EO 14,251. Freeman Decl. ¶ 16. DODEA's repudiation of its contractual obligations is

particularly devastating to those educators whose grievances arose from DODEA actions outside the limitations periods applicable in any other forum in which relief could be sought, such as the U.S. Court of Claims (for compensation claims under the Tucker Act) or the Merit Systems Protection Board (for adverse action claims under Civil Service Reform Act). *Id.* Those grievants constitute the majority of the more than 800 overseas educators whose grievances were pending when EO 14,251 issued. *Id.*

(3) DODEA also has unilaterally instituted a reorganization that alters employees' terms and conditions of employment in contravention of duty to bargain with FEA, FEA-SR, and ACEA over the impact and implementation of such changes under both the CBAs in force between DODEA and each of the Plaintiffs and Chapter 71. Tarr Decl. ¶¶ 51-60; Hunter Decl. ¶¶ 21-25; Gorbea Decl. ¶ 23-30.

On May 22, 2025, employees at DODEA schools received an e-mail from the DODEA Director announcing that in connection with a DOD "optimization of its civilian workforce," DODEA was implementing a "Future-Ready DoDEA (FRD) initiative." Tarr Decl. ¶ 52; Hunter Decl. ¶ 22; Gorbea Decl. ¶ 20. While the e-mail uses euphemisms like "workforce shaping efforts" and "a strategic plan to streamline and improve student services," *id.*, its clear import is that this reorganization will eliminate positions for the 2025-2026 school year: the email closes by telling the recipients that "DoDEA will offer the Voluntary Early Retirement Authority" and "a Voluntary Separation Incentive Payment … to eligible employees impacted by the transformation efforts while working to identify placement or job opportunities for affected employees." *Id.*

A follow-up e-mail sent by Ms. Rukstele the same evening told Speech Assessors, Educational Technologists, Special Education Assessors, and Automation Clerks working for

DODEA that their positions are "impacted [*i.e.*, eliminated] by" the reorganization; the e-mail advised that DODEA is "working to identify placement and job opportunities for affected employees," but stressed that "[t]his does not guarantee that you will not be involuntarily separated from your position." Tarr Decl. ¶ 52; Hunter Decl. ¶ 30; Gorbea Decl. ¶ 25. The e-mail set a June 6, 2025, deadline for choosing the early retirement and voluntary separation incentive option. *Id.* And on June 10, 2025, DODEA sent reassignment notices to some of the educators affected by the reorganization, some of which require relocation to worksites that are far distant from the employees' current duty stations that would require Permanent Change of Station Orders. *Id.* The notices are dated June 9, 2025, and they set a June 11, 2025, deadline for affected employees either accept or decline the reassignments. *Id.* These extremely short deadlines required affected employees to make significant life and career decisions quickly, exerting pressure on those employees to choose early retirement or reassignment under onerous conditions, rather than face potential termination. Tarr Dec. ¶ 55; Gorbea Decl. ¶ 27.

Plaintiffs were unable to ameliorate the impact of the reorganization through bargaining by reason of EO 14,251, as DODEA unilaterally announced and is implementing the reorganization in violation of DODEA's obligation to bargain with FEA, FEA-SR, and ACEA. Each of the CBAs in force between DODEA and the Plaintiffs requires DODEA to bargain over the impact and implementation of changes to terms and conditions of employment arising from management decision, and each of the Plaintiffs timely sent bargaining requests to DODEA, to which DODEA responded with an identically worded email saying that the request would be "held in abeyance" pending the outcome of litigation over EO 14,251. Tarr Decl. ¶ 57; Danahy Decl. ¶¶ 57-59; Hunter Decl. ¶ 25; Gorbea Decl. ¶¶ 28-29.

(4) DODEA also has abrogated its contractual obligations to Plaintiffs by cancelling all official time arrangements. Each of the CBAs in force between DODEA and the Plaintiffs has provisions requiring that DODEA allow certain union officials to use official time to conduct representation activities as well as provisions providing for the Plaintiffs' use of office space for such activities. Tarr Decl. ¶ 46; Danahy Decl. ¶ 40; Gorbea Decl. ¶ 21. On April 29, 2025, Ms. Rukstele notified Plaintiffs FEA, FEA-SR, and ACEA that "**official time**"—a term referring to contractual arrangements that allow union officials to perform representational functions while on duty status—"**is no longer authorized for any purpose**" and directed that "all union/association representatives must be engaged in agency work for 100% of the duty day at the employee's assigned worksite/school" and must "promptly vacate any office space used by the union/association." Tarr Decl. ¶ 45; Danahy Decl. ¶ 37; Gorbea Decl. ¶ 21. The loss of official time has impaired Plaintiffs' ability to carry out their representation of DODEA educators and increased their costs due to the need to move and store their union records. Tarr Decl. ¶ 48; Danahy Decl. ¶¶ 41-42; Gorbea Decl. ¶ 22. For FEA, the loss of official time is particularly harmful as it is a global organization representing members in time zones across the world. Consequently, official time has been integral to FEA's ability to conduct its business and representational functions in a timely manner. Tarr Decl. ¶ 48.

