# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, *et al.*, | ) ) ) |
| *Plaintiffs*; | ) ) Case No. 1:25-cv-1362-PLF |
| v. | ) ) Judge Paul L. Friedman |
| DONALD J. TRUMP, *et al.*, | ) ) |
| *Defendants*. | ) ) ) |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 3

I.    The President's Authority to Control the Conduct of Federal Employees............................ 3

II.   The FSLMRS Framework and Related Executive Orders ..................................................... 4

III.  The Statutory Channeling Requirement ................................................................................ 6

IV.   The Instant Action and Plaintiffs' Motion for Preliminary Injunction................................. 7

LEGAL STANDARD........................................................................................................ 8

ARGUMENT ................................................................................................................... 9

I.    Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims ...................... 9

      A.    The FSLMRS precludes district court jurisdiction over Plaintiffs' claims..................... 9

      B.    Plaintiffs are unlikely to succeed on the merits of their ultra vires or separation of
            powers claims................................................................................................................. 14

      C.    Executive Order 14,251 is valid.................................................................................... 22

      D.    Plaintiffs are unlikely to succeed on the merits of their First Amendment retaliation
            claim.............................................................................................................................. 26

      E.    Plaintiffs are unlikely to succeed on the merits of their Fifth Amendment claims........ 30

II.   Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction......................... 35

III.  The Balance of the Equities and the Public Interest Favor the Government......................... 38

IV.   Any Injunctive Relief Should Be Limited to the Parties to this Case and Plaintiffs
      Should Be Ordered to Post Security. ...................................................................................... 40

CONCLUSION.................................................................................................................. 41

# TABLE OF AUTHORITIES

**Cases**

*AFGE v. Loy,*
  367 F.3d 932 (D.C. Cir. 2004) ........................................................................ 13, 14

*AFGE v. Nicholson,*
  475 F.3d 341 (D.C. Cir. 2007) .............................................................................. 14

*AFGE v. Sec'y of Air Force,*
  716 F.3d 633 (D.C. Cir. 2013) .............................................................................. 11

*AFSA v. Trump,*
  No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ........................... *passim*

*Am. Butterfly Ass'n v. Wolf,*
  977 F.3d 1244 (D.C. Cir. 2020) ............................................................................ 15

*Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan,*
  870 F.2d 723 (D.C. Cir. 1989) ....................................................................... *passim*

*American Foundation of Government Employees, AFL-CIO v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019) ................................................................... 9, 10, 13

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
  897 F.3d 314 (D.C. Cir. 2018) ................................................................................ 8

*Aref v. Holder,*
  774 F. Supp. 2d 147 (D.D.C. 2011) ...................................................................... 26

*Aref v. Lynch,*
  833 F.3d 242 (D.C. Cir. 2016) .............................................................................. 26

*Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.,*
  573 F.3d 815 (D.C. Cir. 2009) ................................................................................ 8

*Axon Enter., Inc. v. FTC,*
  598 U.S. 175 (2023) ....................................................................................... 10, 12

*Bd. of Governors, FRS v. MCorp Fin., Inc.,*
  502 U.S. 32 (1991) ......................................................................................... 14, 16

*Black Lives Matter D.C. v. Trump,*
  544 F. Supp. 3d 15 (D.D.C. 2021) ............................................................. 26, 27, 30

*Bouarfa v. Mayorkas,*
  604 U.S. 6 (2024) ........................................................................................... 16, 22

*Buchanan v. Barr*,
  71 F.4th 1003 (D.C. Cir. 2023) .................................................................................. 26

*Building & Construction Trades Department, AFL-CIO v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ...................................................................................... 3

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
  464 U.S. 89 (1983) ................................................................................................. 4, 13

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir, 2006) ......................................................................... 8, 35, 37

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
  333 U.S. 103 (1948) ................................................................................................... 25

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ................................................................................................... 20

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ................................................................................................... 38

*Cole v. Young*,
  351 U.S. 536 (1956) .............................................................................................. 18, 19

*Nuclear Regul. Comm'n v. Texas*,
  145 S. Ct. 1762 (2025) ...................................................................................... 14, 15, 16

*Conn. LLC v. District of Columbia*,
  336 F.3d 1068 (D.C. Cir. 2003) ................................................................................. 31

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ................................................................................................... 20

*DCH Reg. Med. Ctr. v. Azar*,
  925 F.3d 503 (2019) ................................................................................................... 15

*Def. Logistics Agency*,
  5 F.L.R.A. 126 (1981) ................................................................................................ 37

*Dep't of Def. v. FLRA*,
  685 F.2d 641 (D.C. Cir. 1982) ................................................................................... 23

*Dep't of the Navy v. Egan*,
  484 U.S. 518(1988) .................................................................................................... 24

*Doe v. District of Columbia*,
  796 F.3d 96 (D.C. Cir. 2015) ..................................................................................... 26

*Eisinger v. FLRA*,
   218 F.3d 1097 (9th Cir. 2000) ............................................................. 35

*Elgin v. Dep't of Treasury*,
   567 U.S. 1 (2012) ..................................................................... 12, 13

*FCC v. Beach Commc'ns, Inc.*,
   508 U.S. 307 (1993) ...................................................................... 32

*Fed. Express Corp. v. Dep't of Com.*,
   39 F.4th 756 (D.C. Cir. 2022) ............................................................ 15

*Fed. L. Enf't Officers Ass'n v. Ahuja*,
   62 F.4th 551 (D.C. Cir. 2023) ............................................................ 12

*Five Flags Pipe Line Co. v. Dep't of Transp.*,
   854 F.2d 1438 (D.C. Cir. 1988) ........................................................... 15

*Fla. EB5 Invests., LLC v. Wolf*,
   443 F. Supp. 3d 7 (D.D.C. 2020) ......................................................... 35

*Fund for Animals v. Frizell*,
   530 F.2d 982 (D.C. Cir. 1975) ........................................................... 36

*Gallo v. U.S. Dist. Court For Dist. of Arizona*,
   349 F. 3d 1169 (9th Cir. 2003) .......................................................... 34

*Harrison v. Fed. Bureau of Prisons*,
   298 F.Supp.3d 174 (D.D.C. 2018) ......................................................... 33

*Hartman v. Moore*,
   547 U.S. 250 (2006) ...................................................................... 27

*Heckler v. Ringer*,
   466 U.S. 602 (1984) ...................................................................... 12

*Heffernan v. City of Paterson, N.J.*,
   578 U.S. 266 (2016) .................................................................. 27, 28

*Heller v. Doe*,
   509 U.S. 312 (1993) ...................................................................... 31

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017) ....................................................................... 20

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ................................................................ 18, 21, 24

iv

*Houston Cmty. Coll. Sys. v. Wilson,*
    595 U.S. 468 (2022) ............................................................................ 26

*Immigration and Naturalization Service Los Angeles District Los Angeles, California,*
    52 F.L.R.A. 103 (1996) ...................................................................... 37

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ..................................................................... 29, 32

*Loc. 1498, AFGE v. AFGE, AFL/CIO,*
    522 F.2d 486 (3d Cir. 1975) ................................................................ 4

*Manhattan-Bronx Postal Union v. Gronouski,*
    350 F.2d 451 (D.C. Cir. 1965) ........................................................ 3, 4

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
    429 U.S. 274 (1977) ............................................................................ 26

*Munaf v. Geren,*
    553 U.S. 674 (2008) .............................................................................. 8

*Myers v. United States,*
    272 U.S. 52 (1926) ................................................................................ 3

*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ...................................................... 36

*Nat'l Mining Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2011) .................................................... 36

*Nat'l Rifle Ass'n v. Vullo,*
    602 U.S. 175 (2024) ............................................................................ 27

*Nat'l Treas. Emps. Union v. Trump,*
    No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ............ 37, 41

*Nat'l Urban League v. Trump,*
    ___F.Supp.3d ___, 2025 WL 1275613 (D.D.C. May 2, 2025) .............. 33

*New Vision Photography,*
    54 F. Supp. 3d ................................................................................... 33

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.D.C. 2005) .................................................. 36

*Nieves v. Bartlett,*
    587 U.S. 391 (2019) ............................................................................ 29

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ........................................................................................... 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................... 9, 38

*NLRB v. SW General, Inc.*,
    580 U.S. 288 (2017) ........................................................................................... 20

*NTEU v. Reagan*,
    No. 80-606, 1981 WL 150530 (D.D.C. Sept. 3, 1981) ...................................... 18, 23

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ........................................................................... 15

*Ohio Adjutant General's Department v. FLRA*,
    598 U.S. 449 (2023) ........................................................................................... 14

*Quezada v. Marshall*,
    915 F. Supp. 2d 129 (D.D.C. 2013) ................................................................... 31

*Racine Charter One, Inc. v. Racine Unified Sch. Dist.*,
    424 F.3d 677 (7th Cir. 2005) ............................................................................. 32

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*,
    351 F.3d 1229 (D.C. Cir. 2003) ......................................................................... 20

*Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*,
    421 F.3d 1 (1st Cir. 2005) ................................................................................. 33

*Reichle v. Howards*,
    566 U.S. 658 (2012) ........................................................................................... 29

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) ........................................................................................... 17

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ........................................................................... 21

*Sherley v. Sebelius*,
    644 F.3d 388 (D.C. 2011) ................................................................................... 8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    205 F. Supp. 3d 4 (D.D.C. 2016) ....................................................................... 8

*Stefan v. Perry*,
    41 F.3d 677 (D.C. Cir. 1994) ............................................................................. 31

*Tate v. District of Columbia*,
  627 F.3d 904 (D.C. Cir. 2010) ................................................................ 31

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ............................................................................... 10

*Trump v. CASA, Inc.*,
  606 U.S. ___, 2025 WL 1773631 (2025) .................................................. 40

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ........................................................................... *passim*

*Trump v. Thompson*,
  20 F.4th 10 (D.C. Cir. 2021) ..................................................................... 8

*Turgeon v. FLRA*,
  677 F.2d 937 (D.C. Cir. 1982) ................................................................. 11

*U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*,
  60 F.L.R.A. 202 (2004) ........................................................................... 13

*U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs,*
  *Enf't*, 67 F.L.R.A. 501 (2014) ................................................................. 29

*U.S. Dep't of Lab., Wash., D.C.*,
  37 F.L.R.A. 25 (1990) ............................................................................. 37

*U.S. Dep't of the Treasury, U.S. Mint*,
  35 F.L.R.A. 1095 (1990) .......................................................................... 37

*U.S. v. Moore*,
  543 F.3d 891 (7th Cir. 2008) ................................................................... 32

*United States Department of Defense Ohio National Guard & AFGE Local 3970*,
  71 F.L.R.A. 829 ....................................................................... 13, 14, 37

*United States v. Windsor*,
  570 U.S. 744 (2013) ................................................................................ 30

*United States v. Woods*,
  571 U.S. 31 (2013) .................................................................................. 17

