## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL EDUCATION ASSOCIATION, et al., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 25-1362 (PLF) ) |
| DONALD J. TRUMP, et al., | ) ) ) |
| Defendants. | ) ) |

**DEFENDANTS' MOTION TO STAY PENDING APPEAL**

**Table of Contents**

INTRODUCTION ................................................................................................................................. 1

ARGUMENT ....................................................................................................................................... 2

    I.    The Government Is Likely to Prevail on the Merits. ........................................................ 2

        A.    The Court Lacks Subject Matter Jurisdiction to Issue the Order. ........................... 2

        B.    Executive Order 14,251 Is Not Ultra Vires .............................................................. 4

    II.    Defendants Will Be Irreparably Harmed Absent a Stay. .................................................. 7

    III.    A Stay Will Not Harm Plaintiffs. .................................................................................. 10

    IV.    A Stay Serves the Public Interest .................................................................................. 11

CONCLUSION ................................................................................................................................... 11

**INTRODUCTION**

By Order dated August 14, 2025, Dkt. No. 34, this Court enjoined Defendants (with the exception of President Trump) from implementing Section 2 of Executive Order 14,251 with respect to Plaintiffs and DoDEA employees represented by Plaintiffs, notwithstanding the President's determination pursuant to 5 U.S.C. § 7103(b)(1) that the Department of Defense ("DoD" or the "Department") has as a primary function intelligence, counterintelligence, investigative, or national security work, and that Chapter 71 of title 5, United States Code, cannot be applied to DoD consistent with national security requirements and considerations, *see* Exec. Order No. 14,251 of March 27, 2025, *Exclusions From Federal Labor-Management Relations Programs* §§ 1–2, 90 Fed. Reg. 14,553, 14,553 (Apr. 3, 2025). Defendants have appealed that decision, Dkt. No. 36 (notice of appeal), and now respectfully move to stay the Order pending appeal pursuant to Federal Rule of Civil Procedure 62.

Defendants recognize that this Court disagrees with them on the merits of this case. *See generally* Opinion, Dkt. No. 35 (Aug. 14, 2025). But the D.C. Circuit has twice granted stays pending appeal in materially identical cases, *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025), *reh'g en banc denied* (July 16, 2025); *AFSA v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025), *reh'g en banc denied* (July 30, 2025), and those rulings are binding on the application of the stay factors, *see Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases."). And even if the court disagrees that the D.C. Circuit's *NTEU* and *AFSA* rulings are binding, those decisions certainly demonstrate that Defendants are likely to succeed on appeal. For these reasons, and as discussed further below, this Court should grant the instant motion.

1

**ARGUMENT**

In its preliminary injunction opinion, this Court did not grapple with the D.C. Circuit's stay decisions in *NTEU* and *AFSA*. The only times it cited *NTEU* were when citing the dissenting opinion of Judge Childs. *See* Opinion at 43, 44. And the Court did not cite *AFSA* at all, except to note that a quote it attributed to Defendants' opposition brief was in turn quoting *AFSA*. Opinion at 16. This was an error, as those decisions should "inform how [the] court should exercise its equitable discretion in like cases." *See Boyle*, 145 S. Ct. at 2654 (2025). The stays the D.C. Circuit issued in *NTEU* and *AFSA* reflect the Circuit's judgment that each of stay factors favor the government. *See NTEU*, 2025 WL 1441563, at *1–3; *AFSA*, 2025 WL 1742853, at *1–4.