(5) DODEA has also violated its contractual obligations and Chapter 71 by denying employee requests that they be accompanied by union representatives during investigatory interviews that could lead to discipline. Each of the CBAs in force between DODEA and the Plaintiffs has provisions that give employees the right to have a union representative present at any interview that could lead to discipline or discharge of the employee. Tarr Decl. ¶¶ 49-50; Danahy Decl. ¶ 44 Gorbea Decl. ¶ 11. And Chapter 71, too, mandates that an agency must honor

a bargaining unit employee's request to have a union representative at any agency examination if the employee reasonably believes that the examination may result in disciplinary action. *See* 5 U.S.C. § 7114(a)(2)(B). Following EO 14,251 DODEA has refused to allow stateside employees to have a union representative present during any such meetings, regardless of whether they are held during the duty day or not. Tarr Decl. ¶ 50; Danahy Decl. ¶ 45.

(6) DODEA also has stymied the operation of the sick leave bank for educators facing medical emergencies established under the CBA currently in force between DODEA and ACEA. Gorbea Decl. ¶ 18. To participate in the leave bank, bargaining unit members donate leave time and can request leave time from the bank in emergencies. *Id.* ¶ 19. The bank is administered by a committee consisting of two union-appointed employees and one DODEA representative, which meets to decide whether to grant participating employees' requests to draw on the leave bank when they or their family members are facing medical emergencies. *Id.* The sick leave bank currently has more than 13,000 donated hours. *Id.*

Shortly before Ms. Rutskele sent the April 3, 2025, e-mail "paus[ing] all labor-relations activities," ACEA's Vice-President wrote to DODEA's Caribbean Community Superintendent, as the official responsible for appointing the agency's representative to the committee that administers the leave bank, asking for a meeting of the committee. *Id.* ¶ 20. The reason for the request was ACEA's having received requests for leave hours from three bargaining unit employees who were experiencing medical emergencies. *Id.* As a result of the intervening e-mail "paus[ing] all labor-relations activities," that request was not fulfilled, leaving the three employees, who were in the midst of medical emergencies, without any way to obtain leave hours from the bank to which they had contributed. *Id.*

26

## II.    ARGUMENT

### A.    This Court Has Jurisdiction Over Plaintiffs' Challenge to EO 14,251 and to its Implementation and Enforcemeent

We first address a jurisdictional argument raised by the Government in the *NTEU I* ,

*AFSA I,* and *AFGE* cases—namely, that under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200

(1994), Congress divested the District Courts of jurisdiction to entertain constitutional challenges

to EO 14,251 by requiring that such claims be channeled to the FLRA in the first instance. As

this Court rightly concluded in *NTEU I* and *AFSA I*, this contention has no merit.

In *Thunder Basin*, the Court derived from its prior case law a formula for determining

whether Congress intended to oust district courts of jurisdiction over challenges to agency

actions that turns on two questions: (1) whether Congressional intent to preclude district court

jurisdiction "is fairly discernible in the statutory scheme"; and, if so, (2) whether the "claims are

of the type Congress intended to be reviewed within [the] statutory structure." 510 U.S. at 207,

212. That second question, in turn, entails three further inquiries, to wit, (a) whether the claim is

"wholly collateral to [the] statute's review provisions"; (b) whether the claim is "outside the

agency's expertise"; and (c) whether precluding district court jurisdiction would "foreclose all

meaningful judicial review" of the claim. *Id.* at 212-13.

It is plain that Congress has provided a "special statutory review scheme" with respect to

*some* kinds of claims: Chapter 71 grants the FLRA authority to resolve issues concerning "the

appropriateness of units for labor organization representation under section 7112 of this title," 5

U.S.C. § 7105(a)(2)(A); "issues relating to the duty to bargain in good faith under section

7117(c) of this title," *id.* § 7105(a)(2)(E); "complaints of unfair labor practices under section

7118 of this title," *id.* § 7105(a)(2)(G); and "exceptions to arbitrator's awards under section 7122

of this title, *id.* § 7105(a)(2)(H). But it is risible to posit that it "is fairly discernible in the

statutory scheme," 510 U.S. at 207, that Congress intended to preclude district court jurisdiction over a union's challenge to an executive order excluding an agency from Chapter 71's coverage altogether—and thereby extinguishing the union's statutory representative status, along with all of the statutory rights and administrative remedies that come with it

As this Court reasoned in *NTEU I*, Chapter 71's "administrative review scheme…. is not available to challenge EO 14,251's exclusions of the agencies and subdivisions subject to EO 14,251 for the simple reason that those agencies and subdivisions have been excluded from [Chapter 71's] coverage by the very Executive Order at issue here." 2025 WL 1218044, at *5. *See also AFSA I*, 2025 WL 1387331, at *6 (same); *AFGE*, 2025 WL 17554 at *8-*9 (same). Chapter 71's statutory review scheme is geared entirely toward claims concerning the union and agency rights, duties, and prohibitions established by the statute—and it therefore presupposes statutory coverage. Because EO 14,251 eliminated Chapter 71 coverage with respect to the DOD, Plaintiffs' challenges to EO 14,251 are "expressly outside of the FLRA's purview," *Am. Fed'n of Gov't Emps. v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007).