*Vill. of Willowbrook v. Olech*,
  528 U.S. 562 (2000) ................................................................................ 30

*W. Watersheds Project v. Bernhardt*,
  468 F. Supp. 3d 29 (D.D.C. 2020) .......................................................... 36

*Webster v. Doe,*
    486 U.S. 592 (1988) ................................................................................ 23

*Williams v. Johnson,*
    701 F. Supp. 2d 1 (D.D.C. 2010) ........................................................... 26

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................... 8, 38

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n,*
    758 F.2d 669 (D.C. Cir. 1985) ........................................................ 35, 36

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ......................................................................... 21, 22

*Zukerman v. United States Postal Serv.,*
    64 F.4th 1354 (D.C. Cir. 2023) ............................................................. 38

**The Constitution**

U.S. Const., art. II, § 1, cl. 1 ...................................................................... 3

**Statutes**

5 U.S.C. § 7101 ........................................................................... 4, 21, 34

5 U.S.C. § 7103 .................................................................................. *passim*

5 U.S.C. § 7105 ............................................................................................ 7

5 U.S.C. § 7107 ............................................................................................ 2

5 U.S.C. § 7116 ...................................................................................... 6, 13

5 U.S.C. § 7118 .......................................................................................... 37

5 U.S.C. § 7121 .......................................................................................... 12

5 U.S.C. § 7123 .................................................................................... 10, 11

5 U.S.C. § 7301 ............................................................................................ 4

Pub. L. No. 95-454, 92 Stat. 111 (1978) .................................................... 4

**Rules**

Federal Rule of Civil Procedure 65(c) ...................................................... 41

**Executive Orders**

Exec. Order No. 10,988 (Jan. 17, 1962), 3 C.F.R. § 521 (1959–1963) ........................................... 4

Exec. Order No. 11,491, 3 C.F.R. § 861 (1966–1970) ..................................................................... 4

Exec. Order No. 11,616, 3 C.F.R. § 605 (1971–1975) ..................................................................... 4

Exec. Order No. 11,636, 3 C.F.R. § 634 (1971–1975) ..................................................................... 4

Exec. Order No. 11,838 (Feb. 6, 1975) ............................................................................................. 4

Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979) ....................................................... 5

Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997) ....................................................... 5

Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002) ............................................................ 5

Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008) .................................................... 5, 17

Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017) ........................................................ 5

Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025) ............................................. 5, 6, 24

# INDEX OF EXHIBITS

Ex. 1      Declaration of Michael A. Cogar, Deputy Assistant Secretary of Defense for Civilian Personnel Policy, U.S. Department of Defense (July 22, 2025)

Ex. 1-A      Exhibit A to Declaration of Michael A. Cogar: *Collective Bargaining Agreement (CBA) Between Department of Defense Education Activity (DoDEA) And Federal Education Association (FEA)* (August 1, 2023) ("FEA CBA")

Ex. 1-B      Exhibit B to Declaration of Michael A. Cogar: *Master Labor Agreement For Professional Employees - Between Federal Education Association Stateside Region (FEA-SR) And Department Of Defense Domestic Dependent Elementary And Secondary Schools (DDESS)* (January 11, 2019) ("FEA-SR Pro CBA")

Ex. 1-C      Exhibit C to Declaration of Michael A. Cogar: *Master Labor Agreement Between Federal Education Association Stateside Region (FEA-SR) (Non-Professional Unit) And Department Of Defense Domestic Dependent Elementary And Secondary Schools (DDESS)* (March 25, 2010) ("FEA-SR Non-Pro CBA")

Ex. 1-D      Exhibit D to Declaration of Michael A. Cogar: *Collective Bargaining Agreement (CBA) Between: Department of Defense Education Activity (DoDEA), Department of Defense Domestic Dependent Elementary and Secondary Schools (DDESS)-Puerto Rico and Antilles Consolidated Education Association (ACEA)* (October 20, 2023) ("ACEA CBA")

## INTRODUCTION

Plaintiffs, three labor unions that represent certain employees in schools operated by the Department of Defense Education Activity (DoDEA) within the United States Department of Defense (DoD or the Department), have filed the present lawsuit seeking to second guess a lawful exercise of the President's authority.  The federal statute that governs bargaining with public-sector labor unions authorizes the President to exempt from its coverage "*any* agency" if the President makes the determination that  (A) "the agency . . . has as a primary function intelligence, counterintelligence, investigative, or national security work," and (B) the provisions of the statute "cannot be applied to that agency . . . in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1).

On March 27, 2025, President Trump issued such an order.  In Executive Order 14,251, *Exclusions from Federal Labor Management Relations Program*, the President made the determinations specified in the governing statute, thereby excluding from its coverage the identified agencies, including as relevant here DoD.  Plaintiffs seek to enjoin Defendants—the President, the Director of the Office of Personnel Management (OPM), the Secretary of Defense, DoD, and OPM—from implementing Executive Order 14,251.  Yet, Plaintiffs concede that DoD "taken as a whole, may reasonably be said to have national defense as a primary function[]"—the first prong of the § 7103(b)(1) standard.  Mem. in Supp. of Pls.' Mot. for a Prelim. Inj. 34, ECF No. 22-1 ("Pls.' Mot.").  As to the second prong of the § 7103(b)(1) standard, Plaintiffs do not attempt to show that the President improperly determined that the provisions of the chapter could not be applied to DoD consistent with national security considerations.  Instead, Plaintiffs attack the Executive Order for excluding the Department as a whole, rather than reflecting a more granular determination at the component level.  But the statute plainly authorizes the President to make the determinations at the agency-level, as he did here with DoD.

Plaintiffs' request for a preliminary injunction should be denied for multiple reasons.  Most fundamentally, Plaintiffs fail to establish a likelihood of success on the merits of their claims, which broadly allege that the President impermissibly exceeded lawful authority delegated to him by Congress and that the President, in exercising this authority, retaliated against Plaintiffs.  First, this Court lacks jurisdiction to hear Plaintiffs' claims.  Congress intended claims under Chapter 71 of the Federal Service Labor-Management Relations Statute (FSLMRS or Statute), 5 U.S.C. §§ 7107–7135, to be covered by the comprehensive remedial scheme set forth in that statute. Plaintiffs' claims—which turn on their assertion that DoD and its subcomponent DoDEA remain covered by Chapter 71 and are violating obligations under the FSLMRS and their respective collective-bargaining agreements (CBAs)—do not fall within the narrow exception to such preclusion articulated in *Thunder Basin* and its progeny.  Second, the FSLMRS precludes ultra vires review and Plaintiffs have not identified a clear and mandatory prohibition that the President is alleged to have violated.  To the contrary, Plaintiffs admit that DoD can reasonably be said to have as a primary function national security work, and it thus follows that the President made a reasonable determination as to the first prong of the § 7103(b)(1) standard.  Third, the Court lacks authority to review the President's national security determination, as Congress and this Circuit expressly recognized.  *Am. Fed'n of Gov't Emps., AFL-CIO v. Reagan*, 870 F.2d 723, 727–28 (D.C. Cir. 1989).  And in any event, the President's exercise of discretion here is readily supported by the facts and the law.  Additionally, the President's decision is entitled to a presumption of regularity as a facially valid executive action that Plaintiffs have not, and cannot, overcome by way of their unsupportable First Amendment retaliation claim, which broadly asserts that they have been chilled due to a White House Press Office Fact Sheet's mention of other, non-Plaintiff federal-sector unions.  Finally, Plaintiffs are unlikely to succeed on the merits of their Fifth Amendment Equal Protection, Due Process, or Takings claims because the Executive Order does

not discriminate based on identity; Plaintiffs are not entitled to pre-decisional due process; and Plaintiffs' CBAs with Defendants do not give rise to any property rights.

Nor do Plaintiffs establish irreparable harm absent the immediate relief they seek. The harms alleged in Plaintiffs' motion are all either remediable on a favorable ruling later in this case, or insufficiently certain and imminent to justify the extraordinary relief of a preliminary injunction. Moreover, Plaintiffs waited nearly two months after initiating this lawsuit before filing their motion for preliminary injunction. This delay itself belies Plaintiffs' claims of irreparable harm.

Likewise, the balance of the equities and the public interest favor Defendants, as Plaintiffs' requested preliminary injunction would interfere with the President's lawfully delegated authority to ensure that DoD is able to meet its primary purpose of protecting the national security of the United States. And rather than maintaining the status quo, it would force DoD to undo actions it has already taken to implement the Executive Order, causing significant disruption and resource expenditures.

Accordingly, because Plaintiffs cannot establish any necessary element of the extraordinary relief requested, Plaintiffs' motion for preliminary injunction should be denied.

## BACKGROUND

### I.    The President's Authority to Control the Conduct of Federal Employees

Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America." U.S. Const., art. II, § 1, cl. 1. This power "necessarily encompasses 'general administrative control of those executing the laws,' throughout the Executive Branch of government," *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)), and includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965).

Congress has further recognized this aspect of Executive power by enacting, *inter alia*, 5 U.S.C. § 7301, which provides that "[t]he President may prescribe regulations for the conduct of employees in the executive branch."

Before Congress enacted the FSLMRS, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees[]" by Executive Order. *See, e.g., Loc. 1498, AFGE v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975). "This was a project of the Executive, and not of the Congress." *Manhattan-Bronx Postal Union*, 350 F.2d at 452; *see also* Pls.' Mot. 2 (describing executive orders that governed collective bargaining in the federal civil service prior to the FSLMRS). Indeed, President Kennedy took the first formal measure to regulate federal-sector labor relations when he issued Executive Order No. 10,988, in 1962. Exec. Order No. 10,988 (Jan. 17, 1962), 3 C.F.R. § 521 (1959–1963); *see Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91–92 (1983) ("*BATF*"). Multiple Presidents subsequently amended that Order. *See* Exec. Order No. 11,491, 3 C.F.R. § 861 (1966–1970), as amended by Exec. Orders Nos. 11,616, 11,636, 3 C.F.R. §§ 605, 634 (1971–1975) and Exec. Order No. 11,838 (Feb. 6, 1975), and 3 C.F.R. § 957 (1971–1975).

## II.    The FSLMRS Framework and Related Executive Orders

Against this backdrop, Congress in 1978 passed the FSLMRS, 5 U.S.C. § 7101 *et seq*. The Statute, enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 111, provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *BATF*, 464 U.S. at 91. FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the Statute exempts certain agencies and matters from its coverage. 5 U.S.C. § 7103(a)(3) (excluding from coverage the Federal Bureau of Investigation, the Central Intelligence Agency, and the National Security Agency, among others). FSLMRS also empowers the President to exempt additional agencies

4

from its requirements: It provides that "[t]he President may issue an order excluding *any* agency or subdivision thereof from coverage under [the statute] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1) (emphasis added).