For the same reasons identified by the D.C. Circuit in *NTEU* and *AFSA*, the stay factors likewise favor Defendants here. Specifically, Defendants establish a strong showing of likelihood of success on the merits, that they will be irreparably injured absent a stay, that a stay will not injure Plaintiffs, and that a stay is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

**I.     The Government Is Likely to Prevail on the Merits.**

   **A.     The Court Lacks Subject Matter Jurisdiction to Issue the Order.**

As a threshold matter, the D.C. Circuit last week addressed the Federal Service Labor-Management Relations Statute's ("FSLMRS") preclusion of this Court's jurisdiction over claims like those of Plaintiffs. *See NTEU v. Vought*, No. 25-5091, --- F. 4th ---, 2025 WL 2371608 (D.C. Cir. Aug. 15, 2025). The union plaintiffs in that case had argued that the pending terminations of their members "will harm the employees and decrease [the union's] revenue." *Id.* at *5. Interpreting the Civil Service Reform Act and the FSLMRS, the D.C. Circuit concluded that the district court lacked jurisdiction over the unions' claims because "a specialized-review scheme governs such claims." *Id.* at *4–6; *see also* Defs.' Opp. to Pls.' Mot. for Preliminary Injunction at

2

9–14, Dkt. No. 27 (arguing FSLMRS preclusion).

This Court's holding that it possesses jurisdiction to hear Plaintiffs' claims, Opinion 10–13, is inconsistent with *Vought*. This Court rejected Defendants' preclusion argument in part because the Department of Defense Education Activity ("DoDEA"), in response to an order to show cause issued by the FLRA in an unfair labor practice case, had taken the position that the FLRA lacked jurisdiction over the matter because DoD was excluded from the FSLMRS by Executive Order 14,251.[1] *See* Opinion at 11–12. But that is beside the point. Even if the FLRA were to conclude that it lacks jurisdiction over that matter[2]—or any other FLRA proceeding involving Plaintiffs—a court of appeals could review on appeal the merits of Plaintiffs' statutory and constitutional challenge. Thus, channeling through the FSLMRS's special statutory scheme is still required. *See Vought*, 2025 WL 2371608, at *5 (explaining that the FLRA's "decisions are reviewable in the courts of appeals" and "this scheme is 'exclusive.'" (citation omitted)); *AFGE v. Trump*, 929 F.3d 748, 758–59 (D.C. Cir. 2019) ("[W]e may review the unions' broad statutory and constitutional claims on appeal from an FLRA proceeding even if the FLRA cannot."); 5 U.S.C. § 7123(a). Moreover, the fact that the FLRA in the unfair labor practice matter had issued an order to show cause regarding Executive Order 14,251, *see* Opinion at 11; Tarr Decl. ¶ 41, shows that Plaintiffs' claims here are the very sort that the FLRA may consider.

Plaintiffs may evade the FSLMRS's statutory scheme "in only limited circumstances," not applicable here, "when (1) a finding of preclusion might foreclose all meaningful judicial review;

---

[1] Notably, this Court placed weight on DoDEA's previously stated position regarding the validity of Executive Order 14,251, Opinion at 11–12, but said that Plaintiffs' position that Executive Order 14,251 is invalid "does not provide any relevant information that the Court can use to discern Congress's intent to create a special statutory review scheme," *id.* at 12.

[2] The FLRA has not yet issued a final decision in that particular matter, and instead issued an order placing the case in abeyance after the Federal Education Association ("FEA")—one of the Plaintiff unions in this case—"ask[ed] that the FLRA stay, rather than dismiss, the [unfair labor practice] proceedings given that the validity of [Executive Order 14,251] order is being challenged by multiple unions" in federal litigation. Decl. of Richard Tarr ¶¶ 42–43, Dkt. No. 22-2.