Furthermore, FLRA case law and the record here show that the FLRA will not resolve any cases brought to it by Plaintiffs so long as DODEA is excluded by EO 14,251. In cases in which the FLRA General Counsel has issued unfair labor practice complaints before the issuance of orders excluding the relevant agencies under Section 7103(b)(1), the FLRA has held that an agency's subsequent exclusion from Chapter 71's coverage is "a jurisdictional bar to its consideration of unfair labor practice complaints raised under the Statute." *U.S. Dep't of the Air Force*, 66 F.L.R.A. 589 (Apr. 20, 2012). *See also U.S. Attorney's Off.*, 57 F.L.R.A. 750, 750 (Apr. 25, 2002) (same). And on April 4, 2025, the FLRA, issued order to show cause in years-old unfair-labor-practice case initiated by FEA, citing EO 14,251 and this line of authority and

directing the union to show why the case should not be dismissed. Tarr Decl. ¶ 41. The FLRA

ultimately acceded to FEA's request that it hold the proceedings in abeyance given the court

challenges to EO 14,251—over the objection of DODEA, which insisted that the FLRA lacked

jurisdiction even to stay the proceedings and must dismiss the case, *id.* ¶¶ 43-44—but that

dispensation does not of course allow Plaintiffs recourse to the FLRA for its challenges to EO

14,251.[19]

### B.      The Preliminary Injunction Factors Decisively Weigh in Favor of a Preliminary Injunction

To secure a preliminary injunction, Plaintiffs must establish that "four factors, taken

together, warrant relief: likely success on the merits, likely irreparable harm in the absence of

preliminary relief, a balance of the equities in its favor, and accord with the public interest."

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C. Cir. 2018)

(citation and quotation marks omitted). The last two factors "merge when the Government is the

opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### 1.      Plaintiffs Are Likely to Succeed on the Merits of their Constitutional Challenges to EO 14,251

Plaintiffs' challenges to EO 14,251 fall into four categories, namely that (a) it is *ultra*

*vires* and in violation of the constitutional separation of powers; (b) it violates the First

---

[19] For the reasons stated above, the first prong of the *Thunder Basin* inquiry is not satisfied here,. Hence there is no need to analyze the second prong's three factors. But for completeness, we note that (a) Plaintiffs' challenge to the President's Executive Order is not simply "'collateral' to [Chapter 71's] review provisions," 510 U.S. at 212, it is literally beside the point of them for the reasons stated in the text; (b) Plaintiffs' *ultra vires* and constitutional challenges to EO 14,251 are manifestly "outside the agency's expertise," *id.*; and (c) "a finding of preclusion could foreclose all meaningful judicial review," *id.* at 212-13, given that the FLRA General Counsel would almost certainly decline to issue an unfair labor practice complaint on charges filed by a union *after* issuance of EO 14,251, and such a decision is not subject to judicial review as it is not a final decision of the FLRA. *See Turgeon v. FLRA*, 677 F.2d 937, 940 (D.C. Cir.1982).

Amendment; (c) it violates the Fifth Amendment's guarantee of equal protection of the laws; and (d) by purporting to nullify CBAs between Plaintiffs and the Government, it violates the Fifth Amendment's protection against unlawful takings of property and against deprivations of property without due process of law. We discuss each in turn.

(a)  EO 14,251 is <em>Ultra Vires</em> and Violates the Separation of Powers

As this Court concluded with respect to the plaintiffs in *NTEU I* and *AFSA I*, Plaintiffs are likely to succeed on their claims that EO 14,251 is *ultra vires*. And for the same reasons, Plaintiffs also are likely to succeed on their claim that EO 14,251 is so unmoored from the narrow statutory authority for excluding agencies and agency subdivisions from Chapter 71's coverage, and so contrary to the entire thrust of the statutory scheme, that it also violates the Constitution's separation of powers.

(1) Section 7103(b)(1) delegated to the President a narrow authority to exclude agencies and agency subdivisions from Chapter 71 on the basis of "national security requirements and considerations." As this Court recognized in *NTEU I*, 2025 WL 1218044 at *15, and *AFSA I*, 2025 WL 1387331 at *11-12, the Supreme Court's decision in *Cole v. Young*, 351 U.S. 536, 544 (1956), is the touchstone for addressing, in the context of federal employee protections, claims involving whether executive actions are justified by national security.