Pursuant to this authority, President Carter issued an executive order in 1979 excluding from FSLMRS coverage more than forty-five agencies or agency subdivisions, precluding those agencies and subdivisions employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Notably, the executive order exempted large swaths of DoD from FSLMRS coverage. *See* Decl. of Michael A. Cogar ¶ 3, attached as Ex. 1 (Cogar Decl.) (citing Exec. Order No. 12,171). Every President since then, with the sole exception of President Biden, has issued similar executive orders adding to that list in response to changing circumstances and the evolving investigative and national security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 73 Fed. Reg. 73,991 (Jan. 17, 2017).

Like these other Presidents, on March 27, 2025, President Trump issued another such Executive Order. *See* Exec. Order No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025). In Section 2 of the Executive Order, the President determined that certain agencies and subdivisions have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations. As relevant here, Section 2 of the Executive Order excludes "The Department of Defense, except for any subdivision excluded pursuant to

section 4 of the Executive Order of March 27, 2025, entitled 'Exclusions from Federal Labor-Management Relations Program.'" Exec. Order No. 14,251, § 2(b).  Section 4 of the Executive Order further provides that "the Secretaries of Defense and Veterans Affairs are delegated authority under 5 U.S.C. § 7103(b)(1) to issue orders suspending the application of section 1-402 or 1-404 of the Executive Order 12171, as amended, to any subdivision of the departments they supervise, thereby bringing such subdivisions under the coverage of the Federal Service Labor-Management Relations Statute." *Id.* § 4.  The Secretary of Defense has exercised that delegated authority sparingly, and as a result Executive Order 14,251 continues to cover nearly all of DoD, including DoDEA.  *See* Cogar Decl. ¶ 2 n.1 (citing DoD, Notice of Certification, 90 Fed. Reg. 17,052 (Apr. 23, 2025)).

## III.    The Statutory Channeling Requirement

In the FSLMRS, Congress established a dedicated review scheme for resolving federal labor disputes that provides multiple channels for a union to challenge conduct they allege violates the FSLMRS.  For example, an employee or a union may file a charge with the Federal Labor Relations Authority (FLRA) alleging that an agency has engaged in an unfair labor practice (ULP), which can include, *inter alia*, a failure to negotiate in good faith or comply with any FSLMRS provision.  *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3–2423.6.  The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FLRA. 5 U.S.C. § 7118(a)(1)–(2); *see also id.* § 7104(f)(2).  Alternatively, an employee or union may also file a grievance to challenge violations of CBAs or to pursue "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment[.]" *Id.* § 7103(a)(9).  The statute requires all collective-bargaining agreements to include procedures for resolving such grievances, culminating in an arbitration that can be

appealed through the FLRA. *See id.* §§ 7121–7122. In addition to filing a ULP charge or grievance, a union could also raise relevant arguments in currently pending administrative proceedings that began prior to the Executive Order. *See, e.g.*, Decl. of Richard Tarr ¶¶ 41–44, ECF No. 22-2 (describing order to show cause issued by the FLRA and the administrative parties' responses thereto). The FLRA is broadly authorized to order appropriate relief. 5 U.S.C. §§ 7105(f)–(g), 7118. The FLRA's final orders from these various routes are, with few exceptions not relevant here, subject to specified judicial review "in the United States court of appeals in the circuit in which the [aggrieved] person resides or transacts business or in the United States Court of Appeals for the District of Columbia." *Id.* § 7123(a).

## IV.    The Instant Action and Plaintiffs' Motion for Preliminary Injunction

Plaintiffs Federal Education Association, Federal Education Association Stateside Region, and Antilles Consolidated Education Association are federal-sector labor unions who represent certain employees of DoDEA.

DoDEA is a component of DoD. Specifically, DoDEA is a DoD "Field Activity," which is an organizational entity established by the Secretary of Defense to carry out supply or service functions that are shared across multiple military branches. Cogar Decl. ¶ 5. DoDEA is responsible for planning, directing, coordinating, and managing prekindergarten through 12th grade educational programs on behalf of DoD, operating 161 accredited schools in 9 districts located in 11 foreign countries, 7 states, Guam, and Puerto Rico.[1] *Id.* DoDEA operates under the direction, authority, and control of the Undersecretary of Defense for Personnel and Readiness.

Plaintiffs filed this lawsuit on May 5, 2025. Compl., ECF No. 1. On June 21, 2025, before Defendants had responded to the initial complaint, Plaintiffs filed an amended complaint. First

---

[1] DoDEA employees more than 14,000 employees, approximately 6,650 of whom were represented by Plaintiff unions prior to Executive Order 14,251. Cogar Decl. ¶¶ 7,8(a)–(c).

Am. Compl., ECF No. 21.  On July 2, nearly two months after initiating this lawsuit, Plaintiffs

filed the instant motion for preliminary injunction.  Pls.' Mot. for a Prelim. Inj., ECF No. 22.  On

July 7, the Court stayed Defendants' deadline to respond to the amended complaint pending the

resolution of Plaintiffs' motion for a preliminary injunction, and ordered Defendants to file a

response to that motion on or before July 22.  Minute Order (July 7, 2025).  Defendants hereby

oppose the motion.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–

90 (2008)).  Accordingly, the moving party must "make a 'clear showing that four factors, taken

together, warrant [such] relief'": (1) likely success on the merits; (2) likely irreparable harm in the

absence of preliminary relief; (3) a balance of the equities in its favor; and (4) accord with the

public interest. *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 321 (D.C.

Cir. 2018) (citation omitted).  A preliminary injunction "may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C.

2011) (quoting *Winter*, 555 U.S. at 22).  In the D.C. Circuit, the first two factors "'are the most

critical' factors." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (citation omitted).  Failure

to show either a likelihood of success on the merits or a likelihood of irreparable harm is sufficient

to defeat a preliminary injunction motion.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of*

*Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing *Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.*,

573 F.3d 815, 832 (D.C. Cir. 2009) ("a failure to show a likelihood of success on the merits alone

is sufficient to defeat a preliminary-injunction motion"), *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir, 2006) ("A movant's failure to show any irreparable harm

is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . .

merit such relief.").  And the third and fourth factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Cannot Show Likelihood of Success on the Merits of their Claims

Plaintiffs cannot establish a likelihood of success on the merits of their claims[2] for at least two reasons.  As an initial matter, this Court lacks jurisdiction to hear Plaintiffs' claims because Plaintiffs' claims are statutorily channeled away from district court review and must be brought to the FLRA.  Even if this Court could reach the merits of Plaintiffs' claims, those claims fail.

### A.    The FSLMRS precludes district court jurisdiction over Plaintiffs' claims.

This Court lacks jurisdiction to review Plaintiffs' claims.  By Plaintiffs' account, Executive Order 14,251 is invalid, meaning the agencies and subdivisions identified in the Executive Order remain subject to the FSLMRS, and the CBAs with DoDEA are valid and binding.  Under that theory, Plaintiffs' claims must be channeled to the administrative process provided in the FSLMRS, and the D.C. Circuit's decision in *American Foundation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE v. Trump*"), compels dismissal of this case on jurisdictional grounds.

In *AFGE v. Trump*, numerous federal unions, including Plaintiffs, asserted broad constitutional and statutory challenges to Executive Orders issued by President Trump during his first term.  The orders would have enacted substantial changes to the way federal unions operated.  The D.C. Circuit reversed the district court's decision on jurisdictional grounds, holding that the

---

[2] Plaintiffs' motion for preliminary injunction raises only their constitutional claims and does not appear to include Count 6 and Count 7 of Plaintiffs' Amended Complaint, which raise Administrative Procedure Act claims against only Defendants DoD and Secretary Hegseth.  Pls.' Mot. 38 ("Plaintiffs Are Likely to Succeed on the Merits of their Constitutional Challenges to EO 14,251"); *see also* Am. Compl. ¶¶ 126–35.  Because those claims are not presented in the motion currently before the Court, Defendants do not address them here and reserve all arguments on Plaintiffs' APA claims for forthcoming briefing.

comprehensive administrative-judicial review scheme set forth by the FSLMRS channeled jurisdiction away from federal district courts. 929 F.3d at 753, 762. The D.C. Circuit emphasized that most federal labor disputes must be heard through the FLRA review scheme, with any judicial review occurring in the relevant federal court of appeals. *Id.* at 754–61.

This case requires the same jurisdictional outcome. Similar to those plaintiffs' broad challenge to the Executive Orders at issue in *AFGE v. Trump*, Plaintiffs here allege that Executive Order 14,251 and the OPM Memorandum will result in financial harm and loss of bargaining power. Specifically, Plaintiffs claim that DoDEA repudiated the relevant CBAs, refused to recognize and bargain with the relevant unions, ceased withholding dues, and implemented a reorganization without following the procedures in the CBAs. Pls.' Mot. 16–26. These claims are predicated on the applicability of the FSLMRS. Plaintiffs' claims therefore fall within the Statute's exclusive review scheme and may not be heard here. *AFGE v. Trump*, 929 F.3d at 756.

The *Thunder Basin* factors that the Court applied in *Axon*—the existence of meaningful relief without district court review, whether a claim is "wholly collateral" to the statute's review scheme, and the relevance of agency expertise—establish that the FSLMRS precludes district court jurisdiction over Plaintiffs' claims. *See Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994)). First, a finding of preclusion in this case does not foreclose meaningful judicial review of Plaintiffs' claims. Plaintiffs can bring their claims before the FLRA, and any arguments that the FLRA cannot resolve will be addressed by the circuit courts on appeal through the administrative-judicial review process Congress crafted in the FSLMRS. *See* 5 U.S.C. § 7123(a); *AFGE v. Trump*, 929 F.3d at 759. This can be done through filing an ULP complaint or grievance based on DoDEA's actions taken pursuant to the Executive Order, or by challenging the Executive Order's validity in the context of already-pending FLRA proceedings, including in response to an order to show cause why the case

should not be dismissed for lack of jurisdiction.  *See* Pls.' Mot. 28–29 (explaining that FEA asked for FLRA proceedings to be held in abeyance, rather than dismissed, after they were ordered to show cause why their grievance should not be dismissed for lack of jurisdiction based on the Executive Order).  Any of these routes could lead to a final order of the FLRA that would be reviewable by a federal circuit court on appeal.  *See* Background Section III *supra*; *AFGE v. Sec'y of Air Force*, 716 F.3d 633, 637–40 (D.C. Cir. 2013) (describing "multiple paths" within the FSLMRS's "exclusive remedial regime" through which a union can obtain FLRA and then federal circuit court review).