3

(2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *Vought*, 2025 WL 2371608, at *5 (quoting *AFGE*, 929 F.3d at 755). First, a finding of preclusion would not foreclose meaningful judicial review—and that is true even if Executive Order 14,251 exempts the Department and DoDEA from the FSLMRS, and the FLRA finds that it lacks jurisdiction. *See id.* ("[T]he Supreme Court has held that the [Civil Service Reform Act]," of which the FSLMRS is part, "provides the exclusive means for federal employees to obtain judicial review of adverse personnel actions even in circumstances where . . . the CSRA itself forecloses review." (citing *United States v. Fausto*, 484 U.S. 439, 447 (1988)). As noted above, if the FLRA finds it lacks jurisdiction, the unions can appeal the FLRA decision to a court of appeals and obtain review. Second, Plaintiffs' claims are not wholly collateral to the FSLMRS scheme. Plaintiffs seek to enforce bargaining rights, "which is precisely the relief afforded" through the FSLMRS. *See id.* Third, Plaintiffs' claims are not beyond the expertise of the FLRA. Plaintiffs' claims of interference with collective-bargaining rights are the exact type of claim the FLRA regularly hears in the form of an unfair-labor-practice charge or grievance proceeding. *See* 5 U.S.C. §§ 7116(a), 7118, 7121. They are in "the heartland" of FLSMRS coverage. *See Vought*, 2025 WL 2371608, at *6.

> B. **Executive Order 14,251 Is Not Ultra Vires.**

Plaintiffs are also not likely to succeed on the merits of their ultra vires claim. The D.C. Circuit stay panel in a materially identical case concluded that an ultra vires challenge to Executive Order 14,251 is unlikely to succeed. *AFSA*, 2025 WL 1742853, at *2–3.

The D.C. Circuit in *AFSA* first observed that "it is unclear whether *ultra vires* review is available at all" to challenge Executive Order 14,251. *Id.* *2. This is so because although "the Supreme Court has assumed without deciding that some *ultra vires* claims may lie against presidential action[,] . . . it has held that 'such review is not available when the statute in question

4

commits the decision to the discretion of the President.'" *Id.* at *2 (quoting *Dalton v. Specter*, 511 U.S. 462, 474 (1994)). "Here, the statute commits the relevant decision to the President's discretion." *Id.* at *3. Specifically, the D.C. Circuit found that a provision of the Foreign Service Act, containing nearly identical language as the FSLMRS provision at issue in this case, "delegates broad authority to the President to exclude parts" of the federal workforce from collective bargaining requirements "in the interest of national security." *See id.* at *3 (analyzing 22 U.S.C. § 4103(b), which is materially identical to 5 U.S.C. § 7103(b)(1)); *but see* Opinion at 16 (rejecting the "government's characterization of Section 7103(b)(1) as a 'delegat[ion] of broad authority' to the President").

Next, the *AFSA* court explained that "[e]ven assuming" the "justiciab[ility]" of an ultra vires claim here, the Court's "review must be exceedingly deferential." *AFSA*, 2025 WL 1742853, at *3. Where, as here, "a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for a court to review." *Id.* The *AFSA* court pointed to *Trump v. Hawaii* as an example. In that case, the Supreme Court "assumed that 'some form of review [was] appropriate,'" when considering the President's national-security determinations under the Immigration and National Act. *Id.* (quoting *Trump v. Hawaii*, 585 U.S. 667, 686 (2018)). Notably, the Supreme Court "upheld the President's determination in a single sentence that did not inspect the President's rationale." *Id.* (citing *Hawaii*, 585 U.S. at 686).

"Following that path," the D.C. Circuit in *AFSA* ultimately "assume[d] without deciding that a form of review is appropriate here and conclude[d] that the Executive Order likely withstands the [unions'] 'attacks on [its] sufficiency.'" *Id.* (quoting *Hawaii*, 585 U.S. at 686). In doing so, the D.C. Circuit briefly considered the national security role of the defendant agency in that case—the U.S. Department of State. The D.C. Circuit observed that the Secretary of State is a member of the National Security Council, and that the Department of State's mission is to

5

"protect and promote U.S. *security*, prosperity, and democratic values[.]" *Id.* (quoting *About the U.S. Department of State*, www.state.gov/about/). The Circuit admonished that a "more 'searching inquiry' than this would be 'inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere.'" *Id.* (quoting *Hawaii*, 585 U.S. at 686).