*Cole* involved the termination of an agency employee under a statute allowing agency heads, in their "absolute discretion and when deemed necessary in the interest of national security," to suspend and discharge employees "whenever [agency heads] shall determine such termination necessary or advisable in the interest of the national security of the United States." *Id.* at 541 (1956). Reversing the dismissal of the employee's complaint, the Court concluded that the undefined term "national security" was to be given a "narrow meaning" as the "Act itself reflects Congress' … desire to limit the unreviewable dismissal power to the minimum scope

30

necessary to the purpose of protecting activities affected with the 'national security.'" *Id.* at 544, 547. Accordingly, the Court held, "it is clear from the statute as a whole that that term ["national security"] was intended to comprehend only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Id.* at 544 (emphasis added). In so holding, the Court rejected the "indefinite and virtually unlimited" gloss on "national security" offered by the Government because such a reading would mean that "all positions in the Government could be said to be affected with the 'national security,'" with the result that the statute "though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." *Id.* at 547.

The *Cole* decision could hardly be more apposite here, as the explicitly narrow terms of the Section 7103(b)(1) exception, and the entire thrust of Chapter 71, demonstrate that Congress intended to apply its carefully calibrated collective bargaining scheme for federal employees as broadly as possible consistent with the need to protect sensitive national security and intelligence work. And given EO 14,251's excessive and unprecedented breadth, the only concept of "national security" that could support EO 14,251 would be one that is so elastic and unbounded that "all positions in the Government could be said to be affected with the 'national security,'" 351 U.S. at 547, such that Section 7103(b)(1) provides no limiting principle at all. Hence, EO 14,251 does precisely what the *Cole* decision militates against—using a narrowly drawn exclusion executive authority based on national security "to supersede," *id.,* Chapter 71.

As detailed above, Congress enacted Chapter 71 based on its findings that "labor organizations and collective bargaining in the civil service are in the public interest," 5 U.S.C. *id.* § 7101, and it took care to tailor the law's collective bargaining rights and duties to suit the

Government's "special requirements and needs," 5 U.S.C. § 7101(b), by, *inter alia*, outlawing bargaining over a broad set of management rights, bargaining over matters covered by statute or government-wide regulation, and strikes, *supra* p. 5. As the legislative history shows, Congress's goal was to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. William Clay).

In terms of reach, Congress covered every "Executive agency" other than nine exempted agencies, most of which have obvious law enforcement and national security functions (*i.e.*, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the United States Secret Service, and the United States Secret Service Uniformed Division), 5 U.S.C. § 7103(a)(3), and granted the President the authority to exclude agencies or agency subdivisions from Chapter 71 only where two specific limiting conditions are satisfied: (a) the agency or agency subdivision has a "primary function [of] intelligence, counterintelligence, investigative, or national security work"; and (b) Chapter 71 "cannot be applied" to that agency or subdivision "in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(3)(1). It is instinct in this statutory scheme that Congress intended Chapter 71 to have the broadest possible application without extending to those situations where collective bargaining cannot be conducted consistent with national security.

That Congress designed Chapter 71 as a whole, including Section 7103(b)(3)(1), to preserve collective bargaining for agency employees to the maximum extent consistent with national security is confirmed by the practice of every president to invoke the provision before now, including President Trump during his first administration, who each issued granular

targeted orders excluding particular sub-agencies and agency subdivisions that are clearly engaged in sensitive intelligence and/or national security work.

By contrast, the overbreadth of EO 14,251—"covering two-thirds of the federal workforce," *NTEU I*, 2025 WL 1218044, at *9, and three-quarters of those represented by unions prior to EO 14,251—by itself negates the idea that *bona fide* national security concerns justify the order. The order's dragnet sweeps up four Cabinet departments in their entirety (including the Department of Veteran's Affairs and the Department of Justice); two further Cabinet departments, each with a single exception (the Department of Energy and the Department of the Treasury); seven independent agencies in their entirety (including the Environmental Protection Agency and the Federal Communications Commission); and dozens of agencies and subdivisions within five other Cabinet departments (including the Bureau of Land Management, the Food and Drug Administration, and the National Institute of Allergy and Infectious Diseases). 90 Fed. Reg. 15,553. This partial (but not unrepresentative) list demonstrates that many, if not most, of the Cabinet Departments, agencies, and agency subdivisions excluded by EO 14,251 do not have intelligence or national security "as a primary purpose" under the first of Section 7103(b)(1)'s two conjunctive limiting conditions.

EO 14,251's breadth is unprecedented. No prior president in the nearly half-century history of Chapter 71 has ever excluded from collective bargaining an entire Cabinet Department or an entire independent agency, let alone multiple ones, or so broadly excluded agency subdivisions. EO 14,251 eclipses by far the initial Section 7103(b)(1) order issued by President Carter, *see* Exec. Order No. 12,171, 44 Fed. Reg. 66,565-66 (Nov. 20, 1979),[20] as well as the

---

[20] In *AFGE*, the Government "conceded that the next closest Executive Order in scope" to EO 14,251 was in fact Executive Order 12,171, "which the government acknowledged did not come close to the scope of" President Trump's Executive Order. 2025 WL 1755442, at *5.

order issued President George W. Bush following the enactment the Homeland Security Act of 2002, Pub. L. 107–296, 116 Stat. 2135 (2002), which was the largest reorganization and expansion of the country's national security apparatus since the National Security Act of 1947, Pub. L. 235, 61 Stat. 496 (1947),[21] *see* Exec. Order 13,480, 73 Fed. Reg. 73,991-993.