In a footnote Plaintiffs rely on *Turgeon* to argue that a finding of preclusion would foreclose all meaningful review, as the D.C. Circuit previously found that it lacked jurisdiction to review a decision by the FLRA's General Counsel not to issue an unfair-labor-practice complaint because "there is 'no final order of the [FLRA].'"  *Turgeon v. FLRA*, 677 F.2d 937, 939 (D.C. Cir. 1982).  While the FLRA General Counsel's decision not to issue a complaint is not a reviewable final order, Plaintiffs have not even attempted to raise their claims with the FLRA (despite maintaining that the relevant agencies remain covered by the FSLMRS).  In fact, as noted above, FEA specifically requested that the FLRA hold in abeyance, rather than dismiss or otherwise rule on, a long-standing pending arbitration, thus preventing the FLRA from deciding the case and issuing a final order subject to appeal.  5 U.S.C. § 7123; Pls.' Mot. 28–29.  Plaintiffs certainly have not established that if they did raise their claims with the agency, they would not ultimately be resolved with a final order of the FLRA—which would be a judicially reviewable final order.  5 U.S.C. § 7123(a).

Moreover, Plaintiffs' invocation of constitutional claims does not excuse them from the requirement that they first seek relief before the FLRA.  *Id.*  The Supreme Court has previously held that whether a claim is precluded under the Civil Service Reform Act does not "turn on the

constitutional nature . . . but rather on the type of the employee and the challenged employment action." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012). So too here. Plaintiffs cannot escape the FSLMRS's preclusive review scheme by framing its breach of contract arguments in constitutional terms. In short, Plaintiffs can still receive meaningful judicial review of their claims by bringing them before the FLRA in the first instance, followed by an appeal in the circuit courts.

Second, Plaintiffs' claims are within the statutory scheme and not collateral to it. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions[.]" *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* at 193–94. Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.* No such separation exists here. Plaintiffs challenge DoDEA's refusal to abide by provisions of their CBAs with respect to various actions they have taken. Pls.' Mot. 16–26. These issues fall well within the Statute's broad definition of "grievance," which the CBAs provide the exclusive procedures for resolving.[3]  5

---

[3] The FSLMRS defines a "grievance" as including, *inter alia*, "any complaint[] . . . by any labor organization concerning any matter relating to the employment of any employee; or . . . by any labor organization . . . concerning . . . the effect or interpretation, or a claim of breach, of a collective bargaining agreement." 5 U.S.C. § 7103(a)(9). Also included within the definition is "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment[.]" *Id.* Pursuant to 5 U.S.C. § 7121(a)(1), "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability[,]" and except for narrow circumstances provided for in the statute, "[these] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage." *See also* FEA CBA at 34, attached as Exhibit A to Cogar Decl. (Art. 12 § 2) (defining grievance).

U.S.C. §§ 7103(a)(9), 7121(a)(1). Plaintiffs also broadly complain that by following the Executive

Order, DoDEA has not complied with FSLMRS requirements. That is a quintessential ULP

charge, which the FLRA General Counsel prosecutes, 5 U.S.C. §§ 7116(a)(8), 7118, and is central

to the FLRA's work. Plaintiffs' claims are not collateral by any stretch. *See AFGE v. Trump*, 929

F.3d at 760 ("The unions' challenge in this case is of the type that is regularly adjudicated through

the FSLMRS's scheme: disputes over whether the Statute has been violated."); *AFGE v. Loy*, 367

F.3d 932, 935 (D.C. Cir. 2004) (holding that federal district courts lack "concurrent jurisdiction

over matters within the [FLRA's] exclusive purview").

For similar reasons, Plaintiffs' claims are clearly within the expertise of the FLRA—the

third *Thunder Basin* factor. The FLRA is the federal authority on matters of federal labor relations.

*E.g.*, *BATF*, 464 U.S. at 97 ("[T]he FLRA was intended to develop specialized expertise in its field

of labor relations and to use that expertise to give content to the principles and goals set forth in

the Act." (citation omitted)). In concluding that the unions had to first bring their constitutional

claims before the FLRA and MSPB in *AFGE v. Trump*, the D.C. Circuit noted that those agencies,

despite having less expertise on constitutional issues, may be able to "offer an interpretation of the

[statutes] in the course of the proceeding that might alleviate or shed light on the constitutional

concerns." *AFGE*, 929 F.3d at 761 (citation omitted). Indeed, the FLRA "can apply its expertise"

to plaintiffs' statutory claims and may well offer an interpretation of the statute or Executive Order

14,251 that "obviate[s] the need to address" some of Plaintiffs' broader "constitutional

challenge[s]." *See Elgin*, 567 U.S. at 22–23. The FLRA has "consistently" resolved constitutional

claims, including First-Amendment-retaliation claims. *See U.S. Dep't of Health & Hum. Servs. &

Laborers Int'l Union Loc. 1376*, 60 F.L.R.A. 202, 207 & n.7 (2004) (citing cases). In *United States

Department of Defense Ohio National Guard & AFGE Local 3970*, 71 F.L.R.A. 829, the FLRA

addressed several Constitutional provisions including the Milita Clause in order to resolve a

13

jurisdictional dispute, *id.* at 853 n.13, 855–62 (citing and analyzing arguments regarding U.S. Constitution, art. I, § 8, cls. 15 & 16; *id.* art. II § 2, cl. 1; *id.* Amend. X), and this case was eventually appealed to the Supreme Court in *Ohio Adjutant General's Department v. FLRA*, 598 U.S. 449 (2023).

Plaintiffs rely on *Nicholson* to argue that the Executive Order removed claims involving the DoD from FSLMRS's statutory scheme, such that the FSLMRS's preclusive nature no longer applies. Pls.' Mot. 28. But unlike in *Nicholson* where the D.C. Circuit found certain labor-relations claims to be outside the FLRA's purview because the relevant statute specifically prohibited review of such actions "by any other agency," nothing in § 7103(b)(1) exempts challenges to the President's determinations under that provision from the general channeling scheme. *AFGE v. Nicholson*, 475 F.3d 341, 347–48 (D.C. Cir. 2007) (citation omitted). Thus, the rule that "district courts do not have concurrent jurisdiction over matters within the [FLRA's] exclusive purview" applies here, since Congress did not "expressly" bring challenges to the relevant determination "outside the FLRA's purview." *Id.* (quoting *Loy*, 367 F.3d at 935).

For the foregoing reasons, Plaintiffs' claims must be channeled to the FLRA and the Court lacks jurisdiction over Plaintiffs' claims.

## B.    Plaintiffs are unlikely to succeed on the merits of their ultra vires or separation of powers claims.

As an initial matter, "[u]ltra vires review is [] unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review[.]'" *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) ("*NRC*") (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). Indeed, the D.C. Circuit has engaged in such judicial review only "[i]f Congress ma[de] no specific choice of [the court in which judicial review is to occur] in the statute pursuant to which the agency action is

taken, or in another statute applicable to it[.]" *Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1988). Because the FSLMRS provides for administrative review of Plaintiffs' claims before the FLRA, Plaintiffs' ultra vires claim must fail. *See* Section I(A) *supra*.

Moreover, the bar for asserting an ultra vires claim is high: Plaintiffs must meet a heightened standard "confined to 'extreme'" errors—not present here. *See Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 763–64 (D.C. Cir. 2022); *see also DCH Reg. Med. Ctr. v. Azar*, 925 F.3d 503, 509 (2019) (noting "extremely limited scope" and "extraordinarily narrow" nature of ultra vires claims (citations omitted)). Such a claim "applies only when an agency has taken actions entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *NRC*, 145 S. Ct. at 1775–76 (emphasis in original) (citation omitted). It requires a violation of a "specific prohibition in the statute that is clear and mandatory," a violation that was "obviously beyond the terms of the statute," or action that was "far outside the scope of the task that Congress gave it." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citations omitted). The Supreme Court recently reaffirmed that an ultra vires claim is "essentially a Hail Mary pass— and in court as in football, the attempt rarely succeeds." *NRC*, 145 S. Ct. at 1776 (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

Plaintiffs' ultra vires claims are no exception. Those claims merely assert that the President exceeded the statutory authority granted to him by § 7103(b)(1). But "the President is not an agency[,]" so "it is unclear whether ultra vires review is available at all." *AFSA v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) ("[A]n ultra vires action is a suit in equity . . . and courts generally lack authority to enjoin the President[.]"). In any event, as the D.C. Circuit recently held in another case challenging Executive Order 14,251 and involving claims nearly identical to this one, to succeed on an ultra vires claim, "a plaintiff must show more than a 'routine error in statutory interpretation or challenged findings of fact.'" *Id.* (quoting *Fed. Express Corp.*

*v. Dep't of Com.*, 39 F.4th at 763).  Plaintiffs rely on a strained reading of the statute to support the assertion that the President violated a "clear and mandatory" prohibition within the statute, and point to the Fact Sheet and OPM Memorandum as evidence of improper motive to support Plaintiffs' otherwise insufficient claims.  However, such an attempt to "dress up a typical statutory-authority argument as an ultra vires claim" is a "fairly common maneuver when a litigant tries to squeeze its arguments into the [ultra vires] box—and is in large part why those claims rarely succeed." *NRC*, 145 S. Ct. at 1776.  The claims do not succeed here because the FSLMRS "commits the relevant decision to the President's discretion." *AFSA*, 2025 WL 1742853, at *3. Section 7103(b)(1) "delegates broad authority to the President to exclude parts of the [civil service from 5 U.S.C. Chapter 71] . . . in the interest of national security." *See id.*  "Such determinations are consistent with the President's role as commander-in-chief." *Id.*  Because the President's determination was not prohibited by statute, and the Fact Sheet and OPM Memorandum are insufficient to overcome the presumption of regularity, Plaintiffs are not likely to succeed on their ultra vires claim.

Plaintiffs primarily argue that the Executive Order is ultra vires because of its breadth and scope.  Pls.' Mot. 32–34.  Plaintiffs contend that the statutory scheme indicates that Congress intended collective bargaining rights to apply as broadly as possible *consistent with national security requirements*. *Id.* at 32.  Plaintiffs, however, overlook the fact that Congress also intended the President to have the discretion to determine whether the statute is consistent with national security requirements as it pertains to certain agencies.  *See* 5 U.S.C. § 7103(b)(1) ("The President may issue [an order excluding agencies if] the President [makes the requisite determinations]."); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024) ("As [the Supreme] Court has repeatedly observed, the word 'may' clearly connotes discretion." (cleaned up)).  Indeed, just as Congress broadly intended the statute to apply to "every 'Executive Agency,'" Pls.' Mot. 32 (citation omitted),

Congress also intended the President's discretion to extend to "any agency or subdivision thereof." 5 U.S.C. § 7103(b)(1).