This Court's contrary approach demonstrates that Defendants are likely to succeed on appeal. The Court's insistence that it should "look to the entirety of the Executive Order's exclusions," Opinion at 28, is at odds with the D.C. Circuit's approach in *AFSA*, which appropriately considered only the defendant agency's national security purpose, not the "entirety of the Executive Order's exclusions," *contra id.*; *see AFSA*, 2025 WL 1742853, at *3 (considering Department of State's national security purposes). Thus, here, the Court should have looked at the President's determination with respect to DoD (the agency), rather than questioning the Executive Order's exclusions as a whole or DoDEA in particular (a component of DoD). *Contra* Opinion at 25–35. After all, ultra vires claims "are 'extremely limited' in scope." *Vought*, 2025 WL 2371608, at *18 (quoting *Griffith v. FLRA*, 842 F.2d 487, 493 (D.C. Cir. 1988)).

The President's exclusion of DoD from FSLMRS coverage plainly accords with the authority granted to him by 5 U.S.C. § 7103(b)(1). Like the Secretary of State, *see AFSA*, 2025 WL 1742853, at *3, the Secretary of Defense is also a member of the National Security Council. *See* 50 U.S.C. § 3021(c)(1). And DoD certainly has a national security mission. *See About*, U.S. Department of Defense, https://www.defense.gov/About/ ("Our mission is to provide the military forces needed to deter war and ensure our nation's security."); *see also* Opinion at 27 ("DoD is the quintessential example of an agency that has 'a primary function' of 'national security work.'" (quoting 5 U.S.C. § 7103(b)(1)(A)). Accordingly, "the Government is likely correct that the Executive Order is consistent with the [FSLMRS's] delegation of national-security determinations to the President." *AFSA*, 2025 WL 1742853, at *2.

6

**II.    Defendants Will Be Irreparably Harmed Absent a Stay.**

The injunction inflicts irreparable injuries on Defendants.  *See Nken*, 556 U.S. at 435.  As to this Court's substantively identical preliminary injunctions in *NTEU* and *AFSA*, the D.C. Circuit determined that this stay factor favors the government.  *NTEU*, 2025 WL 1441563, at *2; *AFSA*, 2025 WL 1742853, at *3; *see also AFGE v. Trump*, --- F.4th ---, 2025 WL 2180674, at *5 (9th Cir. Aug. 1, 2025) (staying a similar preliminary injunction that had enjoined multiple agencies including DoD from implementing Executive Order 14,251, and recognizing the irreparable harm to the government of such a preliminary injunction).

As the D.C. Circuit held in *NTEU*, the "preliminary injunction inflicts irreparable harm on the President by impeding his national-security prerogatives, which were explicitly recognized by Congress."  *NTEU*, 2025 WL 1441563, at *2 (citing 5 U.S.C. § 7103(b)); *accord* AFSA, 2025 WL 1742853, at *3 (the "preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress").  The "preliminary injunction ties the government's hands."  *NTEU*, 2025 WL 1441563, at *2; *accord AFGE*, 2025 WL 2180674, at *5 (quoting *NTEU*, 2025 WL 1441563, at *2).  This "transfer of control, from the Executive to the Judiciary," is particularly problematic in the national security context, given the President's "unique responsibility" to keep the nation safe.  *NTEU*, 2025 WL 1441563, at *2 (citation omitted).