Because EO 14,251 sweeps with such a broad brush—excluding multiple Cabinet Departments and independent agencies in their entirety—even within those Departments and agencies that might arguably have intelligence or national security "as a primary purpose" are myriad sub-agencies and subdivisions that certainly do not have such a primary purpose and whose employees are not involved in national security or intelligence work at all. As to those sub-agencies and subdivisions it is preposterous to suppose that collective bargaining "cannot be conducted consistent with national security requirements and considerations." DODEA is a prime example of such an agency subdivision. While DOD, taken as a whole, may reasonably be said to have national defense as a primary function, the Department is vast: with an annual budget well in excess of $800 billion, it is the largest federal agency, has dozens of constituent agencies and myriad other field activities, and is "the country's largest employer, with … more over 811 thousand civilian employees,"[22] not all of whom are engaged in national security work. Of direct relevance here, neither DODEA—which operates public PreK-through-12 schools for children of civilian and uniformed DOD personnel—nor its workforce of public-school educators—performs any national security functions. Thus, DODEA can satisfy neither Section

---

[21]  Darren W. Stanhouse, *Ambition and Abdication: Congress, the Presidency, and the Evolution of the Department of Homeland Security*, 29 N.C. J. Int'l L. & Com. Reg. 691, 691 (2004).

[22] U.S. Dep't of Defense, Agency Financial Report Fiscal Year 2024 at 2, https://comptroller.defense.gov/Portals/45/Documents/afr/fy2024/DoD_FY24_Agency_Financial _Report.pdf.

7103(b)(1)'s first limiting condition as it does not have national security "as a primary purpose" nor its second, more stringent, condition—that collective bargaining under Chapter 71's carefully calibrated scheme "*cannot* be applied … in a manner consistent with national security requirements and considerations" (emphasis added).

As if the foregoing were not enough to show EO 14,251 is entirely unmoored from narrow authority Congress established in Section 7103(b)(1), the President's own words and those of other members of his administration belie any notion that the President acted according to *bona fide* national security concerns. As detailed above those contemporaneous statements, deployed to justify and explain the basis for EO 14,251, demonstrate that the President's action was actuated by animus against federal unions by reason of their speech and petitioning activities and a desire to facilitate the mass firing of federal workers—neither of which is a legitimate national security rationale under Section 7103(b)(1).

All this being so, EO 14,251 is not merely *ultra vires* the President's statutory authority, but also a violation of the Constitution's separation of powers. Although not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," *Dalton v. Specter*, 511 U.S. 462, 472, 114 (1994), Plaintiffs' challenge to the President's authority is no garden-variety "claim[] that an official has acted in excess of his statutory authority," *id*. Rather, Plaintiffs challenge an instance of "the President tak[ing] measures incompatible with the expressed or implied will of Congress," where under separation-of-powers principles, "his power is at its lowest ebb," *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). By leveraging a narrow "national security" exception to upend Chapter 71—stripping its protection from two-thirds of federal employees, and three-quarters of those who were formerly represented by federal unions—EO

14,251 is not simply *ultra vires* but incompatible with the statue. This the President cannot do. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President … to amend, or to repeal statutes.").

The special panel's order staying this Court's injunction in *AFSA I* concluded that the Government was likely to succeed on the merits of the plaintiff's *ultra vires* challenge, *AFSA II*, 2025 WL 1742853 at *2-*3, but that non-controlling order (*see supra* n.1) does not undermine Plaintiffs as the circumstances that the panel found dispositive are not present here, and in any event the panel's sparse reasoning is deeply flawed.

The panel's order boiled down to the following syllogism, with which the panel led its brief discussion:

> The Foreign Service is the workforce through which the United States conducts its foreign affairs. And foreign affairs are critical to national security. So the Government is likely correct that the Executive Order is consistent with the Foreign Service Act's delegation of national-security determinations to the President. [2025 WL 1742853 at *2.]

Whatever the merits of that reasoning with respect to the foreign service workers represented by AFSA, this reasoning simply does not apply to the educators in DODEA's workforce, none of whom conduct the Government's foreign affairs.

Beyond that, the panel's reasoning is fundamentally flawed in three respects:

*First*, a significant portion of the panel's brief discussion is spent casting doubt on the idea that "*ultra vires* review" of presidential actions "is available at all," *id.*, which is contrary to a raft of binding D.C. Circuit authority establishing that executive orders are reviewable for compliance with statutory limits.[23]

_____

[23] *See, e.g.*, *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Courts remain obligated to determine whether statutory restrictions have been violated [by executive actions]."); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1339 (D.C. Cir. 1996)

(*continued . . .*)