Plaintiffs suggest that the Executive Order is suspect because (1) prior administrations chose not to exempt the agencies the President has now chosen to exempt and (2) the President exempted the entirety of the DoD. Pls.' Mot. 32–33. But this argument is at odds with the plain text of the statute. Section 7103 expressly permits the President to exclude *"any agency* or subdivision thereof" from the FSLMRS's coverage. 5 U.S.C. § 7103(b)(1) (emphasis added). In fact, Congress exempted entire agencies in the statute itself, 5 U.S.C. § 7103(a)(3), and the plain text makes clear that the President has the discretion to exempt an entire "agency" or only a "subdivision" of that agency. *See United States v. Woods*, 571 U.S. 31, 45–46 (2013) ("[T]he operative terms are connected by the conjunction 'or' . . . [which in] its ordinary use is almost always disjunctive, that is, the words it connects are to 'be given separate meanings.'" (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979))). And the statute extends the President's authority to "any" agency or subdivision that he determines warrants exempting.[4] Moreover, Plaintiffs fail to recognize that large portions of multiple cabinet-level departments, including DoD, were previously exempted. *See, e.g.*, Exec. Order No. 13,480, *Exclusions From the Federal Labor-management Relations Program*, 73 Fed. Reg. 73,991, 73,991–92 (Dec. 4, 2008) (excluding from the FSLMRS large portions of the Department of Energy, the Department of Justice, and the Department of the Treasury, among others); *see also* Cogar Decl. ¶ 3 (explaining the portions of DoD that were exempted prior to Executive Order 14,251). The President is

---

[4] The very same statutory section also defines "agency" under the FSLMRS to mean "an Executive agency." 5 U.S.C. § 7103(a)(3). An "Executive agency," in turn, is defined in Title 5 as "an Executive department, a Government corporation, and an independent establishment." *Id.* § 105. The FSLMRS therefore empowers the President to exclude in its entirety DoD, which is an Executive department, so long as he makes the determinations required by § 7103(b)(1), which he has.

authorized to extend his predecessors' exemptions to include the entire department based on changing national security considerations. Congress, unlike Plaintiffs, recognized through § 7103(b)(1) that the Nation's national security needs are ever evolving, and the President needs the discretion and flexibility to manage the federal workforce to respond to such changes appropriately. *See AFSA*, 2025 WL 1742853, at *3 ("[a] more 'searching inquiry' . . . would be 'inconsistent with [§ 4103(b)(1)'s] broad statutory text and the deference traditionally accorded the President in this sphere" (quoting *Trump v. Hawaii*, 585 U.S. 667, 686 (2018)); *see also NTEU v. Reagan*, No. 80-606, 1981 WL 150530, at *2 (D.D.C. Sept. 3, 1981) (holding that a § 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making § 7103(b)(1) determinations (citation omitted)). Plaintiffs' atextual reading cannot be squared with Congress's expressed intent or the historical practice of past Presidents.

Even more specious is Plaintiffs' argument that DoDEA specifically was improperly exempted. Plaintiffs argue that the Executive Order sweeps with a "broad brush" by excluding agencies that generally have a national security function but that may also encompass sub-agencies or employees without such a function. Pls.' Mot. 34. Plaintiffs concede that the DoD taken as a whole has a primary national security function, but they argue that certain subdivisions like DoDEA do not. Pls.' Mot. 34. But when the President adopts "a preventive measure . . . in the context of . . . national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 35 (2010), and the President was not required to make the granular determination Plaintiffs prefer (nor is there basis for this Court to defer to Plaintiffs over the President).

Plaintiffs alternatively contend that the President's discretion is cabined by the Supreme

Court's definition of "national security" in *Cole v. Young*, 351 U.S. 536 (1956). Pls.' Mot. 30–31. As an initial matter, this argument does not make sense because the statute at issue in *Cole*—and the term "national security" as used in that case—expressly applied to DoD (along with the Navy, Army, Air Force, and certain other non-DoD agencies). *Cole*, 351 U.S. at 541–42; *id.* at 545 (explaining that in the statute at issue in *Cole* "Congress . . . enumerated those agencies which it determined to be affected with the 'national security'"—including DoD). Even so, in determining whether an agency head acted according to the statute, the Court concluded that the term "national security" in that specific statute was used in a "definite and limited sense"—namely, to refer to "those activities which are directly concerned with the Nation's safety, as distinguished from the general welfare." *Id.* at 543–44. The *Cole* Court did not purport to announce a generally applicable definition of "national security" across the United States Code; it construed particular statutory language based on its surrounding statutory context, specifically the eleven agencies expressly included in the act. The President's discretion under § 7103(b)(1) is not constrained by the *Cole* Court's interpretation of "national security" in an entirely different statutory context.

Nonetheless, the *Cole* definition of "national security" plainly covers DoD and DoDEA. As for DoD, the Court's definition in *Cole* specifically covered DoD. *Cole*, 351 U.S. at 541–42. Since the Court's review should track the President's determination, it should therefore stop at the Departmental level, *see* Section I(C)(2) *supra*, but DoDEA specifically also falls within *Cole*'s definition of national security. DoDEA has a primary national security function given its role in educating servicemembers children, which is critical to DoD's recruitment and retention efforts. *See* Cogar Decl. ¶ 6. Because the United States relies on an all-volunteer military, the support and benefits it offers its members allow it to recruit and retain military personnel. Given that service members are often stationed overseas, DoDEA's ability to provide high-quality education and care for their children is a critical benefit. *Id.* DoDEA is crucially connected to DoD ability to maintain

19

"a robust, well-staffed, and focused military, which is vital to national security." *Id.*

Plaintiffs also misrepresent the statutory structure and legislative history to support their ultra vires claim. Plaintiffs argue that the findings and purpose section somehow limits the President's authority under § 7103(b)(1). Pls.' Mot. 31–32. Here again, Plaintiffs improperly prioritize Congress's finding that "labor organizations and collective bargaining in the civil service are in the public interest" while ignoring that Congress contemplated that collective bargaining should yield to priorities like national security. This Court would be "quite mistaken to assume," as Plaintiffs do, "that 'whatever' might appear to 'further the statute's primary objective must be the law.'" *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (alteration omitted) (citation omitted). "[N]o statute . . . 'pursues its stated purpose at all costs,'" *id.* (alterations omitted) (citation omitted), which is why Congress allowed for exemptions from the FSLMRS. Defendants' reading of that statute, not Plaintiffs', best respects that purpose.

The Court should not consider Plaintiffs' legislative history arguments given the plain meaning of the statutory text shown above. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992). Even so, Plaintiffs' cherry-picked statement of Representative Clay is unpersuasive. Pls.' Mot. 32 ("Congress's goal was to create 'a statutory Federal labor-management program which cannot be universally altered by any President.'" (quoting 124 Cong. Rec. H9637 (daily ed. Sept. 13, 1978) (statement of Rep. William Clay)). That statement addresses only his view that the general purpose of the FSLMRS was to preclude total Presidential control over collective bargaining, and if read to its extreme, it conflicts with the textual delegation of authority in § 7103(b). *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1237 (D.C. Cir. 2003) ("Legislative history can serve to inform the court's reading of an otherwise ambiguous text; it cannot lead the court to contradict the legislation itself."); *See Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator, even the sponsor, are not

controlling in analyzing legislative history."); *see also NLRB v. SW General, Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history."). The FSLMRS's *stated* purpose is far more cabined—to specify particular rights, obligations, and procedures related to collective bargaining in the federal sector. 5 U.S.C. § 7101(b). And in any event, other legislative history regarding § 7103(b) specifically indicates that Congress intended the President's § 7103(b) determinations to be unreviewable. Indeed, Congress chose to replace an earlier version of the provision, which allowed agencies to apply to the FLRA for an exclusion, with the present version. The final version of § 7103(b) therefore "[gave] to the President the power to exclude agencies and agency subdivisions from coverage for national security reasons," "in his or her sole discretion." 124 Cong. Rec. H9633 (daily ed. Sept. 13, 1978) (statement of Rep. Morris K. Udall).

As a last-ditch effort, Plaintiffs argue that the President's Executive Order violates the Constitution's separation of powers. Pls.' Mot 35–36. This is not "an instance of 'the President tak[ing] measures incompatible with the expressed or implied will of Congress'" as Plaintiffs assert. *Id.* at 35 (alteration in original) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J. concurring)). Rather, pursuant to § 7103(b)(1)'s express authorization from Congress, the President exercised his own Article II authority to manage the federal workforce and make sensitive national security determinations. *Youngstown*, 343 U.S. at 636 (Jackson, J., concurring); *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("Article II likewise provides allocation of foreign relations and national security powers to the President, the unitary chief executive."); *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982) (noting that the Constitution's grant of executive power to the President entrusts him "with supervisory and policy responsibilities of utmost discretion and sensitivity . . . [which include] management of the Executive Branch."); *see also Bt, AFL-CIO v. Allbaugh*, 295 F.3d at  ; *see* Pls.' Mot. 2 (noting that

prior to the FSLMRS the President had the authority to manage labor relations in the federal workforce). Consequently, the President's power was at its zenith when making the national security determinations pursuant to § 7103(b)(1), and those determinations should be given "the strongest of presumptions and the widest latitude of judicial interpretation." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

For these reasons, Plaintiffs are unlikely to succeed on their ultra vires claim.

### C.    Executive Order 14,251 is valid.

#### 1.    *The FSLMRS and Binding Circuit Precedent Preclude District Court Review.*

The D.C. Circuit has repeatedly recognized that § 7103(b)(1) entrusts the relevant determinations to the President alone, without interference from courts or other actors. *See, e.g.*, *AFGE*, 870 F.2d at 727. Executive Order 14,251 represents the President's exercise of his authority under the FSLMRS to exclude certain agencies or subdivisions from the provisions of the Statute. The Statute provides that the President "may issue" such an order if he makes the requisite determinations. This is a "quintessential grant of discretion." *Bouarfa*, 604 U.S. at 13 ("As [the Supreme] Court has repeatedly observed, the word 'may' clearly connotes discretion." (cleaned up)). "Moreover, here, Congress has in no way prescribed how that discretion must be exercised." *Id.* In the FSLMRS, Congress vested the President—and the President alone—with the authority to exclude agencies or subdivisions from the statute's coverage; thus the President's determinations are not subject to judicial review. *See id.; cf. Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum[.]"). The Executive Order makes plain that the President determined that each specified agency or subdivision, including DoD, has a relevant primary function and that Chapter 71's provisions could not be applied to that agency or

subdivision in a manner consistent with national security requirements and considerations. The Court's inquiry should end there.

Courts in this Circuit have repeatedly recognized that the President's determinations under the statute are unreviewable. The D.C. Circuit observed that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist," *AFGE*, 870 F.2d at 727 , and emphasized that the statutory determination is entrusted to "the President alone," *Dep't of Def. v. FLRA*, 685 F.2d 641, 650 (D.C. Cir. 1982); *see also NTEU v. Reagan*, 1981 WL 150530, at *2  (holding that a § 7103(b)(1) exclusion by President Carter was "not reviewable" because "Congress intended the chief executive to act 'in his or her sole discretion'" when making § 7103(b)(1) determinations) (quoting 124 Cong. Rec. H.9633 (daily ed. Sept. 13, 1978)). Indeed, the President need not even "insert written findings in an exempting order[]" under § 7103(b)(1). *AFGE*, 870 F.2d at 727.