The injunction specifically and irreparably injures DoD and its component DoDEA as the declaration of Beth Schiavino-Narvaez, attached as Exhibit 1, demonstrates.  Implementation of Executive Order 14,251 had enhanced national security by allowing DoDEA personnel to return to the classroom and focus on educating service member dependents, rather than performing union duties on official time.  Schiavino-Narvaez Decl. ¶ 7(d).  Moreover, the Executive Order had enabled school and District offices to react more nimbly to workplace challenges, such as schedule

7

changes, details, reassignments, and disciplinary actions. *Id.* Consequently, schools were able to better serve the educational needs of dependents of service members in support of DoD's overall national security mission. *Id.* The preliminary injunction has a direct impact on students, including the continuity and quality of their education, because now DoDEA must hold its implementation of long-planned changes in abeyance pending the completion of negotiations with the unions, in accordance with the FSLMRS. *Id.* ¶ 7(e). Additionally, the injunction means that DoDEA has to dedicate resources to respond to union requests to engage in post-implementation bargaining over changes made while the Executive Order was in effect, as well as processing a large number of grievances filed by the unions and individual employees regarding the impacts of actions taken, including but not limited to, reassignments that support the efficiency of the federal service. *Id.*

Moreover, by interfering with DoDEA's management of the schools it operates for children of service members, the preliminary injunction threatens DoD's ability to attract and retain military personnel, and also potentially causes stress and distraction to current military members. "In order to focus on their mission, warfighters—including deployed warfighters—must know that their dependents are well cared for and have access to quality education, which is an essential component of the dependents' overall well-being." Declaration of Michael A. Cogar ¶ 6, Dkt. No. 27-1. "DoDEA's connection to recruitment and retention efforts contributes to the Nation's overall security by helping to promote a robust, well-staffed, and focused military, which is vital to national security." *Id.*

"[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" *Nat'l Insts. Of Health v. Am. Pub. Health Ass'n.*, --- S. Ct. ---, 2025 WL 2415669, at *1 (Aug. 21, 2025) (quoting *Philip Morris USA Inc. v. Scott*, 561 U. S. 1301, 1304 (2010) (Scalia, J., in chambers)). The government faces such harm here. Specifically, DoD and DoDEA face numerous costs and damages, including the

8

costs of arbitrations and costs of returning to negotiations, among others. Schiavino-Narvaez Decl. ¶ 7(f). One of the largest costs is returning union officials to performing union duties on official time.[3] In the short term, implementing the preliminary injunction order will cost more than $30,000 per week because it requires DoDEA to hire approximately 110 substitute teachers to cover for educators returning to performing union duties on official time.[4] *Id.* In the long-term, DoDEA will need to hire at least eight full-time equivalent positions to fill positions that will be vacated by full-time union representatives and those performing official time for more than 50% of the duty day; returning those union officials to their union duties will cost DoDEA more than $1.1 million. In addition to monetary harm, this poses a substantial disruption to the educational environment. *Id.*

Undoing the efforts that DoD and DoDEA had taken to implement the Executive Order prior to the issuance of the preliminary injunction, *see id.* ¶ 7(b), requires significant resources to accomplish, including manhours on the part of Human Resources and legal staff, payroll providers, and supervisory personnel, including school administrators (such as superintendents, principals, and assistant principals), as well as costs such as arbitration-related expenses, *id.* ¶ 7(c). These are resources that DoDEA otherwise could devote to the education of students, ensuring readiness, implementing administration priorities related to establishing a high-performance federal

---

[3] In its preliminary injunction decision, the Court found it "perplexing" that the government would need to expend money to comply with an injunction given that DoDEA's collective bargaining agreements ("CBAs") with Plaintiff unions had not yet been terminated. Opinion at 44. But Defendants had been clear with the Court that they had taken a variety of actions to implement the Executive Order, even if they had not terminated the CBAs. *See, e.g.*, Defs.' Opp. to Pls.' Mot. for Preliminary Injunction at 3 ("[R]ather than maintaining the status quo, [a preliminary injunction] would force DoD to undo actions it has already taken to implement the Executive Order, causing significant disruption and resource expenditures."); Decl. of Michael A. Cogar ¶ 10(b), Dkt. No. 27-1 ("DoD has taken a wide variety of actions to implement the Executive Order to date.").