*Second*, the order suggests that EO 14,251 is unreviewable because "'the statute in question commits the decision to the discretion of the President.'" 2025 WL 1742853 at *2, quoting *Dalton*, 511 U.S. at 474. Without quoting or doing any business with the text of the exclusion provision before it, or with the statute at issue in *Dalton*, the panel made the bald and erroneous assertion that the foreign service exclusion provision is such a statute. 2025 WL 1742853 at *2. But as the D.C. Circuit has held, "*Dalton*'s holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President *and contains no limitations on the President's exercise of that authority*, judicial review of an abuse of discretion claim is not available." *Reich*, 74 F.3d at 1331-32 (emphasis added).[24] And the foreign service exclusion provision, 22 U.S.C. § 4103(b), manifestly does contain limitations on the President's authority, which are nearly identical limiting conditions to those in Section 7103(b)(1)

*Third*, the panel treated EO 14,251's invocation of national security as beyond question, contrary to (and without any reference to) *Cole*'s holding that a "national security" exception to statutory protections for federal employees cannot be used to undermine the purpose of the statutory scheme. Instead of addressing that decision, which was central to this Court's decision

---

("[W]e think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions, so long as the President *claims* that he is acting pursuant [to statutory authority]."); *Dart v. U.S.*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority. Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior….").

[24] The statute in *Dalton* empowered the President to approve or disapprove a commission's recommendations as to military base closures, without *any* criteria or limiting conditions; hence the Court found that the "statute does not at all limit the President's discretion in approving or disapproving the Commission's recommendations … or, indeed, prevent him from approving or disapproving recommendations for whatever reason he sees fit." 511 U.S. at 463.

in *AFSA I*, the panel relied on *Trump v. Hawaii*, 585 U.S. 667 (2018), a case that is inapposite as it concerns the distinct context of immigration controls under a statute that, unlike that at issue here or in *AFSA I*, "exudes deference to the President in every clause," 585 U.S. at 684.

**(b)    EO 14,251 Violates the First Amendment**

To make out a First Amendment retaliation claim courts traditionally require parties to show that "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [them]." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up). Plaintiffs FEA and FEA-SR satisfy each of these elements.

As to the first, FEA sued to enjoin an executive order issued by President Trump in his first administration, joined a coalition of federal unions that includes AFGE in publicizing that lawsuit and criticizing the President, and with that coalition signed numerous letters to Congress protesting policies adopted by the first and second Trump administrations. And FEA-SR has filed multiple bargaining-unit-wide grievances against signature Trump administration policies affecting federal employees this year. *Supra* pp. 9-10. It is beyond cavil that filing lawsuits, criticizing public officials, appealing to lawmakers, and using grievance procedures occupy the highest level of First Amendment protection. *See Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018); *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002).

The second and third requirements—retaliatory action and causation—are answered by EO 14,251 and the White House's Fact Sheet respectively, as the latter expressly and repeatedly states the President's retaliatory motive for the former. In the Fact Sheet, the President rails against "hostile Federal unions" that, in its view, have "declared war on [his] agenda" by, for example, "filing grievances to block Trump policies"; decries "[t]he largest Federal union"—a

clear reference to AFGE, a coalition partner of FEA—because it "describes itself as 'fighting back' against Trump" and "is widely filing grievances to block Trump policies"; and sends an unmistakable message that the President will reward unions that support his policies and punish those who exercise their First Amendment rights to resist them: "President Trump supports constructive partnerships with unions who work with him" but "will not tolerate mass obstruction." *Supra* pp. 13-14.

That said, where, as here, the Government punishes a class of persons in retaliation for the protected speech and petitioning activities of some members of the class, the chilling effect of that retaliation extends to all class members, regardless of whether they are the particular class members the Government had in mind when retaliating or whether they engaged in protected activity at all. Indeed, such instances of 'collective punishment' present a greater affront to the Frist Amendment for precisely this reason. Consequently, the traditional three-element test— which was developed in cases involving retaliation against individuals, typically public employees—is not well suited in this setting.

But the Court's decision in *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016), makes clear that not all First Amendment retaliation claims must fit into the Procrustean bed of the three traditional elements. In *Heffernan*, the Court held that a municipal official violated the First Amendment by demoting an employee in retaliation for First Amendment-protected activity that the official *mistakenly* believed that the employee had engaged in (voicing support for a political candidate disfavored by the government official), concluding that "the government's reason for demoting Heffernan," rather than whether he had actually engaged in the protected activity, "is what counts." *Id.* at 270. Drawing from seminal First Amendment cases such as *Elrod v. Burns*, 427 U.S. 347 (1976), the *Heffernan* Court reasoned that this is so because even

"in the ordinary case" of retaliation for a public employee's protected speech, "the constitutional harm at issue consists in large part of discouraging employees—both the employee discharged (or demoted) and his or her colleagues—from engaging in protected activities"—in short, "[t]he discharge of one tells the others that they engage in protected activity at their peril." *Id.* at 273.