More recently, the D.C. Circuit Court in *AFSA v. Trump*, held that "a more 'searching inquiry' than this would be 'inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere.'"  2025 WL 1742853, at *3 (quoting *Hawaii*, 585 U.S. at 686). Any other conclusion would be flatly inconsistent with the deference due to the President's national security-related determinations. *See, e.g.*, *Hawaii*, 585 U.S. at 686 (dismissing as "inconsistent with the broad statutory text and the deference traditionally accorded the President in th[e national security] sphere" an argument "for a searching inquiry into . . . the President's justifications" for a finding about national interests); *Webster v. Doe*, 486 U.S. 592, 600 (1988) (concluding that a statute authorizing the CIA Director to terminate an employee when the Director "shall deem such termination necessary or advisable in the interests of the United States" forecloses "any meaningful judicial standard of review").

The President's determination under the statute's second prong—whether the provisions

of Chapter 71 "cannot be applied . . . in a manner consistent with national security requirements and considerations," 5 U.S.C. § 7103(b)(1)(B)—is especially ill-suited to judicial second-guessing.  When the President adopts "a preventive measure . . . in the context of . . . national security," he is "not required to conclusively link all of the pieces in the puzzle before [courts] grant weight to [his] empirical conclusions."  *Humanitarian L. Project*, 561 U.S. at 35. Determining the "national security requirements and considerations" of the Nation is not a task for which this Court or any other is well-equipped.  *See id.* at 34 ("the lack of competence on the part of the courts is marked" (citation omitted)); *Dep't of the Navy v. Egan*, 484 U.S. 518, 529(1988) (refusing to review denial of security clearance because "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment . . . [n]or can such a body determine what constitutes an acceptable margin of error in assessing the potential risk").  Rather, the President must be able to make national security-based determinations before the national security is jeopardized.  As with the exemption's first prong, this Court is ill suited to second guess that determination.

### 2.    *The Department of Defense meets the FSLMRS statutory criteria.*

In any event, the President's determination withstands scrutiny.  DoD plainly "has as a primary function intelligence, counterintelligence, investigative, or national security work[.]"  5 U.S.C. § 7103(b)(1)(A); *see also* Cogar Decl. ¶ 4.

Plaintiffs acknowledge that DoD "taken as a whole, may reasonably be said to have national defense as a primary function," but nonetheless assert that the Executive Order is invalid because DoDEA does not satisfy the statutory criteria. Pls.' Mot. 34.  Plaintiffs are mistaken.  The President's determination was made at the Departmental level, as the Statute plainly allows.  *See* Exec. Order No. 14,251 § 2; 5 U.S.C. § 7103(b)(1).  Plaintiffs' argument that the President should have made a more granular, component-specific determination with respect to DoD's various

subdivisions lacks a statutory basis.  Nor do Plaintiffs otherwise explain why they think that the President was not authorized to exempt DoD as a whole.  Instead, Plaintiffs gesture broadly at the overall scope of the Executive Order, urging that somehow its alleged "overbreadth" invalidates the specific determination at issue here—the determination regarding DoD.  Pls.' Mot. 33–34.  And in the national-security context, causal animus cannot be inferred by claiming the exclusions are "overbroad" given the deference owed to the "Executive's predictive judgments," *Hawaii*, 585 U.S. at 707–08.

But it is irrelevant that the Executive Order "exclude[ed] multiple Cabinet Departments and independent agencies in their entirety," Pls.' Mot. 34, particularly given Plaintiffs' admission that DoD "taken as a whole[] may reasonably be said to have national defense as a primary function," *id.*

The President also properly determined that the provisions of Chapter 71 cannot be applied to DoD "consistent with national security requirements and considerations."  5 U.S.C. § 7103(b)(1)(B).  Such a determination requires "delicate, complex" assessments.  *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).  Here, the President determined that DoD's mission requires rapid responses to changed working conditions and unencumbered mobility of their employees— requirements incompatible with Plaintiffs' CBAs.  *See* Cogar Decl. ¶ 9.  For example, "provisions in FEA-SR Pro CBA and the ACEA CBA restrict DoDEA's ability to order an educator to work a full duty day at the school," and require the educator to work "seven hours per day at the school and . . . the eighth hour at an alternate location, arguably contrary to the President's Return to In-Person Work, dated January 20, 2025."  *Id.*  Although the Court should not substantively evaluate the President's determination, the record facts nonetheless bear out his determination that the FSLMRS and CBAs cannot be applied to DoD consistent with national security requirements and considerations.

D.    **Plaintiffs are unlikely to succeed on the merits of their First Amendment retaliation claim.**

Plaintiffs' First Amendment retaliation claim is unlikely to succeed because Plaintiffs fail to establish any element necessary to prove a retaliation claim.   Plaintiffs concede that one Plaintiff—ACEA—did not engage in any protected action; they acknowledge that the President did not have any of the Plaintiffs in mind when he issued the Executive Order; and they make no attempt to establish a causal connection between Plaintiffs' actual or perceived conduct and the Executive Order.  Pls.' Mot. 38–40.  Accordingly, Plaintiffs' retaliation claim must fail.

To prevail on a claim of First Amendment retaliation, Plaintiffs must prove that: "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [them]." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016)), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023).  To establish a "causation link [ ] a plaintiff must allege that his or her constitutional speech was the 'but for' cause of the defendant's retaliatory action." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (quoting *Aref v. Holder*, 774 F. Supp. 2d 147, 169 (D.D.C. 2011)).  "Only once the plaintiff meets this burden of showing at least some causal nexus between [its] speech and the alleged retaliatory conduct does the burden shift to the defendant to show why it would have taken the same action even in the absence of any protected activity." *Williams v. Johnson*, 701 F. Supp. 2d 1, 18 (D.D.C. 2010) (citation omitted).  When the Federal Government can show, as here, that it would have taken the challenged action absent the asserted First Amendment activity, a retaliation claim must fail.  *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468,

477 (2022); *see Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 203 (2024) (Jackson, J., concurring) ("Requiring that causal connection to a retaliatory motive is important, because '[s]ome official actions adverse to . . . a speaker might well be unexceptionable if taken on other grounds.'"(quoting *Hartman v. Moore,* 547 U.S. 250, 256 (2006))).

Rather than identifying any evidence that the President was retaliating against the Plaintiff unions, Plaintiffs simply point to statements in a White House Press Office Fact Sheet regarding other federal-sector unions.  Pls.' Mot. 38–39 (describing the Fact Sheet's "clear reference to AFGE").  Plaintiffs assert that the Court should assume retaliation against all federal unions simply because they are "a coalition partner" of one of the federal unions allegedly targeted by the Fact Sheet and thus the Executive Order.  *Id.* at 39. Plaintiffs do not demonstrate that they engaged in protected conduct—they concede Plaintiff ACEA did not—or that the President had Plaintiffs in mind when issuing the Executive Order—they again concede, he did not.  *Id.* at 39.  Plaintiffs do not have standing to bring a retaliation claim on behalf of any other union or its members.  Plaintiffs must put forth facts establishing that they engaged in protected conduct and that the President intentionally retaliated against Plaintiffs.  Plaintiffs fail to do so.  Even if, in some special circumstances not presented here, the Court may find retaliation where a defendant believes a plaintiff engaged in protected conduct and acts with retaliatory animus, *id.* at 39–40 (citing *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266 (2016)), Plaintiffs offer no evidence to suggest that the President considered Plaintiffs' actual or perceived conduct at all.  Thus, Plaintiffs' generalized retaliation claim must fail.

Plaintiffs' reliance on the White House Press Office Fact Sheet is insufficient for another reason as well.  Statements issued by the White House Press Office are not statements from the President.  Unlike Presidential Memoranda, which are attributed to and signed by the President, Fact Sheets are not direct statements of the President but rather provide information about his

policies and actions. *Compare* The White House, *Strengthening the Suitability and Fitness of the Federal Workforce* (Mar. 20, 2025), https://perma.cc/4YTF-HB6S (signed by President Trump) *with* The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/W93G-Z889 ("Fact Sheet").

Moreover, the White House Press Office Fact Sheet only supports the President's determination that certain excluded agencies have as a primary function national security work or Congress's express contemplation that the FSLMRS could not be applied to all agencies consistent with national security. The Fact Sheet begins by identifying the DoD as having the national security mission to secure the "National Defense." *See* Fact Sheet. The Fact Sheet further explains how union activity has impaired agency functioning in a manner that could undermine national security. There is nothing retaliatory about these observations; rather, they are the very determinations § 7103(b)(1) entrusts the President to make. The Fact Sheet also illustrates ways that union activity can "obstruct agency management" and undermine national-security functions, like requiring Immigration and Customs Enforcement to bargain over cybersecurity measures. *Id.* Particularly in light of the presumption of regularity owed to the President's § 7103(b)(1) determinations, the Court should not accept Plaintiffs' invitation to ascribe unconstitutional motives to the President. *See Am. Fed. of Gov't Employees, AFL-CIO v. Reagan*, 870 F.2d 723, 727–28 (D.C. Cir. 1989).

The President would have taken the same action in any event. As the Fact Sheet explained, union activities have impaired agency functioning in a manner that could undermine national security. *See* Fact Sheet (explaining that the FSLMRS can "enable[] hostile Federal union[s] to obstruct agency management" by impeding agencies from removing employees for poor performance or misconduct and from taking other operational measures including, for example,

"modify[ing] cybersecurity policies."). That reference to union activity in context explains how such activity hampers agencies' ability to pursue their national security functions. *See U.S. Dep't of Homeland Sec., U.S. Immigr. & Customs Enf't*, 67 F.L.R.A. 501 (2014). That the President may have considered Plaintiffs' union activity in reaching the national-security determinations does not render those determinations retaliatory, as even protected speech may be a "wholly legitimate consideration" for determining whether the FSLMRS's requirements can be appropriately applied. *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019) (citation omitted); *see Reichle v. Howards*, 566 U.S. 658, 668 (2012).

In this sensitive area, courts presumptively "limit[] [their] review to whether the Executive g[ave] a 'facially legitimate and bona fide' reason for its action" and "'will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests of" Plaintiffs. *Hawaii*, 585 U.S. at 703 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972)). And even if "it may be appropriate" to look "beyond the facial neutrality of the order," the Executive Order should be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 704–05. Here, as in *Hawaii*, "[i]t cannot be said that it is impossible to discern a relationship to legitimate state interests or that the policy is inexplicable by anything but animus." *Id.* at 706 (quotation marks omitted). Because the order has "a legitimate grounding in national security concerns, quite apart from any [asserted retaliatory animus]," courts "must accept that independent justification." *Id.*

Ultimately, Plaintiffs are unlikely to succeed on the merits of their First Amendment retaliation claims because Plaintiffs fail to establish that they engaged in protected conduct or that the Executive Order was issued in retaliation against Plaintiffs. Further, Plaintiffs cannot make the required showing that its constitutionally protected conduct was the but-for cause of the

President's decision to issue Executive Order 14,251, as the President would have taken the same action regardless of Plaintiffs' conduct, and there was a legitimate reason for the President's actions even if this Court finds one of his motivations impermissible.