[4] Additional costs that are more difficult to quantify include cost of arbitration (transcripts, court reporter), payment of arbitrator fees, damages, attorney fees, and salaries of other personnel for over 450 pending arbitrations. Schiavino-Narvaez Decl. ¶ 7(f).

9

workforce, strengthening probationary periods in the federal service, and restoring accountability to policy-influencing positions in the federal workforce—efforts which serve to strengthen DoD's ability to meet its critical national security mission. *Id.* Complying with the preliminary injunction diverts resources from these critical activities immediately. *Id.*

In sum, Defendants will be irreparably injured if a stay is not issued.

### III.   A Stay Will Not Harm Plaintiffs.

Conversely, Plaintiffs would suffer no irreparable harm from a stay. This Court failed to recognize, as both the D.C. Circuit and Ninth Circuit have, that Plaintiffs' allegations of harm through loss of bargaining power are purely speculative and remediable. *See NTEU*, 2025 WL 1441563, at *1–2; *AFGE*, 2025 WL 2180674, at *14–15.

Moreover, "economic loss does not, in and of itself, constitute irreparable harm," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *accord NTEU*, 2025 WL 1441563, at *2 ("[F]inancial injuries are rarely irreparable." (quoting *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025)). This Court found that only Plaintiff FEA articulated a loss of dues that "creates the sort of injury that is irreparable," and that "[t]he financial harm suffered by FEA-SR and ACEA is not clearly irreparable." Opinion, Dkt. No. 35 at 36–37. The Court did not acknowledge, however, that as of June 2, 2025, already 48% of FEA's members had been successfully signed up for alternative payment of dues—more than half of the 83% of its members that previously participated in automatic dues withholding. *See* Tarr Decl. ¶ 27, Dkt. No. 22-2. Further, "if [Plaintiffs] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum." *Department of Education v. California*, 145 S. Ct. 966, 969 (2025). For Plaintiffs, the FLRA would have broad discretion to fashion appropriate remedies, including by requiring Defendants to compensate for revenues lost from the failure to withhold dues. *NTEU*, 2025 WL 1441563, at *2 ("The Union can seek to recover missing dues in

10

subsequent Federal Labor Relations Authority . . . proceedings if the Union ultimately prevails in this litigation."). Indeed, the FLRA has issued such relief in the past. *E.g.*, *U.S. Dep't of Def., Ohio Nat'l Guard*, 71 F.L.R.A. 829, 830 (2020); *U.S. Dep't of the Treasury, U.S. Mint*, 35 F.L.R.A. 1095, 1100–1102 (1990). This stay factor favors Defendants.

## IV.    A Stay Serves the Public Interest.

Finally, the public interest also favors a stay pending appeal. As the D.C. Circuit held in *NTEU*, "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest" and "[t]o hold otherwise would give to the courts what the Constitution gave to Congress and the President." *NTEU*, 2025 WL 1441563, at *4; *AFSA*, 2025 WL 1742853, at *5 (quoting with approval the first quote); *see also AFGE*, 2025 WL 2180674, at *15 (same). As such, Defendants have met their burden regarding this stay factor as well.

## CONCLUSION

For the foregoing reasons, this Court should enter a stay pending appeal.

Dated: August 22, 2025                                        Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
EMILY M. HALL
TYLER J. BECKER
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
Civil Division, Federal Programs Branch

11

JACQUELINE COLEMAN SNEAD
Assistant Branch Director
Civil Division, Federal Programs Branch

*/s/ Lisa Zeidner Marcus*
LISA ZEIDNER MARCUS
(NY Bar No. 4461679)
Senior Counsel
LYDIA JINES
JEREMY MAURITZEN
SYED AHMAD
Trial Attorneys
U.S. Department of Justice, Civil Division
Federal Programs Branch
1100 L St, NW, Twelfth Floor
Washington, DC 20530
Telephone: (202) 514-3336
Email: lisa.marcus@usdoj.gov

*Counsel for Defendants*