Aso instructive is *Welch v. Ciampa*, 542 F.3d 927, 939 (1st Cir. 2008): "We can discern no principled basis for holding that an employee who supports an opposition group is protected by the First Amendment but one who chooses to remain neutral is vulnerable to retaliation." While "recogniz[ing] that a plaintiff's active support of a candidate or cause may help the plaintiff meet her evidentiary burden of showing that the adverse employment decision was substantially motivated by her political affiliation … neither active campaigning for a competing party nor vocal opposition to the defendant's political persuasion are required." *Id.*

Under the principles articulated in *Heffernan* and *Welch*, retaliation against a broad swath of federal unions for the speech and petitioning activities of some of those unions chills the speech of all impacted unions and violates the First Amendment, regardless of whether they, like FEA and FEA-SR, engaged in the speech and petitioning activities targeted by the President, or whether, like ACEA, they refrained from such activities. In each instance, the President's "reason" for issuing EO 14, 251 "is what counts." 578 U.S. at 268.

### (c)    EO 14,251 Violates the Equal Protection Guarantee of the Fifth Amendment

For largely the same reasons just discussed, Plaintiffs are likely to succeed on their Claim that EO 14,251 violates the guarantee of equal protection provided by the due process clause of the Fifth Amendment. *See U.S. v. Windsor*, 570 U.S. 744, 769-70 (2013); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Assuming for present purposes that EO 14,251 is, by analogy to economic legislation, subject to rational basis review, the President's action fails even that most deferential

standard by reason of his singling out what he called "hostile Federal unions" for adverse treatment for avowedly retaliatory as action.

"The Constitution's guarantee of equality 'must at the very least mean that a bare … desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 570 U.S. at 770 (quoting *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534-35 (1973)). Such a "bare … desire to harm a politically unpopular group" is precisely what motivated the Executive Order's exclusion of 75% of all union-represented federal employees across multiple Cabinet Departments and independent agencies, while providing a blanket exception for agency police and firefighters, whose unions have supported or actively refrained from opposing President Trump. *See supra* pp. 15. This conclusion is all the more inescapable given the White House's statements admitting that the purpose of the order is to harm and punish "hostile Federal unions" for voicing opposition to Trump administration policies and petitioning the government for redress from those policies. *See supra* p. 10.

> **(d)  EO 14,251 Violates the Fifth Amendment's Protections Against Takings and the Deprivation of Property Without Due Process of Law**

Finally, Plaintiffs are likely to succeed on their claims that that EO 14,251 violates the Fifth Amendment in two further, related ways: by nullifying CBAs lawfully entered into by the Government, the order violates the Fifth Amendment's (i) protection against improper takings and/or its protection of substantive due process; and (ii) its guarantee of procedural due process.

(i) For more than 90 years, the Court has affirmed that the Fifth Amendment protects against the Government's retroactive abrogation of its contracts. In *Lynch v. U.S.*, 292 U.S. 571, 579 (1934), the Court held that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States" and that as such, contracts with the Government are protected by the Takings Clause and the Due Process Clause. *See also Cherokee*

*Nation of Okl. v. Leavitt*, 543 U.S. 631, 646 (2005); *U.S. v. Winstar Corp.*, 518 U.S. 839, 875-76 (1996).

EO 14,251, the OPM Guidance, and their implementation by DODEA nullify CBAs lawfully entered into with the Government and retroactively extinguish vested rights under them, including FEA's and FEA-SR's unresolved pay grievances on behalf of more than 900 educators and employees' rights to draw on donated leave hours provided in the sick leave bank established by ACEA's CBA with DODEA. Whether viewed through the lens of an unlawful taking or a deprivation of substantive due process, these actions violated the Fifth Amendment by depriving Plaintiffs and their members of their vested, constitutionally protected property interests in CBAs lawfully entered into with DODEA with no legitimate public purpose or rational justification; indeed, as the President's own words show, EO 14,251 was issued for manifestly improper purposes.

(ii) Because contracts with the Government are property protected by the Fifth Amendment, EO 14,251 also has deprived Plaintiffs and their members of their constitutionally protected property interests in CBAs lawfully entered into with DODEA without having afforded Plaintiffs any notice or opportunity to be heard in violation of the Fifth Amendment's guarantee of procedural due process. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

## 2.    Plaintiffs and Their Members Are Suffering Irreparable Harm

Plaintiffs and their members are currently suffering irreparable harm, and absent a preliminary injunction, will continue to suffer further and more severe irreparable harm by reason of EO 14,251, the OPM Guidance, and DODEA's implementation thereof. As an initial matter, '[i]t has long been established that the loss of constitutional freedoms, 'for even minimal

periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009), quoting *Elrod*, 427 U.S. at 373.