### E. Plaintiffs are unlikely to succeed on the merits of their Fifth Amendment claims.

Plaintiffs' Fifth Amendment claims—that the Executive Order (1) violates the Equal Protection Clause, Pls.' Mot. 40–41; and (2) the Executive Order violates the Fifth Amendment's protections against takings and the deprivation of property without due process, *id.* at 41–42—are likewise unlikely to succeed. Plaintiffs provide only sparse argument with respect to each of these claims. Plaintiffs argue that the Executive Order was motivated by a "bare . . . desire to harm a politically unpopular group," and as such, fails to satisfy even rational basis review. Pls.' Mot. 41 (quoting *United States v. Windsor*, 570 U.S. 744, 770 (2013). Plaintiffs further argue that they have a property right in their CBAs. *Id.* But whether their claim is couched as a substantive or procedural due process claim, Plaintiffs fail to make the threshold showing necessary to support either of their Fifth Amendment claims.

#### 1. *The Executive Order does not violate the Equal Protection Clause.*

Plaintiffs do not adequately explain the basis for their Equal Protection claim. Pls.' Mot. 40–41; *see also* Amend. Compl. ¶¶ 118–21. They summarily state that "'a bare . . . desire to harm a politically unpopular group cannot' justify disparate treatment of that group." Pls.' Mot. 41 (quoting *Windsor*, 570 U.S. at 770). However, Plaintiffs do not define such "politically unpopular group," at most suggesting that the group would be federal unions who do not support the President's policies. Instead, it appears Plaintiffs complain primarily of "intentional and arbitrary discrimination" without identifying a discernible class, so Defendants address Plaintiffs' claim as a "class of one" claim. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing equal

protection claims "where the Plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."). At any rate, Plaintiffs concede that the rational basis standard applies regardless of the underlying basis for their equal protection claim. Pls.' Mot. 40.

There are "two essential elements" to a successful "'class of one' equal protection claim: (1) disparate treatment of similarly situated parties (2) on no rational basis." *3883 Conn. LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003). The first element "serves to distinguish claims to the treatment that was afforded others, which can be cognizable under principles of equal protection, from bare complaints of government unfairness, which cannot." *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013). Accordingly, Plaintiffs "must show an extremely high degree of similarity between themselves and the person to who they compare themselves." *Id.* Moreover, even if Plaintiffs satisfy the first prong, they must overcome a "strong presumption of validity" in order to show that no rational basis exists to support the disparate treatment. *Tate v. District of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010). Indeed, "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, 509 U.S. 312, 319 (1993) (citations omitted). The government "'has no obligation to produce evidence to sustain the rationality of a [regulatory] classification.'" *Stefan v. Perry*, 41 F.3d 677, 684 (D.C. Cir. 1994) (en banc) (quoting *Heller*, 509 U.S. 312, 319). The classification is presumed valid, and "'[t]he burden is on the one attacking the [governmental] arrangement to negative every conceivable basis which might support it,' whether or not the basis had a foundation in the record.'" *Id.* (quoting *Heller*, 509 U.S. at 319–21). Plaintiff cannot meet this high burden.

First, Plaintiffs have not identified similarly situated individuals. Plaintiff argues that the individuals working in "local employing offices of any agency police officers, security guards, or

firefighters" were treated differently pursuant to the Executive Order, but these individuals were not similarly situated. Pls.' Mot. 41; Executive Order 14,251, § 2. The statute requires that the President make determinations based on (1) the functions of specific agencies or subdivisions thereof and (2) whether the requirements of the FSLMRS can be applied to them. 5 U.S.C. § 7103(b)(1). Therefore, in determining whether individuals are similarly situated, the work they perform and the agency subdivisions to which they belong are highly relevant. *See U.S. v. Moore*, 543 F.3d 891, 896 (7th Cir. 2008) ("To be considered 'similarly situated,' the class-of-one challenger and his comparators must be '*prima facie* identical in all relevant respects or directly comparable . . . in all material respect.'") (quoting *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 680 (7th Cir. 2005). Because Plaintiffs' members, and employees in the DoD more generally, perform work that is distinct from the local employing offices that were not excluded, Plaintiffs have not identified a similarly situated individual who was treated differently.

Second, Plaintiffs cannot show that there was no "conceivable state of fact that could provide a rational basis" for the President's determination. [5] *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). Plaintiffs' members work for the DoD, which Plaintiffs concede has a general national security function. Plaintiffs cannot seriously dispute, let alone meet the high bar required for rational basis review, that the President had a rational basis for determining that the DoD has a national security function but local employing offices of police officers, security guards,

---

[5] Given the sensitive nature of national security determinations, Defendants are entitled to the more deferential standard articulated in *Mandel* and *Trump v. Hawaii*. In the national security context, courts presumptively "limit[] [their] review to whether the Executive g[ave] a 'facially legitimate and bona fide reason for its action" and "'will neither look behind the exercise of that discretion, nor test it by balancing its justification' against the asserted constitutional interests" of Plaintiffs. *Hawaii*, 585 U.S. at 703 (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 769–70 (1972)). Accordingly, the Executive Order should be upheld "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id.* at 704–05. For the reasons stated above, *see* Section (I)(C)(2) *supra*, the Executive Order has "a legitimate grounding in national security concerns," and the Court should accept such independent justification.

and fire fighters do not. *See* Section(I)(C)(2) *supra*.

Ultimately Plaintiffs' Equal Protection claim merely reasserts Plaintiffs allegation that the President exempted them, and not law enforcement officers or firefighters, due to their opposition to the President. Pls.' Mot. 40–41. This Court should reject Plaintiffs' bare attempt to convert their failed First Amendment retaliation claim into an Equal Protection claim, as have multiple circuit courts across the country and district courts in the District of Columbia. *See Harrison v. Fed. Bureau of Prisons*, 298 F.Supp.3d 174, 181 (D.D.C. 2018) (citing decisions from six circuits that have determined that bare retaliation claims cannot form the basis for an equal protection claim).

### 2. Plaintiffs do not have a property right necessary to succeed on their Fifth Amendment Due Process or Takings Claims.

Plaintiffs cannot establish any likelihood of success on the merits of their due process or takings claims because they do not have a property interest in their CBAs. Not all public contracts give rise to a constitutionally protected property interest. *See Nat'l Urban League v. Trump*, ___F.Supp.3d ___, 2025 WL 1275613, at *18 (D.D.C. May 2, 2025) ("And ordinary or routine government contracts do not, by themselves, give rise to . . . an interest that due process protects" (cleaned up)); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."). Although Plaintiffs' CBAs generally provide procedural protections to Plaintiffs, they are not themselves employment contracts—or anything "different from the 'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles." *Nat'l Urban League*, 2025 WL 1275613, at *18 (quoting *New Vision Photography*, 54 F. Supp. 3d at 29). Just the opposite: Plaintiffs' CBAs are entered pursuant to the FSLMRS, which makes clear that the President has

authority to exempt agencies and subdivisions from existing union representation. *See* 5 U.S.C. § 7103(b). Plaintiffs' CBAs similarly make clear that they are subject to the provisions of applicable law, which includes § 7103(b)'s authorization for national security exemptions. *See, e.g.*, FEA CBA at 9 (providing that "The purpose of this Agreement is to comply with 5 U.S.C. 7101, *et seq.*" and "the Parties shall be governed by . . . all applicable laws").

Even if Plaintiffs were entitled to due process, they received all the process that was due. The President made the determinations required by the FSLMRS. *See* Section II(C) *supra*. The exercise of that discretion is not reviewable by this Court. *See, e.g.*, *AFGE*, 870 F.2d at 727. To the extent this case implicates due process, the Executive Order's exemption is straightforwardly "legislative" action. Generally, whether an action is legislative or adjudicative turns on "(1) whether the government action applies to specific individuals or to unnamed and unspecified persons; (2) whether the promulgating agency considers general facts or adjudicates a particular set of disputed facts; and (3) whether the action determines policy issues or resolves specific disputes between particular parties." *Gallo* v. *U.S. Dist. Court For Dist. of Arizona,* 349 F. 3d 1169, 1181–1183 (9th Cir. 2003). The facts here satisfy every tenet of that test: the Executive Order applies to agencies, like DoD, not specific individuals; applies to general facts as determined by the President; and, addresses overarching policy objective of the President. Further, attendant to Plaintiffs CBAs is the statutory background pursuant to which they were entered, including that the President can exempt agencies or subdivisions from the FSLMRS if he determines that national security so requires. *See, e.g.*, FEA CBA at 9. Where, as here, the President has made that determination, Plaintiffs are entitled to no additional process. Having entirely failed to engage with this body of law and the FSLMRS backdrop to their CBAs, Plaintiffs are not likely to succeed on this claim.

Moreover, due process does not require *pre-deprivation* process before recission of

Plaintiffs' CBAs, as they claim.  Pls.' Mot 51.  Post-deprivation process available through a challenge to the recission in the FLRA (and the courts of appeals on a petition for review of an FLRA decision) is adequate.  *See, e.g.*, *Eisinger v. FLRA*, 218 F.3d 1097, 1101 (9th Cir. 2000) (U.S. Courts of Appeal have jurisdiction to review final orders of the FLRA with limited exception).  Plaintiffs have not addressed why this process is constitutionally inadequate.  That oversight—again—makes Plaintiffs unlikely to succeed on the merits.

## II.    Plaintiffs Cannot Show Irreparable Harm Absent a Preliminary Injunction

Plaintiffs have not satisfied the D.C. Circuit's "high standard for irreparable injury." *England*, 454 F.3d at 297.  Under that standard, Plaintiffs must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm."  *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).  To qualify as irreparable, the injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm."  *Id.* at 297–98.  Plaintiffs' alleged harms are not irreparable.