Beyond that, as detailed above (at pp. 16-26), not only have Plaintiffs and their members lost the statutory rights and protections of Chapter 71, but they have lost their contractual rights under valid CBAs that remain in force according to the terms, but which DODEA has abrogated by (1) cancelling dues deductions for all Plaintiffs, thereby cutting off "the economic lifeblood of a labor organization and normally its primary source of income," *Local Union No. 5741, United Mine Workers v. NLRB*, 865 F.2d 733, 738 (6th Cir. 1989) (cleaned up); (2) halting collective bargaining negotiations with FEA-SR and grievance and arbitration proceedings with both FEA and FEA-SR, including pay grievances on behalf of more 900 educators pending at various stages of the arbitral process before EO 14, 251 issued; (3) instituting a reorganization that eliminates positions without notice or bargaining with Plaintiffs over the impact and implementation of its decision; (4) refusing to honor employees' rights to have a union representative present during investigatory interviews; (5) cancelling official time arrangements with all Plaintiffs; and (6) stymying the operation of the sick leave bank that it had agreed to in its CBA with ACEA.[25]

As we have shown, the loss of these statutory and contractual rights has created a vicious circle of mutually reinforcing and escalating harms to Plaintiffs and their members. The loss of payroll deduction has reduced Plaintiffs' revenue and required them to divert their dwindling

---

[25] The panel majority in *NTEU II* ruled that the plaintiff had not shown irreparable harm because, in the majority's view, its CBAs remained intact. 2025 WL 1441563, at *1. Leaving aside its ungenerous reading of the factual record in that case, the panel majority recognized "if a specific agency or subagency" terminate CBAs, unions "may seek injunctive relief appropriately tailored to any non-speculative, irreparable harm," *id.*, and Plaintiffs have amply shown such abrogation of their CBAs here.

resources to the resource-intensive task of signing up members for alternative pay systems. This situation leaves fewer resources available for the representation of Plaintiffs' members at a time of great turmoil and uncertainty. And those members are inevitably less inclined to pay dues to unions that cannot bargain with DODEA, enforce their CBAs with DODEA, or even engage in routine representation of members in investigatory interviews or other interactions with management—especially since those members have lost the protections of union activity afforded by Chapter 71 and its enforcement processes. This effect is demonstrated by fact that only about half of FEA members have agreed to continue their membership by paying through alternative means. As the Supreme Court has acknowledged, "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944). *See also Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.").

Most, if not all, of these harms are irreparable. For Plaintiffs, loss of their core functions of collective bargaining, contract enforcement, and workplace representation—combined with the reduction in their revenue—is a threat to their continued existence. A subsequent restoration of those rights, and of the dues lost by reason of the payroll deduction cancellation, cannot restore the services that members have lost, and cannot therefore repair the Plaintiffs' standing in the eyes of their membership as they stand powerless to bargain on members' behalf, enforce members' CBA rights and protections, and even engage in routine interventions with management. In short, "the value of the right to enjoy the benefits of union representation is

immeasurable in dollar terms once it is delayed or lost." *Small v. Avanti Health Sys., LLC*, 661

F.3d 1180, 1192 (9th Cir. 2011).

### 3. Restoring the Longstanding Status Quo of Chapter 71 Coverage Harms Neither the Government nor the Public Interest

Neither the Government nor the public interest would be harmed by a preliminary

injunction that restores the decades-long status quo of Chapter 71's coverage of the DODEA.

There is no legitimate Government interest in enforcing an unconstitutional executive order,[26]

while "the public has an interest in ensuring that statutes enacted by their representatives are not

imperiled by executive fiat." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1015 (9th Cir. 2020) (cleaned

up). And "[i]t is always in the public interest to prevent the violation of a party's constitutional

rights." *Simms v. D.C.*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (cleaned up).[27]

### CONCLUSION

For the foregoing reasons, this Court should grant Plaintiffs' motion for a preliminary

injunction.

Respectfully submitted,

/s/Philip Hostak
Philip A. Hostak
Jason Walta
  * *Counsel of Record*
Caitlin Rooney
National Education Association
1201 16th Street, NW

---

[26] The special panel in *AFSA II* credited the Government's assertion that "the preliminary injunction inflicts irreparable harm to the President by interfering with the national-security determinations entrusted to him by Congress," 2025 WL 1742853, at *3. But that ruling simply assumes the conclusion of a disputed merits issue—whether President Trump was acting according to *bona fide* national security concerns—as to which the President's own words provide a negative answer.

[27] There remains only the question of security under Rule 65(c) as to which Plaintiffs respectfully request that the amount be nominal—we suggest $100—given that a preliminary injunction will not cause the Government any pecuniary loss.

Washington, D.C. 20036
(202) 822-7035
jwalta@nea.org
phostaak@nea.org
crooney@nea.org

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 2, 2025, a true copy of the foregoing Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction was filed electronically filed with the Clerk of Court using the CM/ECF system, and, because no counsel has yet appeared on behalf of the Defendants, was sent by first-class U.S. Mail to each of the Defendants and to the United States Attorney General and the United States Attorney for the District of Columbia at the following addresses:

Donald J. Trump
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Peter Hegseth
1000 Defense Pentagon
Washington, DC 20301

United States Department of Defense
1400 Defense Pentagon
Washington, DC 20301

Charles Ezell
1900 E Street NW
Washington, DC 20415

United States Office of Personnel
   Management
1900 E Street NW
Washington, DC 20415

Jeanine Ferris Pirro
Interim United States Attorney for the
   District of Columbia
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530

Pamela Bondi
United States Attorney General
950 Pennsylvania Ave., NW
Washington, D.C. 20530


/s/Philip Hostak
Philip Hostak