As an initial matter, Plaintiffs offer no reason for their delay in filing this motion for preliminary injunction.  Plaintiffs filed their Complaint on May 5, 2025, nearly 40 days after the Executive Order was issued, and did not seek injunctive relief until months later.  ECF No. 1 (filed May 5, 2025); Pls.' Mot. for Prelim. Inj., ECF No. 22 (filed July 2, 2025).  This is so despite that DoD began taking certain actions pursuant to the Executive Order as early as April 2025.  However, only now, months later do Plaintiffs allege irreparable harm.  This significant delay seriously undercuts Plaintiffs' allegations of irreparable harm, and in particular, its allegations of irreparable economic harm.  *See Fla. EB5 Invests., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020) (finding that "Plaintiff's delay in seeking a preliminary injunction also undercuts its asserted harms" when plaintiff waited *five days* after implementation of rule to file suit).  In this Circuit, a

delay of "44 days" before seeking preliminary injunctive relief has been found "inexcusable" and "bolstered" the conclusion that "an injunction should not issue." *Fund for Animals v. Frizell*, 530 F.2d 982, 987 (D.C. Cir. 1975). And courts in this Circuit have repeatedly concluded that "delays" in filing for preliminary injunctive relief undermine allegations of irreparable harm, even in periods shorter than three months. *See, e.g.*, *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 49 (D.D.C. 2020) ("unexplained delays," including waiting three months before providing statutorily-required notice of suit and waiting five weeks after filing suit to seek a preliminary injunction, "undermine[d] [plaintiffs'] contention that they will be irreparably harmed absent an injunction"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (finding that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm" (collecting cases)); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay in bringing suit and seeking injunctive relief, whether calculated as two months or eight months, "undercut" the plaintiff's "allegation of irreparable harm").

Plaintiffs' alleged injuries in any event are economic, and it is well established that "economic loss does not, in and of itself, constitute irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citing *Wis. Gas Co.*, 758 F.2d at 674); Pls.' Mot. 52 (discussing injuries from lost dues). Apparently recognizing that, Plaintiffs baldly assert that such losses are a threat to their very existence. Pls.' Mot. 53; *Wis. Gas. Co.*, 758 F.2d at 674 (economic harm that "threatens the very existence of the movant's business" might be irreparable). But here, Plaintiffs admit that nearly half of FEA's members will continue to provide regular dues payments through an alternative payment method. Pls.' Mot. 26 ("48% of FEA members ha[ve] opted in to an alternative method of payment"). Thus, Plaintiffs' own evidence belies that their dues losses threaten Plaintiffs' existence.

And in any event, contrary to Plaintiffs' assertion, arbitrators and ALJs have broad latitude to fashion appropriate remedies to make a union whole, including requiring the agency to compensate for revenues lost if found to have improperly withheld dues. Indeed, when an ULP causes unions to suffer monetary losses, the Authority may order the agency to pay backpay, restore leave, or otherwise reimburse the union. *Nat'l Treas. Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) ("the Union can seek to recover missing dues in subsequent [FLRA] proceedings if the Union ultimately prevails in this litigation); *U.S. Dep't of Lab., Wash., D.C.*, 37 F.L.R.A. 25, 39–41 (1990), *abrogated on other grounds by Immigration and Naturalization Service Los Angeles District Los Angeles, California*, 52 F.L.R.A. 103, 106, n.3 (1996). And when agencies have violated the dues deduction requirements of § 7115, the Authority routinely orders agencies to reinstate the deductions, and to reimburse the union its lost dues. *See, e.g., U.S. Dep't of the Treasury, U.S. Mint*, 35 F.L.R.A. 1095, 1100 (1990); *Def. Logistics Agency*, 5 F.L.R.A. 126, 131–33 (1981); *see U.S. Dep't of Def., Ohio Nat'l Guard,* 71 F.L.R.A. 829, 873, 875 (2020) (upholding ALJ decision requiring agencies to reimburse unions when the agency's unlawful conduct prevented dues withholding and ordering such reimbursement); *see also* 5 U.S.C. § 7118(a)(7) (authorizing the FLRA to issue an order that gives a collective-bargaining agreement "retroactive effect" and to take "such other action as will carry out the purpose" of the Civil Service Reform Act). Thus, Plaintiffs' asserted economic loss is not irreparable.

For several reasons, Plaintiffs also have not established irreparable injury from the alleged "loss of their core functions of collective bargaining, contract enforcement, and workplace representation," or from the reduction in revenue, which Plaintiffs allege is "a threat to their continued existence." Pls.' Mot. 53. First, DoD has yet to take any action to terminate a CBA— so any loss of members is not "certain" or "imminen[t]." *England*, 454 F.3d at 297. And as

Plaintiffs recognize, there are alternative methods to collect dues from those employees who choose to remain dues-paying members of Plaintiff unions. Further, even if Plaintiffs somehow could establish certain, imminent loss of members, Plaintiffs offer no reason why losing current members while this litigation is pending could not be remedied by a favorable ruling in this case restoring its scope of representation. Second, any loss of clout or related loss of bargaining power is too speculative a basis for granting relief at this stage. Plaintiffs provide no support for the proposition that potential members who otherwise would have joined the union will decide not to join because of Executive Order 14,251. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–11 (2013) (explaining that a "theory of standing[] which relies on a highly attenuated chain of possibilities[] does not satisfy the requirement that a threatened injury must be certainly impending"). Mere speculation about a loss of bargaining power falls short of the required "clear" showing of irreparable harm. *Winter*, 555 U.S. at 22.

## III. The Balance of the Equities and the Public Interest Favor the Government

A preliminary injunction also is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken,* 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). The Court can decline to grant a preliminary injunction where, as here, these equitable factors favor the Government, even if Plaintiffs show that they suffer an irreparable injury and lack an adequate remedy at law. *See Zukerman v. United States Postal Serv.*, 64 F.4th 1354, 1364 (D.C. Cir. 2023) (declining to find abuse of discretion where district court denied a motion for preliminary injunction after concluding that the first two *Winter* factors favored the plaintiff but that the combined balance of equities and public interest factors weighed against issuing injunctive relief).

A preliminary injunction would inflict harm on the public and the President by interfering with the national-security determinations regarding DoD and entrusted to the President by

Congress.  *See* Cogar Decl. ¶ 10; *AFSA*, 2025 WL 1742853, at *3.  As the D.C. Circuit Court recognized, the clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining.  *See Nat'l Treasury Emps. Union v. Trump*, No. 25-5157 (D.C. Cir. May 16, 2025), *reh'g en banc denied* (July 16, 2025) (holding that "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest.  To hold otherwise would give to the courts what the Constitution gave to Congress and the President").  To that end, the public has an interest in ensuring that agencies with a primary intelligence, counterintelligence, investigative, or national security function, including DoD, operate effectively and without delay to protect the American people.  A preliminary injunction would displace and frustrate the President's decision about how best to address issues of national security, matters on which the courts typically defer to the President's judgment.  The President has long been charged with directing the Executive Branch workforce, and he has determined that DoD, which has a primary national security function, is hamstrung by restrictive terms of CBAs that frustrate his ability to safeguard the interests of the American people.  *See* Cogar Decl. ¶¶ 9–10.  The democratically-elected President's determination regarding the public interest in that sphere is entitled to deference.

DoD has taken a wide variety of other actions to implement the Executive Order to date. Cogar Decl. ¶ 10.  If forced to comply with Plaintiffs' requested preliminary injunction, the Department would have to undo those actions by: reestablishing the withholding of union dues; restarting the processing of grievances; reengaging on arbitrations that had been held in abeyance; reengaging on matters pending before the FLRA; reestablishing the provision of official time to unions: reengaging in collective bargaining under the Statute and in accordance with the provisions of applicable CBAs; and otherwise reverting back to full compliance with the terms of applicable

CBAs, including, but not limited to: overtime distribution requirements, provision of union office space, and adherence to disciplinary and performance management procedural requirements. *Id.* These efforts would require significant resources to accomplish, including manhours on the part of Human Resources and legal staff, payroll providers and supervisory personnel, as well as costs such as arbitration-related expenses. *Id.* ¶¶ 10–11. These are resources that otherwise could be devoted to the implementation of administration priorities related to establishing a high-performance Federal workforce, strengthening probationary periods in the Federal service, and restoring accountability to policy-influencing positions in the Federal workforce, efforts which serve to strengthen the Department's ability to meet its critical national security mission. *Id.* Complying with the requested preliminary injunction would divert resources from these critical activities immediately. *Id.*

      For these reasons, the balance of the equities and the public interest weigh in Defendants' favor, and the Court should deny Plaintiffs' requested injunction.

**IV.**    **Any Injunctive Relief Should Be Limited to the Parties to this Case and Plaintiffs Should Be Ordered to Post Security.**

      While Plaintiffs are not entitled to any preliminary relief, if the Court determines otherwise any relief should be limited to Plaintiffs and Plaintiffs' bargaining unit employees. Plaintiffs' requested relief far exceeds what this Court is authorized to grant. Specifically, Plaintiffs seek an injunction that would prevent DoD and OPM from "implementing, enforcing, or otherwise giving effect to any guidance or direction that has already issued as to the implementation or enforcement of EO 14,251," and "rescind any and all guidance or direction that has already issued[.]" ECF No. 28-2. The Supreme Court recently reaffirmed, however, in *Trump v. CASA, Inc*., 606 U.S. ___, 2025 WL 1773631 (2025), the "principles of equity" that limit district courts to providing party-specific relief. Thus, any relief here should be limited to the parties before the Court.

In addition, the Court should require Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The D.C. Circuit recently clarified that "injunction bonds are generally required." *Nat'l Treasury Emps. Union*, 2025 WL 1441563, at *3 n.4.

DoD and DoDEA would face numerous costs and damages if the Court were to improperly enter Plaintiffs' requested preliminary injunction, including the costs of arbitrations and costs of returning to negotiations, among others. Cogar Decl. ¶¶ 10–11. One of the largest costs to DoDEA would be the costs involved in allowing union officials to return to performing union duties on official time. *Id.* DoD requests that the Court require Plaintiffs to issue a bond of $1,152,000 if the preliminary injunction is limited to DoDEA and the parties in this case. This is the minimum amount needed to cover DoDEA's costs as this represents the average salary of educators multiplied by the eight positions that DoDEA would need to fill if educators are allowed to return to performing union duties on official time. *Id.* Additional costs that are more difficult to quantify include cost of arbitration (transcripts, court reporter), payment of arbitrator fees, damages, attorney fees, and salaries of other personnel. *Id.* If, as Plaintiffs request, the preliminary injunction is not limited to DoDEA and the parties in this case, but instead applies to DoD as a whole, DoD requests a bond of at least $15 million. *Id.*

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: July 22, 2025                    BRETT A. SHUMATE
                                        Assistant Attorney General

                                        YAAKOV M. ROTH
                                        Principal Deputy Assistant Attorney General

EMILY M. HALL
TYLER J. BECKER
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

___/s/ Jeremy Mauritzen___
JEREMY MAURITZEN (CA Bar No. 354615)
LYDIA JINES
SYED AHMAD
Trial Attorneys
LISA ZEIDNER MARCUS
Senior Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St., NW, Twelfth Floor
Washington, DC 20530
Tel: (202) 598-7315
Fax: (202) 616-8470
Email: jeremy.mauritzen@usdoj.gov

*Counsel for Defendants*